Laurel E. Davis (NV Bar No. 3005)
Craig S. Dunlap (NV Bar No. 4974)
FENNEMORE CRAIG, P.C.
300 South Fourth Street, Suite 1400
Las Vegas, Nevada  89101
Telephone:  (702) 692-8000
E-mail:  ldavis@fclaw.com

Douglas C. Northup (AZ Bar No. 013937)*
FENNEMORE CRAIG, P.C.
3003 North Central Avenue, Suite 2600
Phoenix, Arizona 85012-2913
Telephone: (602) 916-5362
Email: dnorthup@fclaw.com
* Admitted Pro Hac Vice

*Counsel for Meritage Homes of
Nevada, Inc.; Meritage Homes Corporation*

**EFILED NOVEMBER 10, 2011**

BAP# NV-11-1639

RECEIVED
Susan M. Spraul, Clerk
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOV 1 5 2011

FILED _____
DOCKETED  11/16/11  v. j.b.
         DATE      INITIAL

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Chapter 11 |
| SOUTH EDGE, LLC, | Case No. BK-S-10-32968-BAM |
| Debtor. | |

### NOTICE OF APPEAL

Meritage Homes of Nevada, Inc.; and Meritage Homes Corporation (collectively "Meritage"), appeal under 28 U.S.C.§ 158(a) or (b) from the *Order Confirming Joint Plan of Reorganization Proposed By JPMorgan Chase Bank, N.A., as Administrative Agent Under the Prepetition Credit Agreement, and the Settling Builders (Amended as of October 21, 2011); and Findings of Fact and Conclusions of Law in Support Thereof* [Docket 1335] (the "**Order**") entered by the Bankruptcy Court in the above-captioned chapter 11 case on the 27th day of October, 2011.  A copy of the Order is attached as **Exhibit 1**.

///

FENNEMORE CRAIG, P.C.
LAS VEGAS

126627.1/S.048

1    The names of all parties to the Order appealed from and the names, addresses and

2    telephone numbers of their respective attorneys are as follows:

3    **APPELLANTS:**

4
5    **Meritage Homes Corporation**
     **Meritage Homes of Nevada, Inc.**

6        FENNEMORE CRAIG, P.C.
         300 South Fourth Street, Suite 1400
7        Las Vegas, NV 89101
         Telephone: (702) 692-8000
8        Facsimile: (702) 692-8099
         Attn.: Laurel E. Davis; Craig S. Dunlap
9
         FENNEMORE CRAIG, P.C.
10       3003 North Central Avenue, Suite 2600
         Phoenix, Arizona 85012-2913
11       Telephone: (602) 916-5000
         Facsimile: (602) 916-5999
12       Attn.: Douglas C. Northup

13
     **APPELLEES:**
14
15   **JPMorgan Chase Bank, N.A.**

16       LEWIS AND ROCA, LLP.
         3993 Howard Hughes Parkway, Suite 600
17       Las Vegas, NV 89169-5996
         Telephone: (702) 949-8320
18       Facsimile: (702) 949-8321
         Attn.: Robert M. Charles, Jr.
19
         MORRISON & FOERSTER, LLP.
20       425 Market Street
         San Francisco, CA 94105-2482
21       Telephone: (415) 268-7000
         Facsimile: (415) 268-7522
22       Attn.: G. Larry Engel

23       MORRISON & FOERSTER, LLP.
         1290 Avenue of the Americas
24       New York, New York
         Telephone: (212) 468-8000
25       Facsimile: (212) 468-7900
         Attn.: Norman S. Rosenbaum; Jordan A. Wishnew; Erica J. Richards
26

FENNEMORE CRAIG, P.C.        126627.1/S.048
   LAS VEGAS
                                          - 2 -

1 **KB Home**
**KB Home Nevada, Inc.**
2 **Toll Brothers, Inc.**
**Coleman-Toll Limited Partnership**
3 **Weyerhauser Real Estate Company**
**Pardee Homes of Nevada, Inc.**
4 **Beazer Homes USA, Inc.**
**Beazer Homes Holdings Corp.**
5
LAW OFFICES OF RICHARD McKNIGHT
6 330 S. Third Street, # 900
Las Vegas, NV 89101
7 Telephone: (702) 388-7185
Facsimile: (702) 388-0108
8 Attn.: Richard McKnight
9 STUTMAN TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
10 Los Angeles, CA 90067
Telephone: (310) 228-5600
11 Facsimile: (310) 228-5788
Attn.: K. John Shaffer; Anthony Arnold
12
13 Dated: November 10, 2011.

14 Respectfully submitted,

15 FENNEMORE CRAIG, P.C.

16 By: /s/ Laurel E. Davis
Laurel E. Davis
17
18 *Counsel for Meritage Homes of Nevada, Inc.;*
*Meritage Homes Corporation*
19
20
21
22
23
24
25
26

FENNEMORE CRAIG, P.C.
LAS VEGAS

126627.1/S.048

# EXHIBIT 1

**Entered on Docket**
**October 27, 2011**

*Bruce A. Markell*

Hon. Bruce A. Markell
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>SOUTH EDGE, LLC,<br><br>                    Debtor. | Case No.: 10-32968 (BAM)<br><br>Chapter 11<br><br>**Hearing Information**<br><br>Date:        October 26, 2011<br>Time:        9:30 a.m.<br>Courtroom:   #3 |

**ORDER CONFIRMING JOINT PLAN OF REORGANIZATION PROPOSED BY
JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT UNDER THE
PREPETITION CREDIT AGREEMENT, AND THE SETTLING BUILDERS
(AMENDED AS OF OCTOBER 21, 2011); AND FINDINGS OF FACT AND
CONCLUSIONS OF LAW IN SUPPORT THEREOF**

I.      **INTRODUCTION**

     A.      **The Plan Is Confirmed.**

        1.      JPMorgan Chase Bank, N.A., as administrative agent under the Prepetition Credit Agreement, and the Settling Builders (collectively, the "Plan Proponents") filed the *Joint Plan of Reorganization Proposed By JPMorgan Chase Bank, N.A., As Administrative Agent Under The Prepetition Credit Agreement, And The Settling Builders* (as amended, the "Plan") on August 1, 2011 [D.E. 844, and as amended by D.E. 1005, 1030, and 1309], and the *Disclosure Statement For The Joint Plan Of Reorganization Proposed By JPMorgan Chase Bank, N.A., As*

1

*Administrative Agent Under The Prepetition Credit Agreement, And The Settling Builders* (including all exhibits thereto, the "Disclosure Statement") on August 1, 2011 [D.E. 843, and as amended by D.E. 1002 and 1028], which Disclosure Statement was approved by Order of this Court on September 8, 2011 (the "Disclosure Statement Order") [D.E. 1024].

2.     The Court hereby confirms the Plan in accordance with Bankruptcy Code sections 1127(a), 1129, and 1141, and as further set forth in this *Order Confirming Joint Plan Of Reorganization Proposed By JPMorgan Chase Bank, N.A., As Administrative Agent Under The Prepetition Credit Agreement, and The Settling Builders (Amended As Of October 21, 2011); and Findings Of Fact And Conclusions of Law In Support Thereof* (the "Confirmation Order").

3.     The Plan as confirmed by this Court is attached as Exhibit "1" to this Confirmation Order.  The Plan is incorporated into this Confirmation Order by this reference. Unless otherwise defined herein, all capitalized terms shall have the meanings given such terms in the Plan.

**B.     The Confirmation Hearing And The Record.**

1.     The Court held a confirmation hearing on the Plan on October 17, 19, and 26, 2011 (the "Confirmation Hearing").   Appearances at the Confirmation Hearing were as reflected in the record.

2.     In connection with the Confirmation Hearing, the Court considered the following:

(A)     The Plan, the Disclosure Statement, and the Plan Supplement [D.E. 1134].

(B)     The live in-court and/or declaration testimony of eight witnesses: (i) Mr. Carter D. Morrison, a Senior Vice President of National Valuation Consultants, Inc., who was an expert witness for the Agent and whose Declaration included an appraisal of the Debtor's real property assets [*see* D.E. 1149]; (ii) Mr. Jeffrey R. Truitt, a Principal of XRoads Solutions Group, LLC, who was an expert witness for the Settling Builders with respect to satisfaction of the "best interests test" of Bankruptcy Code section 1129(a)(7) and the value of the Debtor's assets [*see* D.E. 1151]; (iii) Mr. Larry Seay, Chief Financial Officer of Meritage Homes Corporation, which opposes confirmation of the Plan [*see*

D.E. 1211]; (iv) Ms. Cynthia Nelson, the Chapter 11 Trustee and a Senior Managing Director in the Los Angeles Corporate Finance practice of FTI Consulting, Inc., who supports confirmation of the Plan [*see* D.E. 1214]; (v) Mr. Robert V. McGibney, Executive Vice President for KB Home Nevada, Inc., which is one of the Settling Builders and Plan Proponents [*see* D.E. 1272]; (vi) Mr. Albert Z. Praw, Executive Vice President, Real Estate and Business Development of KB Home, which is also one of the Settling Builders and Plan Proponents [*see* D.E. 1273]; (vii) Mr. William A. Austin, Executive Director at JPMorgan Case Bank, N.A., which is the Agent and one of the Plan Proponents [*see* D.E. 1274]; and (viii) Ms. Julia G. Osborne, a Director of BMC Group, Inc., the balloting agent for the Plan Proponents [*see* D.E. 1275]. With the agreement of all parties, and in accordance with Federal Rule of Civil Procedure 43(c) and Rules 9014 and 9017 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), direct testimony was introduced through written declarations, and all witnesses were made available for cross-examination in open court by interested parties and the Court.

(C)    The *Objection To Joint Plan Of Reorganization* and *Memorandum Of Points And Authorities In Support Of Meritage's Objection To Joint Plan Of Reorganization* (the "Meritage P&A") filed by Meritage Homes of Nevada, Inc. and Meritage Homes Corporation (the "Meritage Parties") [*see* D.E. 1209 and 1210].

(D)    The designations of deposition testimony by the Meritage Parties and the Plan Proponents from depositions of Mr. John McDonagh, Mr. William A. Austin, Mr. Robert McGibney, Ms. Cynthia Nelson, and Mr. Albert Praw [*see* D.E. 1147, 1203, 1204, 1205, 1206, and 1276].

(E)    The *Memorandum Of Points And Authorities In Support Of Confirmation Of Joint Plan Of Reorganization [etc.]* filed by the Plan Proponents [*see* D.E. 1278].

(F)    The exhibits submitted by the Meritage Parties and the Plan Proponents [*see* D.E. 1212 and 1285]; the Meritage Parties and the Plan Proponents stipulated on the record that the exhibits are admissible in terms of foundation and authenticity, but the parties reserved objections as to relevance.

3

ny-998792                                                                    290659.1

1         (G)     The *Objection to Proposed Order Confirming Joint Plan of Reorganization*

2    *Proposed By JPMorgan Chase Bank, N.A., as Administrative Agent Under the Prepetition*

3    *Credit Agreement, and the Settling Builders (Amended as of October 21, 2011); and*

4    *Findings of Fact and Conclusions of Law in Support Thereof* filed by the Meritage Parties

5    [D.E. 1324], as well as any other pleadings filed by parties-in-interest related to the

6    Confirmation Hearing.

7         (H)     The arguments of counsel at the Confirmation Hearing.

8         (I)     The Court's taking of judicial notice pursuant to Federal Rule of Evidence

9    201 (as made applicable through Bankruptcy Rule 9017) of (i) all prior proceedings in this

10    Chapter 11 Case, including all adversary proceedings therein; (ii) the Final Award in the

11    JAMS Arbitration Proceeding titled *South Edge, LLC and Focus South Group, LLC v. KB*

12    *Home Nevada, Inc., Coleman Toll Limited Partnership, Pardee Homes of Nevada, Beazer*

13    *Homes Holdings Corp. and Meritage Homes of Nevada, Inc.* (the "Focus Arbitration"),

14    which award was confirmed by a judgment entered by the U.S. District Court for the

15    District of Nevada on November 2, 2010 [U.S. Dist. Ct. Nevada case no. 08-1711-PMP,

16    D.E. 361], and which judgment is being appealed to the United States Court of Appeals

17    for the Ninth Circuit [U.S. Ct. of Appeals for the Ninth Circuit case no. 10-17562];

18    (iii) the U.S. District Court for the District of Nevada's dismissal of the appeals of this

19    Court's orders for relief in connection with the involuntary chapter 11 bankruptcy petition

20    filed against the Debtor and directing the appointment of a chapter 11 trustee and denial of

21    the Settling Builders' motion to intervene in the appeals [U.S. Dist. Ct. Nevada case nos.

22    11-240-PMP and 11-301-PMP], which dismissals have been appealed to the United States

23    Court of Appeals for the Ninth Circuit [U.S. Ct. of Appeals for the Ninth Circuit case nos.

24    11-16146, 11-16174, and 11-16177]; and (iv) certain documents, provided to this Court in

25    connection with the Confirmation Hearing, arising in litigation involving the Meritage

26    Parties and the Agent which relates to the Debtor, including pleadings and/or transcripts

27    from U.S. District Court of the District of Nevada case numbers 08-1711-PMP and 11-

28    01364-PMP, Common Pleas Court of Franklin County, Ohio case number 11CVH 08

4

        

1     10353, and U.S. Bankruptcy Court for the Southern District of Ohio case number 11-

2     2388.

3              3.       The Alameda Liquidating Trust ("Alameda"), a Member of the Debtor,

4     filed an objection to confirmation and an accompanying declaration of Hugh Scheffy [D.E. 1201

5     and 1202]. The Court reviewed the Alameda objection and accompanying declaration prior to

6     being advised at the commencement of the Confirmation Hearing that a settlement had been

7     reached between the Plan Proponents and Alameda, which resulted in the withdrawal of the

8     Alameda objection at that time.

9              4.       In addition to the foregoing, Focus South Group, LLC, another Member of

10     the Debtor, indicated that it would oppose confirmation of the Plan, as would its related entities

11     Holdings Manager, LLC, and Landtek, LLC (together with Focus South Group, LLC and other

12     related entities, the "Focus Parties"). A settlement, however, was negotiated with the Focus

13     Parties which, among other things, (i) resolved a pending adversary proceeding in this Chapter 11

14     Case among the Agent, the Chapter 11 Trustee, and certain of the Focus Parties [adversary

15     proceeding no. 11-01141] regarding, among other things, their competing claims to

16     approximately $26 million in MI Funds and allegedly avoidable transfers received by certain of

17     the Focus Parties, (ii) settled litigation between the Settling Builders and the Focus Parties

18     relating to the Focus Arbitration, and (iii) provided for various releases and assignments among

19     the Agent, Prepetition Lenders who consent thereto, the Focus Parties, the Chapter 11 Trustee, the

20     Estate, and the Settling Builders. The Chapter 11 Trustee sought approval of the settlement in

21     this Chapter 11 Case pursuant to Bankruptcy Rule 9019, and FSG-R, LLC (one of the Focus

22     Parties) similarly sought approval of the settlement in its chapter 11 case, also pursuant to

23     Bankruptcy Rule 9019. The Court approved the settlement in both chapter 11 cases [D.E. 1295 in

24     this Chapter 11 Case, and D.E. 148 in FSG-R's chapter 11 case, case no. 09-30126]. A copy of

25     the final, executed settlement agreement (the "Focus Settlement Agreement") is at D.E. ____. As

26     a result of this settlement, the Focus Parties support confirmation of the Plan.

27              5.       After due deliberation and sufficient cause appearing in accordance with

28     Federal Rule of Civil Procedure 52, as incorporated pursuant to Bankruptcy Rule 9014, the Court

1  orally stated its findings of fact and conclusions of law on the record and reported them in open

2  court at the conclusion of the Confirmation Hearing. These oral findings of fact and conclusions

3  of law are incorporated herein by this reference. To the extent any finding of fact shall be

4  determined to be a conclusion of law, it shall be so deemed, and vice versa.

5  **II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW**

6          **IT IS HEREBY FOUND AND DETERMINED** by this Court that, together with

7  the findings of fact and conclusions of law made on the record at the Confirmation Hearing:

8      **A.    Background.**

9          1.    The Debtor is a limited liability company that owns a real estate

10  development project known as Inspirada. In the interests of brevity, the Court adopts the factual

11  recitations of the Chapter 11 Trustee, Ms. Cynthia Nelson, in paragraphs 10 through 15 and 18

12  through 19 of the *Declaration Of Cynthia Nelson, Chapter 11 Trustee, In Support Of*

13  *Confirmation Of The Plan Of Reorganization* ("Nelson Declaration") [D.E. 1214], which are

14  unchallenged.

15          2.    On December 9, 2010, certain of the Prepetition Lenders commenced an

16  involuntary chapter 11 bankruptcy petition (the "Involuntary Petition") against the Debtor. In

17  connection with the Involuntary Petition, JPMorgan Chase Bank, N.A., in its capacities as Agent

18  and a Prepetition Lender, filed the *Motion for Appointment of an Interim and Permanent Chapter*

19  *11 Trustee for South Edge, LLC (I) During the "Gap" Period and (II) on a Permanent Basis*

20  [D.E. 7]. On February 3, 2011, following a contested trial on the Involuntary Petition, the Court

21  entered an order for relief under chapter 11 of the Bankruptcy Code against the Debtor [D.E. 400]

22  and issued an order directing the appointment of a chapter 11 trustee [D.E. 401]. On February 20,

23  2011, the Office of the United States Trustee designated Cynthia Nelson to serve as trustee for the

24  estate of South Edge, LLC. [D.E. 441] and on February 23, 2011, the Court entered an order

25  approving the appointment of the Ms. Nelson as chapter 11 trustee for the Debtor [D.E. 449].

26          3.    On May 23, 2011, the Plan Proponents became party to a Plan Support

27  Agreement (dated as of May 19, 2011). The Plan Support Agreement was consented to by more

28  than 92% in amount of the Prepetition Lenders. The Plan Proponents filed the Plan (as

ny-998792
290659.1

1    subsequently amended) on August 1, 2011. The Disclosure Statement Order was entered on

2    September 8, 2011.

3         4.    The Chapter 11 Trustee, through a letter agreement among counsel, entered

4    into an agreement with the Settling Builders dated June 8, 2011, providing the terms of the

5    Chapter 11 Trustee's consent to the Plan Support Agreement and its attached Plan Term Sheet

6    (such letter agreement, together with two errata dated June 9, 2011, the "Trustee's Consent").

7    **B.    This Court Has Jurisdiction Over This Core Proceeding.**

8         1.    This Court has jurisdiction over the Chapter 11 Case pursuant to 28 U.S.C.

9    § 1334. Confirmation of the Plan is a core proceeding in which the Court may enter a final order

10   in accordance with 28 U.S.C. § 157(b)(2). Venue of the Chapter 11 Case in this District is proper

11   pursuant to 28 U.S.C. §§ 1408 and 1409. No objection has been raised to this Court's jurisdiction

12   or the core nature of these proceedings.

13   **C.    The Plan Proponents' Expert Witnesses Are Qualified, And The Witnesses**

14   **Testifying In Support of Confirmation Are Credible.**

15        1.    No party has challenged the qualifications of the Plan Proponents' expert

16   witnesses, Mr. Carter Morrison or Mr. Jeffrey Truitt. Based upon their respective declarations,

17   the Court finds both of them to be qualified as experts to testify as to the matters that are the

18   subject of their declarations, specifically, the current market value and present value of the

19   Debtor's assets and what creditors may receive from those assets under the Plan and in a

20   hypothetical liquidation under chapter 7 of the Bankruptcy Code as of the Plan's projected

21   Effective Date. Their declarations have assisted the Court in understanding valuation issues that

22   are relevant to confirmation, and they satisfy the requirements of Federal Rule of Evidence 702

23   and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

24        2.    Mr. Praw, Mr. Austin, Mr. McGibney, and Ms. Nelson each were subject

25   to cross examination in the Court. Having observed each of them, and in light of the record and

26   other evidence presented in connection with the Confirmation Hearing, the Court concludes that

27   the testimony of each was credible. The Court also finds the unchallenged testimony of Mr.

28   Morrison, Mr. Truitt, and Ms. Osborne to be credible.

ny-998792                                                                 290659.1

D.    **Notice Of The Confirmation Hearing And Solicitation Of The Plan Were Proper.**

1.    This Court approved the Disclosure Statement as containing adequate information as required by Bankruptcy Code section 1125(b), and entered the Disclosure Statement Order on September 8, 2011 [D.E. 1024].

2.    In accordance with Bankruptcy Code sections 1125(b), 1126, and 1128, the applicable provisions of the Bankruptcy Rules (including Bankruptcy Rules 2002, 3017, 3018, and 3020), and the Disclosure Statement Order, the Court finds and concludes that:

(i)    notice of the Confirmation Hearing was proper and sufficient so as to advise all interested parties of the hearing and of their right to object to confirmation of the Plan; notice of the Confirmation Hearing was sent to all known Holders of Claims and Equity Interests [*see* D.E. 1087, 1097, 1140, 1152, 1159, and 1164]; notice of the Confirmation Hearing also was published in the Las Vegas Review-Journal and the Las Vegas Sun [*see* D.E. 1143];

(ii)    concurrent with the solicitation of votes to accept or reject the Plan, there was transmitted to the Holders of Claims and Equity Interests in all Classes that were eligible to vote a copy of the Plan and the Disclosure Statement [D.E. 1087, 1140, 1159, 1164, and 1275]; and

(iii)    notice of the assumption and assignment of the executory contracts specified in Exhibit D of the Plan Supplement to the Acquirer was proper and sufficient so as to advise all non-Debtor parties to such contracts of the proposed assumption and assignment, and of such parties' right to object thereto [D.E. 1142 and 1152].

E.    **There Is Overwhelming Support For Confirmation Of The Plan.**

1.    Other than the Meritage Parties, no Holder of a Claim or Equity Interest in the Debtor has objected to confirmation of the Plan. Confirmation of the Plan is supported by every secured creditor to return a ballot (more than 99% in dollar amount of the total Prepetition Lender Claims), every unsecured creditor to return a ballot, and seven of the Debtor's eight

ny-998792                                                                                                                    290659.1

1  Members (including (i) the four Settling Builders that are Members, (ii)  Focus South Group,

2  LLC and Alameda, which support the Plan based upon settlements that were announced at or

3  before the Confirmation Hearing, and (iii) Kimball Hill Homes of Nevada, Inc., which consents

4  to confirmation based upon clarifying language contained later in this Confirmation Order.

5         2.    Additionally, the Chapter 11 Trustee entered into the Trustee's Consent

6  and supports confirmation of the Plan and approval of the settlements contained in the Plan.

7         3.    The solicitation of votes to accept or reject the Plan was made in good faith

8  and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules,

9  the Disclosure Statement Order, and all other rules, laws, and regulations.

10        4.    As set forth in the *Certification And Declaration Of Noticing And Balloting*

11 *Agent Regarding Solicitation And Tabulation Of Votes In Connection With The Joint Plan Of*

12 *Reorganization* [D.E. 1275], all Holders of Claims in Classes S3, U1, and U2 who returned

13 ballots voted to accept the Plan.  No votes to reject the Plan were received.  The voting results are

14 as follows:

| IMPAIRED CLASS AND DESCRIPTION | ACCEPT | | REJECT | |
| --- | --- | --- | --- | --- |
| | VOTES COUNTED | AMOUNT | VOTES COUNTED | AMOUNT |
| Class S3 Prepetition Lender Secured Claims | 78 100.00% | $328,487,813.32 100.00% | 0 0.00% | $0.00 0.00% |
| Class U1 Prepetition Lender Deficiency Claims | 78 100.00% | $37,922,053.35 100.00% | 0 0.00% | $0.00 0.00% |
| Class U2 General Unsecured Claims | 4 100.00% | $302,742.91 100.00% | 0 0.00% | $0.00 0.00% |

**F.    The Plan Complies With All Applicable Provisions Of Title 11 Of The United**

**States Code (Section 1129(a)(1)).**

1.    The Plan complies with all applicable provisions of title 11 of the United

States Code, as required by Bankruptcy Code section 1129(a)(1), including the requirements of

Bankruptcy Code sections 1122 and 1123.

9

*Classification And Treatment Of Claims And Interests (Sections*
*1123(a)(1) Through (a)(4).*

2.      The Plan (i) designates eight Classes of Claims and Equity Interests in
accordance with Bankruptcy code section 1123(a)(1), (ii) specifies which Classes are not
impaired under the Plan (specifically, Classes P1, S1, and S2) in accordance with Bankruptcy
Code section 1123(a)(2), (iii) specifies the treatment of all Classes that are impaired under the
Plan (specifically, Classes S3, U1, U2, U3, and E1) in accordance with Bankruptcy Code section
1123(a)(3), and (iv) provides the same treatment for each Claim or Equity Interest within a
particular Class, in accordance with Bankruptcy Code section 1123(a)(4).  Claims of the kind
specified in Bankruptcy Code sections 507(a)(2), (a)(3), and (a)(8) are not included in any Class.

3.      The classification of Claims and Equity Interests in the Plan complies with
Bankruptcy Code section 1122.  Each Class contains Claims or Equity Interests that are
substantially similar to the other Claims or Equity Interests in such Class.

4.      The classification of Unsecured Claims in three separate Classes (Class U1
(Prepetition Lender Unsecured Claims), Class U2 (General Unsecured Claims) and Class U3
(Member Claims)) complies with the Bankruptcy Code and applicable case law, including
*Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323 (9th Cir. 1994), and *Barakat v. The Life*
*Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520 (9th Cir. 1996).  The separate classification of
Unsecured Claims is based upon the Court's consideration of the totality of the factual and legal
circumstances of this Chapter 11 Case, including the following factors which, considered
together, justify such separate classification:

(i)      the economic realities of this Chapter 11 Case, including but not limited to
the facts (x) that Agent, for itself and on behalf of the Prepetition Lenders, holds valid,
perfected, and unavoidable Liens on substantially all of the Estate's assets, (y) the value of
those assets is far less than the amount the Prepetition Lender Claims, and (z) the Agent
and the Prepetition Lenders will have an unsatisfied deficiency Claim of approximately

ny-998792

290659.1

1     $47 million[1] against the Debtor's Estate after receiving distributions under the Plan;

2     accordingly, absent the settlement and distribution scheme set forth in the Plan, Holders of

3     Unsecured Claims would receive no distributions whatsoever in this Chapter 11 Case on

4     account of their Claims; the Meritage Parties and other Holders of Class U3 Member

5     Claims are receiving no less than what they are entitled to receive under the absolute

6     priority rule or would be entitled to receive in a liquidation of the Debtor;

7         (ii)    the fact that the Prepetition Lenders have agreed to far less favorable

8     treatment for their Prepetition Lender Deficiency Claims in Class U1, on a pro rata basis,

9     than general unsecured creditors will likely receive in Class U2;

---

[1] The Prepetition Lenders asserted a total Claim against the Debtor as of the Petition Date of $367,538,209.77, including unpaid principal and interest through that date. The Agent asserts that the Debtor's outstanding indebtedness to the Agent and the Prepetition Lenders under the Prepetition Credit Agreement and related documents would amount to approximately $382 million as of the projected November 30, 2011 Effective Date of the Plan. Pursuant to the unchallenged testimony of the Chapter 11 Trustee in the Nelson Declaration, the Chapter 11 Trustee believes that figure accurately represents the amount of the outstanding indebtedness that would exist under the terms of the Prepetition Credit Agreement as of November 30, 2011. Accordingly, this Court adopts and finds those Claim amounts to be accurate.

Furthermore, as set forth in the unchallenged testimony of the Chapter 11 Trustee in the Nelson Declaration, pursuant to the *Third Stipulation Extending Trustee's Authorization To Use Cash Collateral* attached to the *Notice Of Stipulation Further Extending Trustee's Authorization To Use Cash Collateral* [D.E. 766] filed with the Court on June 30, 2011, the Chapter 11 Trustee conducted an investigation of the Liens and security interests asserted by the Agent, on its behalf and on behalf of the Prepetition Lenders, in the property of the Debtor's bankruptcy Estate, and concluded that those Liens and security interests are valid and properly and timely perfected on all property of the Estate and, except for "permitted Liens," as defined in the Prepetition Credit Agreement, and certain of the Estate's postpetition bankruptcy avoidance claims, of a first priority.

This testimony, together with other evidence in the record, demonstrates that the Prepetition Lenders are undersecured, and thus generally would not be entitled to postpetition interest under Bankruptcy Code section 506(b). However, because the Agent, for the benefit of the Prepetition Lenders, holds valid liens on substantially all of the Estate's assets, the Prepetition Lenders would have to be paid their postpetition interest before unsecured creditors could receive any distribution from the Estate, absent the settlement set forth in the Plan. Given a projected Effective Date Claim for the Prepetition Lenders of approximately $382 million, and given that the Prepetition Lenders will receive $335 million under the Plan (assuming the settlement with Focus South Group, LLC and its related entities closes on the Effective Date), the Prepetition Lenders will have a deficiency of approximately $47 million, and there would be no value for unsecured creditors or equity holders. Even if postpetition interest is not considered, the Prepetition Lenders would have a deficiency of more than $32 million on the Effective Date.

(iii)    the evidence at the Confirmation Hearing that the payment of general

unsecured creditors in Class U2 will materially benefit the Debtor's project, Inspirada and

the community by facilitating construction in the future;

(iv)    the fact that Claims in Class U3, including those asserted by Meritage

Homes of Nevada, Inc., are unliquidated and subject to material disputes and

counterclaims, including the fact that Meritage Homes of Nevada, Inc. was stated in the

Focus Arbitration to have breached some of its obligations to the Debtor; and the

liquidation of Class U3 Member Claims would delay significantly distributions to other

unsecured creditors were the Class U3 Claims to be classified with other Claims in Class

U2;

(v)    the fact that all Member Claims, including those of the Settling Builders,

are receiving the same treatment in Class U3, and that no member of Class U3, other than

the Meritage Parties, has objected to confirmation of the Plan;

(vi)    the fact that Member Claims are asserted by parties who were on the

Debtor's Management Committee prior to the Involuntary Petition, including Meritage

Homes of Nevada, Inc.; and

(vii)    the fact that, to the extent Holders of Claims in Class U3 owe anything

under their Guaranties in favor of the Agent or Acquisition Agreements with the Debtor,

such Holders' Claims are subordinated to the Claims of the Agent and the Prepetition

Lenders pursuant to Section 7 of the Repayment Guaranties, Section 6 of the Completion

Guaranties and Limited Guaranties, and Section 4 of the Assignment of Acquisition

Agreements executed by each Member; thus, even if such Class U3 Holders were to

receive any distributions under the Plan, such distributions would have to be turned over

to the Prepetition Lenders, until they were paid in full; the Court finds that giving effect to

the relevant priorities under applicable law is a fair, equitable, and appropriate basis for

separate classification of Class U3 Claims.

5.    The Plan does not result in a "*de facto* subordination" of the Meritage

Parties' Claims. *See* Meritage P&A at p. 23. The Plan properly provides for the separate

12

1  classification and treatment of *all* Member Claims, and the Meritage Parties' Claims are receiving

2  the same treatment as all other Member Claims, including those of the Settling Builders.

3  <center>***Adequate Means For Implementation (Section 1123(a)(5)).***</center>

4          6.     The Plan provides adequate means for its implementation in accordance

5  with Bankruptcy Code section 1123(a)(5), including (i) the transfer of assets free and clear of

6  liens (other than Liens securing LID assessments and such other governmental rights and

7  entitlements that run with the land) to the Acquirer in accordance with Bankruptcy Code section

8  1123(a)(5)(B) & (D), (ii) the settlement, release, and discharge of the Agent's Liens vis-à-vis the

9  Estate and its Assets, in accordance with Bankruptcy Code section 1123(a)(5)(E), and (iii) the

10  amendment of the Prepetition Credit Agreement, pursuant to the Prepetition Credit Agreement

11  Amendment included in the Plan Supplement as Exhibit "A", in accordance with Bankruptcy

12  Code section 1123(a)(5)(F).

13  <center>***Non-Voting Securities (Section 1123(a)(6)).***</center>

14          7.     The Debtor's Estate will be administered by the Estate Representative until

15  such time as the Estate's assets are fully administered, at which time the Debtor will be dissolved.

16  No equity securities will be distributed under the Plan, and no assets will revest in the Debtor.

17  Accordingly, Bankruptcy Code section 1123(a)(6) is not applicable.

18  <center>***Selection Of Management (Section 1123(a)(7)).***</center>

19          8.     The selection of the Executive Committee for the Acquirer, as set forth in

20  the Operating Agreement of Inspirada Builders, LLC (Exhibit "G" to the Plan Supplement), is

21  consistent with the interests of Holders of Claims and Equity Interests and with public policy.

22  Thus, to the extent Bankruptcy Code section 1123(a)(7) applies, the Plan satisfies its

23  requirements. The Administrative Member of the Acquirer, and the members of the Acquirer's

24  Executive Committee, each as set forth in the Plan Supplement, are qualified to manage the

25  Acquirer's business, based upon the declarations of Mr. Praw and Mr. McGibney, and Exhibit

26  "F" to the Plan Supplement. No party has challenged the qualifications and selection of

27  management of the Acquirer.

28

<center>13</center>

*Permissive Plan Provisions, Including Settlement Of Claims (Section 1123(b)).*

9. The Plan properly contains permissive provisions under Bankruptcy Code section 1123(b), including, among other things, (i) the assumption and assignment to the Acquirer of certain executory contracts listed on Exhibit "D" to the Plan Supplement, in accordance with Bankruptcy Code section 1123(b)(2), and subject to the further consideration by this Court in Paragraphs III.D.1 through 5 of this Confirmation Order, (ii) the settlement and release of the Estate's claims against the Settling Builders, the Agent, and the Prepetition Lenders (as set forth in Paragraph III.E.2 of this Confirmation Order and in the Plan), as provided in Bankruptcy Code section 1123(b)(3)(A), and (iii) the retention and enforcement of claims belonging to the Estate by the Estate Representative, as provided in Bankruptcy Code section 1123(b)(3)(B).

10. The Nelson Declaration sets forth the basis of the Chapter 11 Trustee's support for the Plan and the settlements of Estate causes of action contained in the Plan, including Section 8.5 of the Plan. *See* Nelson Declaration at ¶¶ 29-45. The Nelson Declaration shows that the Chapter 11 Trustee has considered (a) the probability of success in the litigation of the causes of action that are being settled; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors. *See In re A&C Properties*, 784 F.2d 1377 (9th Cir. 1986). Based upon these considerations, the Chapter 11 Trustee has concluded that the Estate and its creditors are best served by confirmation of the Plan and the settlements contained therein. The Court concludes that the Trustee has exercised her reasonable business judgment in supporting the Plan and the settlements therein, and that the settlements satisfy the *A&C Properties* test.

11. The Meritage Parties contend that the Plan cannot settle causes of action belonging to the Estate, citing, among other cases, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000). *See* Meritage P&A at pp. 32-40. The Meritage Parties' argument is without merit. Bankruptcy Code section 1123(b)(3) expressly provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or

14

ny-998792                                                                                                     290659.1

1  to the estate." There is no requirement that such a plan be proposed by a trustee or debtor in

2  possession, and Bankruptcy Code section 1122(c) makes clear that "[a]ny party in interest" may

3  file a plan when, as here, a chapter 11 trustee has been appointed. In any event, as the Nelson

4  Declaration makes clear, the Chapter 11 Trustee supports the Plan and the settlements contained

5  in the Plan.

6          12.    In addition to Section 8.5, the Plan provides for various releases, covenants

7  not to sue, limitations on liability, and injunctions pursuant to Sections 8.6, 8.7, 8.8, 8.9, and 8.10

8  thereof. The releases, covenants not to sue, limitations on liability, and injunctions provided in

9  the Plan (i) are within the jurisdiction of the Court under 28 U.S.C. § 1334; (ii) are integral

10  elements of the transactions incorporated into the Plan; (iii) confer material benefit on, and are in

11  the best interests of, the Plan Proponents, Debtor, the Estate, and Holders of Claims against the

12  Debtor, and are important to the overall objectives of the Plan; (iv) are consistent with sections

13  105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code; (v) are

14  in exchange for valuable consideration; and (vi) were properly noticed to Holders of Claims and

15  Equity Interests.

16          13.    The exculpation and limitation of liability provisions in Section 8.10 of the

17  Plan establish a standard of care within this Chapter 11 Case, and are thus consistent with the rule

18  in this Circuit that actions taken by parties in furtherance of a federal bankruptcy case are

19  governed exclusively by federal bankruptcy law. *See MSR Exploration v. Meridian Oil*, 74 F.3d

20  910 (9th Cir. 1995); *Gonzales v. Parks*, 830 F.2d 1033 (9th Cir. 1987). Moreover, this Court has

21  exclusive jurisdiction over such actions, which may not be collaterally attacked in a non-

22  bankruptcy forum. There is a compelling need for Section 8.10 of the Plan, because the Meritage

23  Parties already brought actions against the Plan Proponents in non-bankruptcy forums based upon

24  actions they have taken in this Chapter 11 Case.

25          14.    The Court's retention of jurisdiction as set forth in Article X of the Plan is

26  appropriate and necessary to the implementation of the Plan.

27

28

ny-998792

290659.1

**G.   The Plan Proponents Have Complied With All Applicable Provisions Of Title 11 Of The United States Code (Section 1129(a)(2)).**

1.   The Agent and the Settling Builders, as co-proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice for the U.S. Bankruptcy Court for the District of Nevada, the Disclosure Statement Order, and other orders of this Court with respect to the Plan.  Good, sufficient, and timely notice of the Confirmation Hearing has been given to holders of Claims and Equity Interests and to other parties in interest to whom notice is required to be given in accordance with the Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules.  Ballots of Holders of Claims entitled to vote on the Plan were properly solicited and tabulated in accordance with the Disclosure Statement Order.  The Plan Proponents have complied with Bankruptcy Code section 1129(a)(2), including, but not limited to the requirements set forth in Bankruptcy Code sections 1125 and 1126.

2.   The Plan Proponents, the Trustee, and their employees, attorneys, consultants, and financial advisors have acted in good faith, and in compliance with the applicable provisions of title 11, with respect to the solicitation of votes to accept or reject the Plan, and the Plan Proponents, the Trustee, and their employees, attorneys, consultants, and financial advisors are entitled to the protection under Bankruptcy Code section 1125(e).

**H.   The Plan Has Been Proposed In Good Faith And Not By Any Means Forbidden By Law (Section 1129(a)(3)).**

1.   The Plan, and the compromises and settlements embodied therein, have been proposed in good faith and not by any means forbidden by law, as evidenced by, among other things, the totality of the circumstances surrounding the formulation of the Plan and the record of this Chapter 11 Case.  *See In re Trans Max Techs., Inc.*, 349 B.R. 80 (Bankr. D. Nev. 2006).  The Plan provides the greatest opportunity to maximize the value of the Estate, and the Trustee and the Plan Proponents have exercised sound and reasonable business judgment through the Plan.  As such, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(3).

16

2.     The evidence at the Confirmation Hearing demonstrates that the Plan was negotiated by the Plan Proponents in good faith and at arms' length. The purpose of the Plan was not to take unfair advantage of the Meritage Parties, but rather to achieve a fair and reasonable resolution of the Debtor's complex financial and legal problems. With the exception of the Meritage Parties, all parties that have been involved in years of litigation – the Settling Builders, the Agent, the Focus Parties, and the Debtor – will be achieving peace. In addition, the Plan Proponents have resolved their, and the Estate's, claims against Alameda in connection with Plan confirmation, and in turn Alameda has agreed to support the Plan. The Plan thus will end the years of deadlock and litigation that have plagued the Debtor and its development, and avoid the significant expense, great uncertainties, and potentially extensive delays and materially lesser recoveries for creditors that would be occasioned by denial of confirmation of the Plan. The Plan will benefit not only the Debtor, but also the community, the hundreds of residents who currently live within the Debtor's project, and the City of Henderson.

3.     The Meritage Parties raise various arguments for why, in their view, the Plan was not proposed in good faith and in accordance with law. *See* Meritage P&A [D.E. 1210] at pp. 15-22. The Court finds that each of the Meritage Parties' contentions to be without merit.

> ### *The Plan Is Not Being Proposed By Means Forbidden By Law, And The Plan Does Not Improperly Attempt To Restructure Rights Between And Among non-Debtor Parties (Meritage P&A at pp. 2; 15-16; 20-22).*

4.     The Plan does not violate the Operating Agreement, and the Plan Proponents have not violated the Operating Agreement in proposing the Plan. Section 1(v) of the First Amendment to the Debtor's Operating Agreement (the "First Amendment") was, by its express terms, adopted to "conform" the Debtor's Operating Agreement to the Prepetition Credit Agreement (Section 1 of the First Amendment is titled "Amendment to Conform to Credit Agreement," and the preamble to the section reads "In order to conform to the requirements of Section 8.01 of the Credit Agreement . . . ."). Section 1(v) of the First Amendment, in turn, provides that the Debtor will not enter into any transactions with its Members or their affiliates "except as permitted under Section 7.07 of the Credit Agreement." Section 7.07 of the

17

1  Prepetition Credit Agreement was included among the Debtor's covenants to the Prepetition

2  Lenders, and states that "[t]he Borrower [Debtor] will not sell, lease or otherwise transfer any

3  property or assets to, or purchase, lease or otherwise acquire any property or assets from, or

4  otherwise engage in any other transactions with, any of its Members, the General Manager [of the

5  Debtor] or Affiliates of any Member or the General Manager," with certain exceptions.

6      5.      The Prepetition Credit Agreement is being amended under the Plan in

7  accordance with its terms, with the required consent of the Prepetition Lenders, and as set forth in

8  the Prepetition Credit Agreement Amendment (Exhibit "A" to the Plan Supplement).  Section 3

9  of the Prepetition Credit Agreement Amendment provides that "Section 7.07 of the Credit

10  Agreement is hereby amended to the extent necessary to allow for the implementation of the

11  transactions contemplated by the Plan, including the acquisition by the Acquirer of the Estate

12  assets pursuant to Section 6.2 of the Plan."  The Prepetition Credit Agreement Amendment is in

13  accordance with law, the terms of the Prepetition Credit Agreement, and, in particular,

14  Bankruptcy Code section 1123(a)(5)(F), which provides for the amendment of credit agreements

15  as part of a plan.

16      6.      There is no evidence that Section 1(v) of the First Amendment or Section

17  7.07 of the Prepetition Credit Agreement was intended to benefit Members of the Debtor,

18  including the Meritage Parties.  Nor have the Meritage Parties demonstrated any prejudice by this

19  amendment.  To the contrary, the Meritage Parties' Equity Interests in the Debtor have no value,

20  in light of the Debtor's insolvency, and the Meritage Parties' have stated their desire to no longer

21  have any business operations in the Las Vegas area and business relationships with the Settling

22  Builders.  Meritage acknowledges that "[t]he Project no longer fits within Meritage's business

23  plan." *Meritage's P&A* [D.E. 1209] at 10.  Moreover, the Trustee, on behalf of the Debtor and its

24  Estate, has no objection to the First Amendment.  Thus, even if the Plan were to violate the

25  Debtor's Operating Agreement, the Meritage Parties have demonstrated no harm arising from any

26  such violation.

27      7.      Without limitation, all documents and agreements necessary to implement

28  the Plan (including the Prepetition Credit Agreement Amendment, Indemnity Agreement, the

1  Consenting Lenders' Participation Agreement, and all related documents and agreements) (i) are

2  reasonable, have been negotiated in good faith, at arms' length, in accordance with law, for

3  legitimate business purposes, and are in the best interests of the Debtor, the Estate, and the

4  Holders of Allowed Claims, and (ii) upon completion of documentation and execution on or after

5  the Effective Date, shall be legal, valid, binding, and enforceable documents not in conflict with

6  any federal or state laws.

7                   ***The Plan Proponents Are Not Using The Plan As A Litigation Tactic***

8                                   ***(Meritage P&A at pp 16-17).***

9           8.      The Plan is not being used by the Plan Proponents as an improper

10  "litigation tactic" against the Meritage Parties.  The Plan is a good faith resolution of the Debtor's

11  financial problems.

12           9.      The Meritage Parties' contention that the Plan Proponents are "tacking on

13  post-petition interest to the Agent's claim" in violation of Bankruptcy Code sections 502 and 506

14  is without merit.  *See* Meritage P&A at 17.  As noted, the Agent holds a blanket lien on the

15  Debtor's assets and, therefore, unsecured creditors and equity holders could not receive any

16  distributions until the Prepetition Lenders' Claims were paid in full, including postpetition

17  interest.  Moreover, the Meritage Repayment Guaranty includes a guaranty of both principal and

18  interest owing to the Prepetition Lenders, including postpetition interest.  *See* Meritage

19  Repayment Guaranty § 2(a) ("The Liabilities shall include, without limitation of any of the

20  foregoing, interest accruing after the commencement of a proceeding under bankruptcy,

21  insolvency or similar laws of any jurisdiction at the rate or rates provided in the Facility

22  Documents.").

23           10.     Nor are the Meritage Repayment Guaranty Escrow provisions (Section

24  3.4(F) of the Plan) lacking in good faith.  Section 16 of the Meritage Repayment Guaranty

25  expressly provides that each Prepetition Lender "may assign, sell participations in or otherwise

26  transfer its rights under the Facilities to any other person or entity . . . ."  Section 3.4(F) of the

27  Plan comports with this provision.  The Court finds nothing to be unfair or lacking in good faith

28  as to the Meritage Parties, as to the Plan's treatment of the Meritage Repayment Guaranty.

ny-998792

290659.1

11.    The Meritage Parties contend that the Plan Proponents' bad faith is evidenced by various emails between the Plan Proponents and their representatives during the period that they were negotiating the Plan Support Agreement. *See, e.g.*, Meritage P&A at p.17 n.16. The Court finds, however, that the emails reflect negotiating positions of the parties in the context of trying to resolve years of high stakes and very contentious litigation. The record shows that the purpose of the Plan was to deal with the entire project and more than $350 million in Claims against the Debtor, of which the Meritage Parties were a relatively small portion. Moreover, the transaction that is being presented to the Court for its approval is the Plan, and not various proposals and counter-proposals that the parties circulated in the course of their good faith negotiations.

### *The Plan Does Not Improperly Strip The Meritage Parties Of Their Contractual Subrogation Rights Or The Benefits Of LID Reimbursements (Meritage P&A at pp. 17-18).*

12.    The Meritage Parties assert that the Plan improperly impairs their contractual rights to subrogation, presumably under Section 6 of the Meritage Repayment Guaranty. The Meritage Party's subrogation rights, however, have not matured. The Meritage Parties have not paid the Prepetition Lenders anything on account of the Meritage Repayment Guaranty, although they have had opportunity to do so. Thus, as of the present time, the Meritage Parties have no lien on the Debtor's property, and their contingent, unliquidated subrogation claim is disallowable under Bankruptcy Code sections 502(e)(1) and 509. Moreover, the Meritage Parties have no right to prevent the Agent and the Prepetition Lenders from releasing their liens on the Debtor's property. *See* Meritage Repayment Guaranty § 3(b) ("The liability of the Guarantor under this Guaranty is absolute, irrevocable and unconditional irrespective of . . . .any exchange, release or non-perfection of any Collateral . . . ."). Nor do the Meritage Parties have any interest in the LID reimbursements. The LID reimbursement rights are subject to the Agent's perfected liens, which are in turn subject to the TIP Loan Lenders' priming liens. The Meritage Parties have no lien on or other valid interest in the LID reimbursements.

20

*The Plan Does Not Attempt To Take Advantage Of Meritage (Meritage P&A at pp. 18-19).*

13.     The Meritage Parties contend that the Settling Builders are acting in bad faith by proposing the Plan, after first having opposed the involuntary petition. The evidence shows, however, that the Settling Builders are resolving their disputes with the Agent, the Prepetition Lenders, and the Estate through a settlement, and as part of that settlement, the Settling Builders are agreeing to withdraw their challenges to this Chapter 11 Case and the appointment of the Chapter 11 Trustee. There is no evidence of bad faith in the Settling Builders' actions.

14.     The Settling Builders, the Agent, the Prepetition Lenders, and the Debtor's Estate are entering into a good faith settlement of disputes that have existed for more than three years. The Settling Builders, the Agent, and the Prepetition Lenders are making substantial contributions to the settlement. The Settling Builders are paying more than $330 million, which amount will include all Allowed Administrative Expense Claims and Priority Claims of the Chapter 11 Case, and a $1 million General Unsecured Claim Recovery Fund, which is expected to provide Holders of Allowed General Unsecured Claims in Class U2 with a substantial dividend. The Settling Builders also are agreeing to fund all future LID assessments, property taxes, maintenance, and security expenses for the project while negotiations continue with the City of Henderson regarding the future development of the project, as set forth on the budget included as Exhibit "C" to the Acquirer's Operating Agreement (Exhibit "G" to the Plan Supplement). The Agent and the Prepetition Lenders are consenting to the Plan, notwithstanding a deficiency of approximately $47 million (including postpetition interest). The settlement of these disputes is in good faith, at arms' length, and not for the purpose of prejudicing any other party. Finally, in furtherance of the Plan, the Agent, the Trustee, and the Settling Builders entered into a Settlement Agreement and Mutual Release with the Focus Parties, which was approved by the Court on October 17, 2011 [*see* D.E. 1295].

I.      **The Plan Complies With Bankruptcy Code Section 1129(a)(4).**

1    1.    The Plan complies with the requirements of Bankruptcy Code section

2    1129(a)(4).  Section 4.5 of the Plan provides that each professional who holds or asserts a

3    Professional Compensation Claim will be required to file with the Court, and serve upon all

4    parties required to receive notice, a final application within sixty (60) days after the Effective

5    Date.

6         **J.    The Plan Complies With Bankruptcy Code Section 1129(a)(5).**

7              1.    The Plan complies with the requirements of Bankruptcy Code section

8    1129(a)(5).  The Plan Proponents have disclosed in the Plan Supplement [D.E. 1134] the identity,

9    affiliations, and compensation of the individuals proposed to serve, after confirmation of the Plan,

10   as directors, officers, or managers, as applicable, of the Acquirer under the Plan and the

11   appointment to, or continuance in, such office of such individuals is consistent with the interests

12   of creditors and equity security holders and with public policy.  The qualifications of the

13   Acquirer's Administrative Member and Executive Committee are set forth in the Plan

14   Supplement, and the uncontested evidence at trial shows that they are qualified to run the

15   Acquirer's business.  No party has challenged their qualifications.  No insider of the Debtor will

16   be employed or retained by the Reorganized Debtor, except that the Acquirer will be the Estate

17   Representative.

18        **K.    Bankruptcy Code Section 1129(a)(6) Is Not Applicable.**

19             1.    Bankruptcy Code section 1129(a)(6) is inapplicable to this Chapter 11 Case

20   because the Plan does not contain rate changes for which a governmental regulatory commission

21   has jurisdiction after confirmation.

22        **L.    The Plan Complies With The Best Interests Test Of Bankruptcy Code Section**

23        **1129(a)(7).**

24             1.    The Plan complies with Bankruptcy Code section 1129(a)(7).  Each Holder

25   of a Claim or Equity Interest in an impaired Class of Claims or Equity Interests will receive under

26   the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date

27   of the Plan, that is not less than the amount that such holder would so receive or retain if the

28   Debtor were liquidated under chapter 7 on such date.  The Best Interests Test Analysis submitted

by Mr. Jeffrey Truitt [D.E. 1151] was not contested, and it shows that under nearly any litigation

scenario, a liquidation of the Estate would not yield sufficient assets to pay the Prepetition

Lenders and Holders of Administrative Expense Claims in full. Accordingly, in a liquidation, the

Holders of Unsecured Claims or Equity Interests would not receive anything.

**M. Because Every Impaired Class Has Not Accepted The Plan, The Requirements Of Section 1129(b) Will Apply (Section 1129(a)(8)).**

1. In accordance with Bankruptcy Code section 1129(a)(8), Classes S3, U1 and U2 (the sole impaired Classes of Claims under the Plan that are entitled to vote) have each voted to accept the Plan in accordance with section 1126(c). Classes P1, S1, and S2 under the Plan are unimpaired and therefore are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes U3 and E1 did not vote, but were deemed to have rejected the Plan. Because the impaired Classes U3 and E1 have not accepted the Plan, the requirements of Bankruptcy Code section 1129(a)(8) have not been met with respect to such Classes, thereby requiring application of Bankruptcy Code section 1129(b). As is more fully set forth hereinafter, the Plan satisfies section 1129(b) with respect to Classes U3 and E1.

**N. The Plan Complies With The Requirements Of Section 1129(a)(9) With Respect To Priority And Administrative Claims.**

1. The Plan's treatment of Allowed TIP Loan Claims, Administrative Expense Claims, Gap Claims, Allowed Priority Tax Claims, Professional Compensation Claims, and other unclassified priority claims as set forth in Bankruptcy Code section 507(a) satisfies the requirements set forth in Bankruptcy Code section 1129(a)(9) because, except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that: (i) the Holder of each Allowed Administrative Claim and Allowed Gap Claim shall be paid in full, in Cash on the Effective Date; (ii) each Holder of an Allowed TIP Loan Claim shall be paid in full, in cash on the Effective Date; (iii) the Holders of Allowed Priority Tax Claims shall be paid in full, in Cash on the Effective Date, or in such amounts and on such other terms as may be agreed to by the Holders of such Claims and the Debtors, or according to the ordinary business terms of the Debtors and such Holders; and (iv) the Holders of Allowed

ny-998792

290659.1

1   Professional Compensation Claims shall be paid in full in cash in the amounts approved by the

2   Bankruptcy Court that have not previously been paid: (a) on or as soon as reasonably practicable

3   following the date on which the order relating to the allowance of any such Allowed Professional

4   Compensation Claim is entered; or (b) on such other terms mutually agreed upon by the Settling

5   Builders and the Holder of an Allowed Professional Compensation Claim.

6   **O.  The Plan Satisfies The Impaired Consenting Class Requirement Of Section**

7       **1129(a)(10).**

8       1.      The Plan complies with Bankruptcy Code section 1129(a)(10).  The

9   impaired Classes S3, U1, and U2 each voted to accept the Plan, determined without including

10  acceptance by any insider (as defined by section 101(31) of the Bankruptcy Code).

11  **P.  To The Extent Applicable, The Plan Satisfies The Feasibility Requirement Of**

12      **Section 1129(a)(11).**

13      1.      Since the liquidation of the Debtor is proposed in the Plan, the provisions

14  of Bankruptcy Code section 1129(a)(11) do not apply.  However, even if the provisions of section

15  1129(a)(11) were to apply to the Plan, the Plan is not likely to be followed by a liquidation of the

16  Acquirer or the need for further financial reorganization.  This is because, based upon the capital

17  contributions and other funding requirements, the guaranties, and the cash that will be contributed

18  to the Acquirer on the Plan's Effective Date, and further based on the Interim Budget contained in

19  the new Operating Agreement for the Acquirer for the first three years following the Effective

20  Date (Exhibit "C" to Exhibit "G" of the Plan Supplement), the Acquirer will have sufficient

21  funding through, and beyond, the time the Acquirer expects it will take to negotiate the terms of

22  the future development of the Inspirada project with the City of Henderson.

23  **Q.  The Plan Provides For The Payment Of Statutory Fees, As Required By**

24      **Section 1129(a)(12).**

25      1.      The Plan complies with the requirements set forth in section 1129(a)(12) of

26  the Bankruptcy Code in that the Plan provides for the payment of all fees under 28 U.S.C. § 1930

27  as of the Effective Date or as they come due after such time.  *See* Plan § 11.10.

28  **R.  Sections 1129(a)(13) Through (a)(16) Are Inapplicable.**

ny-998792                                                                                         290659.1

1.     Section 1129(a)(13) of the Bankruptcy Code is inapplicable, because there are no retiree benefits, as the term is defined in section 1114, affected under the Plan.

2.     The Debtor is not required or obligated on any domestic support obligation, and thus section 1129(a)(14) of the Bankruptcy Code is inapplicable.

3.     The Debtor is not an individual, and thus section 1129(a)(15) of the Bankruptcy Code is inapplicable.

4.     The Debtor is a moneyed, business, or commercial entity, and thus section 1129(a)(16) of the Bankruptcy Code is inapplicable.

5.     The uncodified requirement that an individual debtor prove that he or she has provided all tax information that was requested pre-confirmation is inapplicable because the Debtor is not an individual. *See* Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005, §1228(b), Pub. L. 109-8, 119 Stat. 23, 200.

**S.    The Plan Is Fair And Equitable, And The Plan Does Not Unfairly Discriminate Against Any Classes Of Claims Or Equity Interests (Section 1129(b)).**

1.     The requirements of Bankruptcy Code section 1129(b) are applicable with respect to Classes U3 and E1, because they are deemed to have rejected the Plan.  The requirements of section 1129(b) are met as to both of these Classes, because the Plan does not discriminate unfairly and is fair and equitable with respect to Classes U3 and E1.

2.     As the uncontested evidence demonstrates, no Holder of a Claim or an Interest in a Class that is junior to Classes U3 or E1 will receive or retain any property under the Plan, on account of such Claim or Interest.  Moreover, as the evidence demonstrates, there is no residual value in the Assets in excess of the Prepetition Lender Secured Claims in Class S3 that either Holders of Class U3 Member Claims or Class E1 Equity Interests are entitled to receive. Therefore, the Plan satisfies the absolute priority rule and is fair and equitable with respect to Holders of Claims and Interests in Classes U3 and E1.

3.     The Plan does not discriminate unfairly against Holders of the Member Claims in Class U3. As set forth in Paragraphs II.F.2 through 5 above, reasonable business and

ny-998792

290659.1

1   legal justifications exist for the separate classification of Member Claims in Class U3. Those

2   same factors justify the separate treatment of Class U3. Although Class U3 creditors are

3   receiving treatment under the Plan that is different from the treatment for Class U1 and U2

4   Claims, such treatment does not unfairly discriminate against them. The differential treatment for

5   Class U3 has a reasonable basis in law and fact, is necessary for the reorganization, is proposed in

6   good faith, and is to a degree that is consistent with the purpose for the differential treatment. *See*

7   *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115

8   F.3d 660 (9th Cir. 1997).

9   **T.      The Principal Purpose Of The Plan Is Not To Avoid The Payment Of Taxes**

10   **Or The Application Of Securities Laws  (Section 1129(d)).**

11   1.      The principal purpose of the Plan is not the avoidance of taxes or

12   avoidance of the requirements of section 5 of the Securities Act of 1933; rather, it is to restructure

13   the Debtor's financial problems. No governmental unit has requested that the Court deny

14   confirmation on such basis. Therefore, the Plan satisfies the requirements of Bankruptcy Code

15   section 1129(d).

16   **U.      The Plan Does Not Grant An Improper Discharge To A Liquidating Debtor**

17   **(Section 1141(d) And Meritage P&A at pp. 28-30).**

18   1.      The Debtor is not entitled to a discharge because it is liquidating under the

19   Plan. *See* Bankruptcy Code section 1141(d)(3). In accordance with this requirement, the Plan

20   does not contain a discharge provision. However, some assets will remain in the Debtor's Estate

21   post-confirmation (as section 1141(b) allows), including the Development Agreement, the COH

22   Acquisition Agreement, other development-related agreements with the City and Clark County

23   School District, and the Retained Actions. After the Plan's Effective Date, the Debtor's Estate

24   will remain subject to the protections of the automatic stay of Bankruptcy Code section 362 until

25   the Estate's assets are fully administered. *See Hillis Motors v. Hawaii Auto. Dealers' Ass'n (In re*

26   *Hillis Motors)*, 997 F.2d 581 (9th Cir. 1993). The injunction provisions in Section 8.3 of the Plan

27   implement these protections and are thus appropriate. They are of limited duration and protect

28

ny-998792                                                                                            290659.1

only the Debtor and its Estate through the completion of the liquidation of the Estate's assets, at
which time the Debtor will be dissolved.

**V.     Plan Modifications.**

1.     The modifications made to the Plan after the solicitation of votes on the
Plan had commenced do not materially adversely change the treatment of any Holder of a Claim
or Equity Interest who had previously cast a Ballot to either accept or reject the Plan.
Accordingly, no further disclosure of information, solicitation of votes, or voting is required.
Pursuant to Bankruptcy Code section 1127(a) and Bankruptcy Rule 3019, none of these
modifications require additional disclosure under Bankruptcy Code section 1125 or re-solicitation
of votes under Bankruptcy Code section 1126, nor do they require that Holders of Claims or
Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of
the Plan.  The Plan, as modified and attached hereto, shall constitute the Plan confirmed by the
Court.

**W.     Conditions To Confirmation.**

1.     All conditions to confirmation in Section 9.1 of the Plan have been
satisfied.

**X.     Member Settlements And Reservations (Alameda, Focus, And Kimball Hill).**

1.     Alameda withdrew its objections to Confirmation of the Plan before the
start of the Confirmation Hearing after reaching an agreement with the Plan Proponents.  The
provisions of the agreement will be the subject of a separate order to be entered by the
Bankruptcy Court.

2.     The Focus Parties reached an agreement with the Plan Proponents and the
Trustee prior to the Plan objection deadline.  The provisions of that agreement are the subject of a
separate order entered by this Court [*see* D.E. 1295].

3.     Reservation of Rights for Kimball Hill.

a.     Notwithstanding any provision of the Plan or any order or agreement entered or
approved in furtherance of the Plan, no provision shall constitute or be deemed to
constitute an impairment or enhancement in any respect of the ability of U.S. Bank

27

1    National Association, as the Plan Administrator for the KHI Post-Consummation

2    Trust and the Liquidation Trust Administrator for the KHI Liquidation Trust, to

3    assert and maintain defenses or counterclaims against any Entities that have

4    asserted or may assert Claims against Kimball Hill, Inc., Kimball Hill Homes

5    Nevada, Inc., or any of their affiliated debtors (together, "Kimball Hill");

6    provided, however, that (1) Kimball Hill may not seek or obtain any affirmative

7    recoveries from the Debtor, its Estate, or the Acquirer of the Debtor's assets, and

8    (2) Kimball Hill agrees that the formulation, proposing, confirmation, and

9    consummation of the plan (the "Plan Activities") by each of the Plan Proponents

10    was in good faith and in accordance with law, and shall not give rise to any

11    liability of (or any offsetting counterclaims or defenses against) any of the Plan

12    Proponents to Kimball Hill relating to the Plan Activities; provided, however,

13    nothing herein shall be construed to release any Plan Proponent from (i) its

14    obligations set forth in the Plan, or (ii) willful misconduct or gross negligence as

15    determined by a Final Order.

16    b.    Notwithstanding any provision of the Plan or any order or agreement entered or

17    approved in furtherance of the Plan, no provision shall constitute or be deemed to

18    affect the exclusive jurisdiction of the United States Bankruptcy Court for the

19    Northern District of Illinois to hear and determine all Claims asserted against

20    Kimball Hill, Inc., Kimball Hill Homes Nevada, Inc., or any of their affiliated

21    debtors in accordance with the Findings of Fact, Conclusions of Law, and Order

22    Confirming Joint Plan of Kimball Hill, Inc. and its Debtor Subsidiaries Pursuant to

23    Chapter 11 of the United States Bankruptcy Code [Docket No. 1118; Case No. 08-

24    10095].  Based upon the foregoing, Kimball Hill consents to the confirmation of

25    the Plan and the treatment of Equity Interests in Class E1 thereof.

26    **III.    ORDER CONFIRMING PLAN**

27

28

290659.1

Based upon the foregoing findings and conclusions, and those additional findings and conclusions stated on the record, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

    **A.**     **The Plan Is Confirmed.**

    1.     The Plan is confirmed as having satisfied all of the applicable requirements of chapter 11 of the Bankruptcy Code.

    **B.**     **Objections To Confirmation Are Overruled.**

    1.     The Meritage Parties' objection to confirmation of the Plan is overruled in its entirety.

    2.     Any other objection to confirmation of the Plan not resolved by the terms of this Confirmation Order or by a statement announced on the record of the Confirmation Hearing and not otherwise withdrawn, waived, or settled is overruled and denied in its entirety.

    **C.**     **Effect Of Confirmation.**

    1.     The failure specifically to include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety.

    2.     On the Confirmation Date (and subject to the occurrence of the Effective Date), the provisions of the Plan shall become binding on the Debtor, the Estate, the Trustee, the Reorganized Debtor, all Holders of Claims against or Equity Interests in the Debtor, and all other parties in interest in the Chapter 11 Case whether or not such Holders of Claims or Equity Interests are impaired, and whether or not such Holders of Claims or Equity Interests have accepted the Plan. Because the Debtor will be liquidating its Assets, the Debtor will not receive a discharge under the Plan. However, until all remaining Assets of the Estate are administered, and except as otherwise provided in the Plan or this Confirmation Order, all Entities shall be barred from asserting against the Debtor, the Reorganized Debtor, or the Estate, or their respective successors or property, any other or further Claims, demands, debts, rights, Causes of Action, liabilities, or Equity Interests based upon any act, omission, cause, transaction, state of facts, or other activity of any kind or nature that occurred prior to the Effective Date.

29

3.     Pursuant to sections 105(a), 1123(b)(3), 1129, and 1141 of the Bankruptcy Code and Bankruptcy Rules 3016 and 9019, the settlements, compromises, releases, and injunctions set forth in the Plan among the Debtor, the Estate, the Plan Proponents, and their related parties are approved as integral parts of the Plan, were negotiated at arms' length and in good faith, are fair, equitable, reasonable, and are in the best interest of the Debtor, its Estate, and the Holders of Claims and Equity Interests.  In addition, because the Plan is a good-faith settlement as to the Released Parties, no co-defendant or joint tortfeasors shall have any indemnity or contribution claims, which shall be disallowed by the application of Bankruptcy Code section 502(e), by California Code of Civil Procedure section 877.6 (which shall apply to the maximum extent permitted by applicable law), Nevada Revised Statute 17.245, and any similar law of any other jurisdiction.

4.     Pursuant to Bankruptcy Code section 1146(a), any transaction arising out of, contemplated by, or in any way related to the Plan, whether occurring on or after the Effective Date, including without limitation: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor, the Acquirer, or the Reorganized Debtor; (ii) the creation, modification, consolidation, or recording or filing of any mortgage, deed of trust, financing statement, or other security interest or instrument, or the securing of additional indebtedness by such or other means; (iii) the making, assignment, or recording of any lease or sublease; or (iv) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer, or termination executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including, without limitation, transfers of real property from the Estate to the Acquirer, and subsequent distributions of such real property to the Settling Builders in accordance with the Inspirada Builders, LLC Operating Agreement), in each case, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate federal, state or local

30

1   governmental officials or agents shall and are hereby directed to forego the collection of any such

2   tax or governmental assessment and to accept for filing and recordation any of the foregoing

3   instruments or other documents without the payment of any such tax or governmental assessment.

4          5.      Pursuant to Bankruptcy Code sections 1123(a), 1141(a), and 1142 and the

5   provisions of this Confirmation Order, the Plan and all Plan-related documents (including, but not

6   limited to, Exhibits A through G included in the Plan Supplement) shall be, and hereby are, legal,

7   valid, binding and enforceable notwithstanding any otherwise applicable nonbankruptcy law.

8   Each of the Plan Supplement documents (to the extent not already approved by order of this

9   Court) is hereby approved.  The Plan Proponents may modify, amend, or enter into the Plan

10  Supplement documents or any other documents, without further order of this Court as necessary

11  to implement the Plan, provided any such amendment or modification shall not be materially

12  inconsistent with the provisions of the Plan.

13         6.      Except as otherwise provided in the Plan, this Confirmation Order, the

14  Focus Settlement Agreement, or in any contract, instrument, release, or other agreement or

15  document created pursuant to the Plan, on the Effective Date and concurrently with the applicable

16  distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other

17  security interests against any property of the Estate (including the Liens granted to the Agent for

18  its own behalf and on behalf of the Prepetition Lenders pursuant to the Prepetition Credit

19  Documents) shall be fully released and discharged, and the Assets shall be free and clear of any

20  such interests.

21         7.      As of the Effective Date, except as otherwise provided in this Confirmation

22  Order, this Confirmation Order shall be construed as and shall constitute for any and all purposes

23  a full and complete general assignment, conveyance, and transfer of the Assets or a bill of sale

24  transferring good and marketable title in the Assets to the Acquirer, free and clear of all Liens,

25  Claims, and encumbrances (except for LID assessments and such other government rights and

26  entitlements that run with the land).  Each and every federal, state and local governmental agency

27  or department is hereby authorized to accept any and all documents and instruments necessary

28  and appropriate to consummate the transactions contemplated by the Plan.

8.        Except as otherwise set forth in the Plan, the Plan Supplement, or this Confirmation Order, the Acquirer shall have no liability or responsibility for any liability or other obligations of the Debtor.  Without limiting the generality of the foregoing, to the extent allowed by law, the Acquirer shall not be liable for any Claims against the Debtor, and the Acquirer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any such liability that may be imposed by statute or any theory of successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Effective Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Assets or the Debtor, or any obligations of the Debtor arising prior to the Effective Date.

9.        The Acquirer is a good faith purchaser, as that term is used in Bankruptcy Code section 363(m), and the Acquirer is entitled to the full protections of section 363(m).

10.        Pursuant to Section 6.2 of the Plan, the Retained Actions are being left in the Estate, to be administered by the Estate Representative in accordance with the Plan, as well as the City and County-related rights and agreements included in Section 5.5 of the Plan.  This Confirmation Order shall constitute notice of the Settling Builders' intention to keep the Retained Actions in the Estate as of the Effective Date, rather than assigning them to the Acquirer.  The Estate Representative shall have the full authority to pursue the Retained Actions after the Effective Date, and confirmation of the Plan shall not in any way release, impair, or otherwise prejudice the Estate Representative's pursuit of such Retained Actions, including, but not limited to, causes of action against the Meritage Parties for unfunded capital calls and other claims and causes of action arising under or relating to the Debtor's Operating Agreement.

11.        Other than the four Repayment Guaranties of the Settling Builders, which are being satisfied in full under the Plan, the Plan and its confirmation shall not in any way discharge or otherwise release in any way the Agent's or the sub-Agent's claims under the Guaranties against the Members and Member Affiliates.  *See American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.),* 885 F.2d 621, 625-26 (9th Cir.1989); *Seaport Automotive Warehouse, Inc. v. Rohnert Park Auto Parts, Inc. (In re Rohnert Park Auto Parts, Inc.),* 113 B.R. 610, 614-17 (9th Cir. BAP 1990).  Nor shall the Plan or confirmation

32

1    thereof effectuate a release of any Retained Actions against the Members or Member Affiliates,

2    except with respect to (i) the Settling Builders, (ii) the Focus Parties (if the Focus Settlement

3    Agreement that has been approved by the Bankruptcy Court becomes effective), and

4    (iii) Alameda, subject to the terms of the settlement described on the record at the Confirmation

5    Hearing and to be filed with the Bankruptcy Court. The Plan's treatment of the Class S3 and U1

6    Claims will not affect the Meritage Parties' liability on their Repayment, Completion, and

7    Limited Guaranties, which are not being satisfied or released under the Plan. *See American*

8    *Hardwoods*, 885 F.2d at 625 ("'Generally, discharge of the principal debtor in bankruptcy will

9    not discharge the liabilities of codebtors or guarantors . . . .'") (quoting *Underhill v. Royal*, 769

10   F.2d 1426 (9th Cir. 1985)); *see also* Meritage Repayment Guaranty § 2(a) ("the obligations of the

11   Guarantor hereunder shall not be reduced by amounts paid by any other guarantor"); id §§ 3 & 4

12   (the obligations of the Meritage Parties under the Repayment Guaranty are absolute and

13   irrevocable); id. § 16 ("any Lender may assign, sell participations in or otherwise transfer its

14   rights under the Facilities [as defined in the Prepetition Credit Agreement] to any other person or

15   entity on and subject to the terms set forth in the [Prepetition] Credit Agreement, and the other

16   person or entity shall then become vested with all the rights and benefits granted to the Lenders in

17   this Guaranty or otherwise").

18          12.     Payment obligations incurred after the Effective Date of the Plan shall not

19   be subject to application or proof of claim and may be paid by the Acquirer or the Estate

20   Representative in the ordinary course of business and without further Bankruptcy Court approval.

21   **D.     Executory Contracts, Insurance Coverage, And City Of Henderson**

22   **Agreements.**

23          1.      Insurance Coverage.

24   (a)     Except as provided for the Chartis Policies as addressed below in Paragraph

25   III.D.1(b) – (d), the provisions of the Plan and this Confirmation Order shall not diminish or

26   impair in any manner the enforceability and coverage of any insurance policies that may cover

27   Claims against the Debtor or any other Person. Nothing in the Plan and this Confirmation Order

28   shall be deemed to constitute a rejection of any insurance policies or related agreements relating

33

1 to any insurance policies under section 365 of the Bankruptcy Code to the extent such policies

2 and agreements exist and are executory.

3    (b)  The 1st Excess Liability Policy No. 7532913 (the "1st Excess Policy") issued by

4 the Insurance Company of the State of Pennsylvania ("ICSP") and the 2nd Excess Liability

5 Policy No. 1061104 (the "2nd Excess Policy," collectively with the 1st Excess Policy, the

6 "Policies") issued by Lexington Insurance Company ("Lexington," and together with ICSP, the

7 "Chartis Insurers") shall be assumed by the Debtor and assigned to the Acquirer. The Policies

8 shall be amended by the Vertical Construction Exclusion Endorsement (the "Vertical

9 Construction Endorsement") and the Changes in Followed Policy Endorsement attached as

10 Exhibit "2" hereto.[2] In the event, that evidence is discovered that demonstrates that the Policies

11 include coverage for vertical construction (other than the two water towers referenced in the

12 Vertical Construction Endorsement), then such evidence will be submitted to the Chartis Insurers.

13 If the Chartis Insurers agree that the Policies do cover vertical construction (other than the two

14 water towers referenced in the Vertical Construction Endorsement) after review of the evidence,

15 then the Vertical Construction Endorsement will be removed. If Chartis disputes such evidence,

16 then the parties shall resolve their disputes regarding the coverage of vertical construction through

17 the agreed arbitration procedure also included as part of Exhibit "2" hereto.

18    (c)  The Policies are hereby further amended to provide that any construction manager

19 for the Inspirada master planned community that is hired by the Acquirer shall be of the same or

20 greater quality than Landtek, LLC, and if the Acquirer hires a construction manager of lesser

21 quality than Landtek, LLC such event shall constitute a material increase in risk under the

22 Policies.

23    (d)  The Chartis Insurers, the Debtor, the Acquirer and the Plan Proponents each

24 reserve all rights such that neither the assumption and assignment of the Policies nor anything in

25 the Plan, Disclosure Statement, or otherwise related thereto shall in any way operate to, or have

26 the effect of, altering or impairing in any respect the legal, equitable or contractual rights,

27

28 [2]  This Exhibit will be submitted to the Court with the final form of order.

                           

obligations and defenses of the insureds or the Chartis Insurers under the Policies. The rights and obligations of the parties and others under the Policies, including, without limitation, the right to cancel or deny coverage, shall be determined in accordance with non-bankruptcy law in accordance with all of the rights of the parties arising under or related to the Policies and related agreements if any, including, without limitation, the terms, conditions, limitations, exclusions and endorsements thereof, which shall remain in full force and effect.

2.   Subject to Paragraph III.D.1 of this Confirmation Order (with respect to certain insurance contracts) and Paragraph III.D.3 through 5 of this Confirmation Order (with respect to the City of Henderson and Clark County School District), on the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected in accordance with the provisions and requirements of Bankruptcy Code sections 365 and 1123, except those executory contracts, unexpired leases, and other obligations that (i) have previously been assumed by the Trustee pursuant to an order of the Bankruptcy Court, (ii) are the subject of a motion to assume filed by the Trustee at any time prior to the Effective Date, or (iii) are Assumed Obligations listed in the Contract Assumption Schedule that was filed with the Plan Supplement. The assumption and assignment of the Chartis Policies shall be governed by Paragraphs III.D.1(b)-(d) above. Entry of this Confirmation Order shall constitute approval of the assumption and assignment of the Assumed Obligations to the Acquirer.

3.   Notwithstanding anything to the contrary in Article V of the Plan, the Plan shall defer the decision by the Settling Builders to assume or reject the Development Agreement, the COH Acquisition Agreement, and other development-related agreements with the City and Clark County School District (to the extent the Development Agreement (a portion of which is an ordinance of the City), the COH Acquisition Agreement, and such other agreements constitute executory contracts under Bankruptcy Code section 365) until after the Effective Date. The rights of the Trustee under section 365 and the Settling Builders under section 1123(b)(2) with respect to the assumption or rejection of such contracts shall vest in the Estate Representative as of the Effective Date. The City has acknowledged that it will consider modifications to the LID T-18 and Master Plans (the Development Agreement), which modifications, if acceptable, will be made

35

1   only in accordance with, and subject to the satisfaction of all requirements of all applicable laws,

2   rules, regulations, ordinances, and statutes, as applicable, of both the City and State of Nevada,

3   including but not limited to NRS 271, as amended, NRS 278, as amended, and all provisions of

4   the LID T-18 documents and all other documents and agreements currently in place between the

5   City and the Debtor related to the project or the LID bonds.  If the Development Agreement, the

6   COH Acquisition Agreement, and other related contracts, permits, and entitlements are

7   determined to be executory contracts at the time of such decision, then such contracts shall be

8   subject to Article V of the Plan.

9           4.      Notwithstanding any other provision of the Plan, the COH Acquisition

10  Agreement may not be assumed or assigned until such time as the City has given its consent,

11  which consent shall not be unreasonably withheld as provided in section 6.2 of the COH

12  Acquisition Agreement, and such consent must be received before any motion to assume or

13  assign may be filed.  All other related City contracts for Inspirada that constitute or are a part of

14  the definition of Development Agreement shall stand alone and shall each individually be subject

15  to the requirements of Bankruptcy Code section 365, to the extent each is an executory contract.

16  Until such time as the COH Acquisition Agreement is assumed, assigned, or rejected, it shall

17  remain in the Estate and be administered by the Estate Representative.

18          5.      The City supports the deferral of any motion to assume or reject the

19  Development Agreement, the COH Acquisition Agreement, and related agreements.  Deferral

20  will enable the City and the Settling Builders to continue their negotiations regarding the future of

21  the project.  The Meritage Parties' opposition to the deferral is overruled.  *See* Meritage P&A at

22  pp. 30-32.  The Meritage Parties have failed to cite any authority for the proposition that a non-

23  debtor party, such as the City, cannot consent to a post-confirmation decision on whether to

24  assume or reject a contract.  Nor have the Meritage Parties demonstrated how deferral will

25  prejudice their rights, given that the Meritage Parties own no land within the development and

26  will have no economic interest in the Acquirer or the Debtor.

27      **E.      Releases And Limitations Of Liability.**

28

1            1.     The Plan Proponents, the Trustee, and their respective professionals and

2   advisors have acted in good faith with respect to the solicitation of votes to accept or reject Plan,

3   and the Plan Proponents, the Trustee, and their respective professionals, and advisors are entitled

4   to the protection under section 1125(e) of the Bankruptcy Code.

5            2.     Pursuant to Section 8.5 of the Plan, effective as of the Effective Date,

6   except for the obligations created by or arising under the Plan or the TIP Financing Agreement,

7   the Debtor, the Estate, and the Trustee release unconditionally, and are hereby deemed to release

8   unconditionally, (a) the Settling Builders; (b) the TIP Loan Lenders; (c) the Agent; (d) the

9   Prepetition Lenders; and (e) with respect to each of the foregoing Entities, each of their respective

10   directors, officers, employees, agents, representatives, shareholders, partners, members, affiliates,

11   attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities

12   as such (collectively, the "Released Parties") from any and all Claims, obligations, suits,

13   judgments, damages, rights, Causes of Action, and liabilities whatsoever (including, without

14   limitation, those arising under the Bankruptcy Code or nonbankruptcy law, and those assertable

15   by the Debtor, its Estate, or the Trustee, whether under Bankruptcy Code section 544, the other

16   Avoidance Actions, or otherwise), whether known or unknown, foreseen or unforeseen, existing

17   or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission,

18   transaction, event, or other occurrence, taking place at any time through and including the

19   Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the

20   Debtor, (iii) the Prepetition Loan Documents, (iv) the management, operation, or financing of the

21   Debtor and the Debtor's Estate, or (v) the formulation, negotiation, implementation, confirmation,

22   or consummation of this Plan, the Disclosure Statement, the Trustee's Consent, or any other

23   contract, instrument, release, or other agreement or document entered into during the Chapter 11

24   Case, or otherwise created in connection with this Plan or the Debtor.

25            3.     Pursuant to Section 8.7 of the Plan, effective as of the Effective Date, in

26   consideration for the Settling Builders' payment of the Settling Builders' Repayment Guaranty

27   Amount, the settlements contained in this Plan, and the releases to be granted by the Settling

28   Builders and the TIP Loan Lenders:

                                                      290659.1

a. all obligations of the Settling Builders to the Agent and the Prepetition Lenders on account of the Repayment Guaranties shall be released and discharged, on account of the treatment of Classes S3 and U1 under the Plan, which provide for the Settling Builders' full payment of the Repayment Guaranties; and

b. The Agent and the Consenting Prepetition Lenders release unconditionally, and are hereby deemed to release unconditionally, the Settling Builders, the TIP Loan Lenders, and each of their respective directors, officers, employees, agents, representatives, shareholders, partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such, from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever (including, without limitation, those arising under the Bankruptcy Code or nonbankruptcy law), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, taking place on or prior to the Petition Date through and including the Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the Debtor (including, but not limited to, any claims on account of the Guaranties), (iii) the management, operation, or financing of the Debtor and the Debtor's Estate, or (iv) the formulation, negotiation, implementation, confirmation, or consummation of this Plan, the Disclosure Statement, the Trustee's Consent, or any other contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case, or otherwise created in connection with this Plan or the Debtor.

Notwithstanding the foregoing subparagraph (b):

(x) the Agent and the Consenting Prepetition Lenders shall not be deemed to release Claims against or obligations of the Settling Builders arising under the Plan, the Confirmation Order, or the Prepetition Credit Documents (other than the Settling Builders' Repayment Guaranties, which shall be satisfied in full pursuant to Section 3.4 of the Plan). Rather, any such Claims against the Settling Builders shall be subject to the covenant not to sue and turnover provisions contained in Section 8.6 of the Plan, such that in any action by the Agent (or its successor)

38

against the Settling Builders, a percentage of any recovery equal to the Prepetition Consenting Lenders' percentage of the total Prepetition Lender Claims shall be subject to turnover to the Settling Builders pursuant to Section 8.6 of the Plan; and

(y)    the release contained in Section 8.7 of the Plan and in Paragraph III.E.3 hereof shall not be interpreted to be a release by the Agent and the Prepetition Lenders of (i) obligations created by the Plan, (ii) any claims against a Settling Builder that do not arise under or relate to the Prepetition Credit Documents or the Debtor, and (iii) with respect to Highland Capital and its affiliates, any claims relating to properties purchased in relation to the Inspirada development by Essex Real Estate Partners, LLC and/or Las Vegas Developments Associates, Inc.

4.    Pursuant to Section 8.8 of the Plan, effective as of the Effective Date, in consideration for the settlement contained in this Plan and the releases to be granted by the Agent and the Consenting Prepetition Lenders, the Settling Builders and the TIP Loan Lenders release unconditionally, and are hereby deemed to release unconditionally, the Agent and the Consenting Prepetition Lenders, and each of their respective directors, officers, employees, agents, representatives, shareholders, partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such, from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever (including, without limitation, those arising under the Bankruptcy Code or nonbankruptcy law), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, taking place on or prior to the Petition Date through and including the Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the Debtor (including, but not limited to, any claims on account of the Guaranties), (iii) the Prepetition Loan Documents, (iv) the management, operation, or financing of the Debtor and the Debtor's Estate, or (v) the formulation, negotiation, implementation, confirmation, or consummation of this Plan, the Disclosure Statement, the Trustee's Consent, or any other

1    contract, instrument, release, or other agreement or document entered into during the Chapter 11

2    Case, or otherwise created in connection with this Plan or the Debtor.

3            Notwithstanding the foregoing:

4    (x)    To the extent that actions are brought or continued by or for the benefit of the non-

5            Consenting Prepetition Lenders against the Settling Builders, the Settling Builders

6            shall not be deemed to have released any counterclaims or defenses arising under

7            or relating to the Prepetition Credit Documents; and

8    (y)    the release contained in Section 8.8 of the Plan and paragraph III.E.4 hereof shall

9            not be interpreted to be a release by the Settling Builders or the TIP Loan Lenders

10           of (i) obligations created by the Plan, (ii) any claims that do not arise under or

11           relate to the Prepetition Credit Documents or the Debtor, and (iii) with respect to

12           KB Home and its affiliates, claims relating to properties purchased in relation to

13           the Inspirada development by Essex Real Estate Partners, LLC and/or Las Vegas

14           Developments Associates, Inc.

15           5.    Effective as of the Effective Date, in consideration for the settlements

16   contained in the Plan, in the event a Successor Agent is appointed, the Successor Agent shall, and

17   shall be deemed to, release any Claims against the Agent and Consenting Prepetition Lenders

18   under the Prepetition Credit Agreement or otherwise, including for future indemnity or expense

19   reimbursement, except with respect to the Consenting Prepetition Lenders: (a) Claims relating to

20   the costs to prosecute the MI Litigation (assuming the election to prosecute is made under the

21   Plan), provided; however, that the Successor Agent may only offset unpaid fees and expenses

22   against the proceeds of the MI Litigation, and (b) Claims, including counter claims or cross

23   claims, asserted by the Meritage Parties against JPMorgan Chase Bank, N.A., in any capacity,

24   including as Agent, which do not directly address the Meritage Parties' liability for, and amount

25   of damages with respect to, the Meritage Repayment Guaranty. In all other respects, pursuant to

26   the Prepetition Credit Agreement and the Consenting Lenders' Prepetition Participation

27   Agreement, the Successor Agent shall only be entitled to seek indemnity and expense

28   reimbursement from the non-Consenting Prepetition Lenders and, with respect to the Meritage

1  Repayment Guaranty action, the Settling Builders. Nothing set forth herein, shall relieve nor be

2  deemed to relieve, the Consenting Prepetition Lenders from their obligations under the

3  Prepetition Credit Agreement as amended by the First Amendment to Prepetition Credit

4  Agreement, to the Agent, and JPMorgan Chase Bank, N.A. in the event of the Appointment of a

5  Successor Agent, including, without limitation, their obligations for expense reimbursement and

6  indemnification.

7      6.  In accordance with Section 8.10 of the Plan, none of (a) the Debtor, the

8  Reorganized Debtor, or the Estate Representative, (b) the Agent, (c) the Consenting Prepetition

9  Lenders, (d) the Settling Builders, (e) the TIP Loan Lenders, (f) the Trustee, and (g) with respect

10  to each of the foregoing Entities, each of their respective directors, officers, employees, agents,

11  representatives, shareholders, partners, members, affiliates, attorneys, investment bankers,

12  restructuring consultants, and financial advisors in their capacities as such (collectively, the

13  "Exculpated Parties"), shall have or incur any liability to any Entity for any act or omission in

14  connection with, relating to, or arising out of the Chapter 11 Case, the formulation, negotiation,

15  implementation, confirmation, or consummation of this Plan, the Disclosure Statement, or any

16  contract, instrument, release, or other agreement or document entered into during the Chapter 11

17  Case or otherwise created in connection with this Plan; provided, however, that nothing in

18  Section 8.10 of the Plan shall be construed to release or exculpate any Exculpated Party from

19  (i) its obligations set forth in the Plan, or (ii) willful misconduct or gross negligence as

20  determined by a Final Order.

21      7.  Nothing in this Confirmation Order, the Plan or the Plan Documents shall

22  impair the Focus Parties' rights under the Focus Settlement Agreement, and such agreement shall

23  be fully enforceable according to its terms notwithstanding the confirmation of the Plan or the

24  occurrence of the Effective Date in connection therewith.

25    **F.**  **Bar Dates And Miscellaneous Provisions.**

26      1.  All Professional Compensation Claims incurred through and including the

27  Effective Date shall be filed no later than sixty days after the Plan's Effective Date, pursuant to

28  Section 4.5 of the Plan. All Rejection Claims arising from the rejection of executory contracts

1     shall be filed within thirty days after entry of this Confirmation Order, pursuant to Section 5.4 of

2     the Plan.

3             2.      This Confirmation Order is a final order and the period in which an appeal

4     must be filed shall commence upon the entry hereof.

5             3.      In accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and

6     notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), this

7     Confirmation Order shall not be stayed and shall be effective immediately upon its entry.

8             Respectfully submitted this 27th day of October, 2011

| | |
|---|---|
| LEWIS AND ROCA LLP | MORRISON & FOERSTER LLP |
| Robert M. Charles, Jr. (Nevada Bar No. 6593) | Norman S. Rosenbaum (admitted *pro hac vice*) |
| 3993 Howard Hughes Parkway, Suite 600 | Jordan A. Wishnew (admitted *pro hac vice*) |
| Las Vegas, Nevada 89169-5996 | Erica J. Richards (admitted *pro hac vice*) |
| | 1290 Avenue of the Americas |
| MORRISON & FOERSTER LLP | New York, New York 10104 |
| G. Larry Engel (admitted *pro hac vice*) | |
| 425 Market Street | |
| San Francisco, California  94105-2482 | |

9
10
11
12
13             Attorneys for JPMorgan Chase Bank, N.A., as Administrative Agent

| | |
|---|---|
| LAW OFFICES OF RICHARD McKNIGHT | STUTMAN TREISTER & GLATT PC |
| Richard McKnight (Nevada Bar No. 001313) | Robert A. Greenfield (admitted *pro hac vice*) |
| 330 S. Third Street #900 | K. John Shaffer  (admitted *pro hac vice*) |
| Las Vegas, Nevada 89101 | Anthony Arnold  (admitted *pro hac vice*) |
| | 1901 Avenue of the Stars, 12th Floor |
| | Los Angeles, California 90067 |

14
15
16
17             *Attorneys for the Settling Builders*

18
19
20
21
22
23
24
25
26
27
28

ny-998792

290659.1

1          LOCAL RULE 9021 CERTIFICATION

2    In accordance with LR 9021, counsel submitting this document certifies that the order accurately
     reflects the court's ruling and that (check one):

3    <u>XXXX</u>         This Court has waived the requirement set forth in LR 9021(b)(1).

4    _____         No party appeared at the hearing or filed an objection to the motion.

5
6    _____         I have delivered a copy of this proposed order to all counsel who appeared
                     at the hearing, and any unrepresented parties who appeared at the hearing,
                     and each has approved or disapproved the order, or failed to respond, as
7                    indicated below [list each party and whether the party has approved,
                     disapproved, or failed to respond to the document]:
8

9    _____         I certify that this is a case under Chapter 7 or 13, that I have served a copy
                     of this order with the motion pursuant to LR 9014(g), and that no party has
10                   objected to the form or content of the order

11

12   Submitted by:
     LEWIS AND ROCA LLP

13

14   By:    /s/ Robert M. Charles, Jr. (# 6593)
     Attorneys for JPMorgan Chase Bank, N.A.,
15   As Administrative Agent

16
                                          # # #
17

18

19

20

21

22

23

24

25

26

27

28

290659.1

# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

|  |  |  |
|---|---|---|
| In re: | ) | Case No.: 10-32968 (BAM) |
|  | ) |  |
| SOUTH EDGE, LLC, | ) | Chapter 11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## JOINT PLAN OF REORGANIZATION PROPOSED BY JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT UNDER THE PREPETITION CREDIT AGREEMENT, AND THE SETTLING BUILDERS (AMENDED AS OF OCTOBER 21, 2011)

LEWIS AND ROCA LLP
Robert M. Charles, Jr.
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
Telephone: (702) 949-8320
Facsimile: (702) 949-8321
E-mail: rcharles@LRLaw.com

MORRISON & FOERSTER LLP
G. Larry Engel (admitted *pro hac vice*)
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
E-mail: lengel@mofo.com

Norman S. Rosenbaum (admitted *pro hac vice*)
Jordan A. Wishnew (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
E-mail: nrosenbaum@mofo.com
E-mail: jwishnew@mofo.com

Attorneys for JPMorgan Chase Bank, N.A., as Administrative Agent

LAW OFFICES OF RICHARD McKNIGHT
Richard McKnight (Nevada Bar No. 001313)
330 S. Third Street #900
Las Vegas, Nevada 89101
Telephone: (702) 388-7185
Facsimile: (702) 388-0108
E-mail: rmcknight@lawlasvegas.com

STUTMAN, TREISTER & GLATT PC
Robert A. Greenfield (admitted *pro hac vice*)
K. John Shaffer (admitted *pro hac vice*)
Anthony Arnold (admitted *pro hac vice*)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
E-mail: rgreenfield@stutman.com
E-mail: jshaffer@stutman.com
E-mail: aarnold@stutman.com

Attorneys for the Settling Builders

# EXHIBIT 1
## TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND GENERAL PROVISIONS ...................................................1
    1.1.    Definitions. .................................................................................................................1
    1.2.    Interpretation. ...........................................................................................................14
    1.3.    Computation Of Time. .............................................................................................14
ARTICLE II CLASSIFICATION AND TREATMENT OF CLAIMS AND
    EQUITY INTERESTS ............................................................................................14
ARTICLE III TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...............................15
    3.1.    Class P1 – Priority Non-Tax Claims. ......................................................................15
        (A)    Classification. .............................................................................................15
        (B)    Allowance. ..................................................................................................15
        (C)    Treatment. ..................................................................................................16
        (D)    Impairment And Voting. ............................................................................16
    3.2.    Class S1 – Other Secured Claims. ...........................................................................16
        (A)    Classification. .............................................................................................16
        (B)    Allowance. ..................................................................................................16
        (C)    Treatment. ..................................................................................................16
        (D)    Impairment And Voting. ............................................................................17
    3.3.    Class S2 – LID Claims. ...........................................................................................17
        (A)    Classification. .............................................................................................17
        (B)    Allowance. ..................................................................................................17
        (C)    Treatment. ..................................................................................................17
        (D)    Impairment And Voting. ............................................................................17
    3.4.    Class S3 – Prepetition Lender Secured Claims. .......................................................17
        (A)    Classification. .............................................................................................17
        (B)    Summary Of Treatment. .............................................................................17
        (C)    Allowance And Treatment. .........................................................................18
        (D)    Manner Of Payments. .................................................................................19
        (E)    Impairment And Voting. ............................................................................20
        (F)    Meritage Repayment Guaranty Election. ..................................................20
        (G)    Consenting Prepetition Lender Assignment. ..............................................21
        (H)    Agent And Prepetition Lender Fees. ..........................................................21
    3.5.    Class U1 – Prepetition Lender Deficiency Claims. ..................................................22

i

EXHIBIT 1

EXHIBIT 1

  (A) Classification. ...................................................................22

  (B) Allowance. ......................................................................22

  (C) Treatment. ......................................................................22

  (D) Impairment And Voting. ..................................................22

 3.6. Class U2 – General Unsecured Claims. ...................................22

  (A) Classification. ...................................................................22

  (B) Allowance. ......................................................................22

  (C) Treatment. ......................................................................22

  (D) Impairment And Voting. ..................................................23

 3.7. Class U3 – Member Claims. ....................................................23

  (A) Classification. ...................................................................23

  (B) Allowance. ......................................................................23

  (C) Treatment. ......................................................................23

  (D) Impairment And Voting. ..................................................23

 3.8. Class E1 – Equity Interests. ....................................................23

  (A) Classification. ...................................................................23

  (B) Allowance. ......................................................................23

  (C) Treatment. ......................................................................23

  (D) Impairment And Voting. ..................................................24

**ARTICLE IV TREATMENT OF UNCLASSIFIED CLAIMS** ................................24

 4.1. Summary. ...............................................................................24

 4.2. TIP Loan Claims. ...................................................................24

 4.3. Administrative Expense Claims And Gap Claims. ...................24

 4.4. Priority Tax Claims. ..............................................................24

 4.5. Professional Compensation Claims. ........................................25

 4.6. Agent Adequate Protection Claims. ........................................25

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES** .......................................................................................26

 5.1. Assumption Or Rejection Of Executory Contracts And Unexpired
Leases Generally. ...................................................................26

  (A) Rejected Contracts And Leases. .........................................26

  (B) Assumed Obligations. ......................................................26

  (C) Right To Reject Assumed Obligations. ..............................26

 5.2. Payment Of Cure Amounts. .....................................................26

EXHIBIT 1

# EXHIBIT 1

| | | | |
|---|---|---|---|
| **5.3.** | | **Objections To Assumption And Proposed Cure Amounts.** | 27 |
| | (A) | Requirement Of Timely Objection. | 27 |
| | (B) | Consequences Of Failure To Object. | 27 |
| **5.4.** | | **Rejection Claims Bar Date.** | 27 |
| **5.5.** | | **Development Agreement And COH Acquisition Agreement.** | 28 |
| **ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN** | | | **28** |
| **6.1.** | | **Settling Builders' Funding Of The Plan.** | 28 |
| **6.2.** | | **Acquisition Of Assets By Acquirer.** | 29 |
| **6.3.** | | **Continued Estate And Debtor Corporate Existence.** | 29 |
| **6.4.** | | **Formation Of Acquirer.** | 29 |
| **6.5.** | | **Amendment To Prepetition Credit Agreement.** | 29 |
| | (A) | Filing Of Prepetition Credit Agreement Amendment. | 29 |
| | (B) | Effect Of Plan On Prepetition Credit Agreement and Prepetition Credit Agreement Amendment. | 29 |
| | (C) | The Agent And Successor Agent. | 30 |
| **6.6.** | | **Corporate Action.** | 31 |
| **6.7.** | | **Dismissal Of The Trustee.** | 31 |
| **6.8.** | | **Preservation Of Retained Actions.** | 31 |
| **6.9.** | | **Exemption From Certain Transfer Taxes.** | 31 |
| **6.10.** | | **Dismissal Of Litigation And Appeals Relating To Involuntary Petitions.** | 32 |
| **ARTICLE VII DISTRIBUTIONS AND CLAIMS RECONCILIATION** | | | **32** |
| **7.1.** | | **Payment Of Allowed Claims.** | 32 |
| **7.2.** | | **Time Of Distributions.** | 32 |
| **7.3.** | | **No Interest On Allowed Claims.** | 32 |
| **7.4.** | | **Claims Administration Responsibility.** | 33 |
| | (A) | Sole Responsibility Of The Estate Representative. | 33 |
| | (B) | Objections To Claims. | 33 |
| | (C) | Determination And Estimation Of Allowed Claims. | 33 |
| **7.5.** | | **Delivery Of Distributions.** | 33 |
| **7.6.** | | **Bar Date For Professional Compensation Claims And Other Administrative Expense Claims.** | 34 |
| **7.7.** | | **Procedures For Treating And Resolving Disputed And Contingent Claims.** | 34 |
| | (A) | No Distributions Pending Allowance. | 34 |

# EXHIBIT 1

# EXHIBIT 1

|  |  |  |  |
|---|---|---|---|
|  | (B) | Disputed Claim Reserve Account. | 34 |
|  | (C) | Distributions After Allowance. | 35 |
|  | (D) | Limitation On Distributions. | 35 |
|  | (E) | No Recourse. | 35 |
| 7.8. | | Compromises And Settlements. | 35 |
| 7.9. | | De Minimis Distributions. | 35 |
| 7.10. | | Setoffs And Recoupment. | 35 |
| 7.11. | | Compliance With Tax Requirements. | 36 |

**ARTICLE VIII EFFECT OF THIS PLAN ON CLAIMS AND INTERESTS** ........................**36**

| 8.1. | Vesting Of Assets. | 36 |
|---|---|---|
| 8.2. | Treatment Of Retained Actions And Avoidance Actions. | 36 |
| 8.3. | Post-Confirmation Injunction And Discharge. | 38 |
| 8.4. | Compromise And Settlement Of Claims, Interests, And Controversies. | 38 |
| 8.5. | Release Of Certain Parties By The Debtor, The Estate, And The Trustee. | 38 |
| 8.6. | Covenants Regarding Turnover Of Recoveries, Cooperation, And Not To Sue By The Agent And Consenting Prepetition Lenders. | 39 |
| 8.7. | Release Of The Settling Builders And The TIP Loan Lenders By The Agent And Prepetition Lenders. | 40 |
| 8.8. | Release Of The Agent And The Consenting Prepetition Lenders By The Settling Builders And The TIP Loan Lenders. | 41 |
| 8.9. | Release Of The Agent And The Consenting Prepetition Lenders By The Successor Agent. | 42 |
| 8.10. | Exculpation And Limitation Of Liability. | 43 |
| 8.11. | Meritage-Related Indemnification. | 43 |
| 8.12. | Several Liability Of Settling Builders. | 43 |
| 8.13. | Effect Of Confirmation. | 43 |
|  | (A) Binding Effect. | 43 |
|  | (B) Filing Of Reports. | 44 |

**ARTICLE IX CONDITIONS PRECEDENT** ........................................................................**44**

| 9.1. | Conditions To Confirmation. | 44 |
|---|---|---|
| 9.2. | Conditions To Occurrence Of The Effective Date. | 44 |
| 9.3. | Waiver Of Conditions Precedent. | 45 |
| 9.4. | Confirmation Deadline. | 45 |

EXHIBIT 1

## EXHIBIT 1

**ARTICLE X RETENTION AND SCOPE OF JURISDICTION OF THE BANKRUPTCY COURT** ...................................................................................45

    **10.1.**   Retention Of Jurisdiction. ...........................................................................45

    **10.2.**   Alternative Jurisdiction. .............................................................................47

**ARTICLE XI MISCELLANEOUS PROVISIONS** ....................................................47

    **11.1.**   Modification Of The Plan. ..........................................................................47

    **11.2.**   Effect Of Non-Occurrence Of Conditions To Confirmation. ....................47

    **11.3.**   Revocation Or Withdrawal Of The Plan. ...................................................47

    **11.4.**   Terms Binding. ...........................................................................................48

    **11.5.**   Successors And Assigns. .............................................................................48

    **11.6.**   Confirmation Order And Plan Control. ......................................................48

    **11.7.**   Governing Law. ..........................................................................................48

    **11.8.**   Severability. ...............................................................................................48

    **11.9.**   Incorporation By Reference. ......................................................................49

    **11.10.**  Payment Of Statutory Fees. .......................................................................49

    **11.11.**  Notices. ......................................................................................................49

    **11.12.**  Reservation Of Rights. ...............................................................................51

v

## EXHIBIT 1

# EXHIBIT 1

JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent under the Prepetition Credit Agreement, and KB Home Nevada Inc., a Nevada corporation, Coleman-Toll Limited Partnership, a Nevada limited partnership, Pardee Homes of Nevada, a Nevada Corporation, Beazer Homes Holdings Corp., a Delaware corporation, KB Home, a Delaware corporation, Toll Brothers, Inc., a Delaware corporation, Weyerhaeuser Real Estate Company, a Washington corporation, and Beazer Homes USA, Inc., a Delaware corporation, hereby collectively propose the following Joint Plan of Reorganization Proposed by JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent under the Prepetition Credit Agreement, and the Settling Builders for the resolution of the outstanding claims against and interests in South Edge, LLC, a Nevada limited liability company and chapter 11 debtor.  Reference is made to the Disclosure Statement (as hereinafter defined), distributed contemporaneously herewith, for a discussion of the Debtor's history, properties, and business operations, a summary and analysis of this Plan, and certain related matters.  Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, and in accordance with Sections 11.1 and 11.3 of this Plan, the Agent and the Settling Builders reserve the right to alter, amend, modify, revoke, or withdraw this Plan at any time prior to its substantial consummation.

## ARTICLE I

## DEFINITIONS AND GENERAL PROVISIONS

### 1.1. Definitions.

The following terms (which appear in this Plan as capitalized terms) shall have the meanings set forth below.

"**Acquirer**" means Inspirada Builders, LLC, the entity that will acquire the Assets pursuant to this Plan.

"**Acquisition Agreement**" means the Purchase and Sale Agreement and Joint Escrow Instructions (as amended by the First Amendment and Second Amendment to Purchase and Sale Agreement and Joint Escrow Instructions), dated November 1, 2004, executed by each Member wherein the Member agreed, among other things, to purchase certain land from the Debtor in order to develop, in part, a master planned community (for clarity, this definition does not include the COH Acquisition Agreement).

"**Administrative Expense Claim**" means a Claim for payment of an administrative expense of the kind described in Bankruptcy Code section 503(b) and entitled to priority under Bankruptcy Code section 507(a)(2), including, without limitation:

(a) any actual and necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estate or operating the business of the Debtor and the administration of the Estate by the Trustee;

(b) any actual expenses necessary or appropriate to facilitate or effectuate this Plan;

1

EXHIBIT 1

# EXHIBIT 1

(c) any amount required to be paid under Bankruptcy Code section 365(b)(1) in connection with the assumption of executory contracts or unexpired leases pursuant to this Plan;

(d) all Professional Compensation Claims; and

(e) all fees and charges payable by the Estate or the Trustee pursuant to section 1930 of title 28 of the United States Code;

provided, however, that Administrative Expense Claims shall not include Gap Claims.

  "**Agent**" means JPMorgan Chase Bank, N.A., in its capacity as Administrative Agent under the Prepetition Credit Agreement.

  "**Agent Adequate Protection Claims**" means the fee/expense reimbursement and superpriority administrative expense claims granted to the Agent, for itself and on behalf of the Prepetition Lenders, pursuant to the terms of the Cash Collateral Orders and the Final TIP Order.

  "**Allowed Claim**" means a Claim against the Debtor or the Estate, or any portion thereof, that either:

(a) has been allowed pursuant to this Plan or a Final Order; or

(b) satisfies all three of the following criteria: (i) the Claim is not a Disputed Claim, (ii) the Claim has not been disallowed by a Final Order, and (iii) either: (x) a proof of claim for such Claim has been timely filed with the Bankruptcy Court that has not been withdrawn or superseded, or (y) the Claim has been listed in the Schedules (as may have been amended) as neither disputed, contingent, nor unliquidated, and no proof of claim has been timely filed.

  Unless otherwise specified in this Plan or in a Final Order allowing such Claim, an Allowed Claim shall not include any interest on the amount of such Claim accruing from and after the Petition Date. If the Effective Date does not occur, the allowance of any Claim or portion thereof by the terms of this Plan shall be of no force or effect, and all rights of parties in interest with respect thereto shall be preserved.

  "**Allowed _____ Claim**" means a Claim of the particular type specified that is also an Allowed Claim (e.g., an Allowed Administrative Expense Claim is an Administrative Expense Claim that is also an Allowed Claim).

  "**Assets**" means all property of the Estate within the meaning of Bankruptcy Code section 541, of any nature whatsoever, including, without limitation, all property, real and personal, tangible and intangible, wherever situated, as such property exists on the Effective Date or thereafter, including, but not limited to:

(a) all real and personal property of the Debtor and the Estate that constitutes the "Inspirada" development;

2

EXHIBIT 1

## EXHIBIT 1

    (b)    all cash, accounts receivable, payment intangibles, and other rights to payment, including but not limited to the Estate's right to receive payments or reimbursements in connection with the LID; and

    (c)    all Causes of Action and Claims of any kind, including but not limited to Causes of Action and Claims of the Debtor, the Trustee, and the Estate against the Members for any unfunded capital contributions, obligations to acquire land within the "Inspirada" development (including so-called "takedown claims"), or other obligations under the Operating Agreement;

but excluding (x) all Assets that are being used to fund Distributions under this Plan, and (y) all Causes of Action released, waived, or extinguished by the Estate or the Trustee pursuant to this Plan or a Final Order.

    "**Assumed Obligations**" means, except as provided in Section 5.5 of this Plan, collectively, all payment and performance obligations of the Debtor under executory contracts, leases, and other obligations assumed by the Reorganized Debtor or the Acquirer pursuant to this Plan, all as identified by the Acquirer on the Contract Assumption Schedule and to the extent the foregoing are assumed in accordance with Section 5.1 of this Plan.

    "**Avoidance Actions**" means any Cause of Action of the Trustee or the Estate arising under Bankruptcy Code sections 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553, regardless of whether or not such Cause of Action was commenced prior to the Effective Date.

    "**Ballot**" means each of the ballot forms for voting to accept or reject this Plan distributed to all Holders who are entitled to vote on the Plan.

    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time, and also includes §§ 157, 158, 1334, 1408, 1412, and 1452 of title 28 of the United States Code to the extent applicable to the Chapter 11 Case.

    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Nevada, in which the Chapter 11 Case was filed, or any other court of competent jurisdiction that exercises original jurisdiction over the Chapter 11 Case.

    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075, and any applicable Local Rules and standing orders of the Bankruptcy Court, as amended from time to time.

    "**Builder Shares**" means the respective percentage shares of each pair of affiliated Settling Builders to be included in the Plan Supplement.

    "**Business Day**" means any day other than a Saturday, Sunday, or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

    "**Cash Collateral Orders**" means the order entered by the Bankruptcy Court on April 21, 2011 [D.E. 624], which approved a stipulation, between and among the Agent, the Trustee, and certain Members that was subsequently amended and extended by stipulations

3

## EXHIBIT 1

## EXHIBIT 1

approved by the Bankruptcy Court [*see* D.E. 676, 736, and 803], which provided the Trustee with continued use of the Agent's cash collateral in accordance with the terms thereof through July 29, 2011 (as such authorization may be further amended or supplemented).

> "**Causes of Action**" means any and all Claims and causes of action held by or capable of assertion by the Debtor, its Estate, and/or the Trustee, including, without limitation, all Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable, directly or derivatively, in law, equity, or otherwise, provided, however, that Causes of Action shall not include Claims of the Trustee for her own compensation or other rights that are personal to the Trustee.

> "**Chapter 11 Case**" means the reorganization proceedings of the Debtor under chapter 11 of the Bankruptcy Code, Case No. 10-32968 (BAM), filed with the Bankruptcy Court on the Petition Date.

> "**City**" means the City of Henderson, Nevada.

> "**Claim**" means a "claim" as defined in Bankruptcy Code section 101(5).

> "**Claims Bar Date**" means, as applicable, either:

(a)    June 29, 2011, the final date for all Entities asserting certain Claims against the Debtor or its Estate to file proofs of claim on account of such Claims, or such other date that may have been agreed upon by the Trustee and approved by the Bankruptcy Court for particular claimants;

(b)    August 2, 2011, the final date for governmental units asserting certain Claims against the Debtor or its Estate to file proofs of claim on account of such Claims, or such other date that may have been agreed upon by the Trustee and approved by the Bankruptcy Court for particular claimants;

(c)    thirty days after notice of an amendment to the Schedules with respect to a Claim that previously was scheduled in a liquidated, non-contingent, and undisputed amount, which amendment either (i) reduces the amount or lowers the priority status of such Claim, or (ii) changes the status of such Claim to unliquidated, contingent, or disputed;

(d)    such other date as the Bankruptcy Court may fix as the final date for filing proofs of claim on account of Rejection Claims pursuant to Sections 5.4 or 5.5 of this Plan; or

(e)    such other date as the Bankruptcy Court may fix as the final date for filing proofs of claim on account of Professional Compensation Claims and other Administrative Expense Claims pursuant to Section 7.6 of this Plan.

# EXHIBIT 1

**"Claims Objection Deadline"** means the later of (a) one hundred twenty days after the Effective Date or (b) sixty days after the filing of any Claim, including any Rejection Claim; provided, however, that (x) the deadline may be extended before its expiration by an order of the Bankruptcy Court, which may be obtained upon a showing of cause pursuant to an ex parte application by the Estate Representative, and (y) objections to Professional Compensation Claims and other Administrative Expense Claims shall be in accordance with Section 7.6 of the Plan.

**"Class"** means a category or group of substantially similar Claims or Equity Interests as designated in Articles II and III of this Plan.

**"COH Acquisition Agreement"** means the "Acquisition Agreement" by and between City and the Debtor dated as of April 1, 2006.

**"Collateral"** means any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is neither avoided nor otherwise deemed invalid pursuant to a Final Order.

**"Completion Guaranty"** means each respective "Completion Guaranty" made as of November 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), entered into by Members and Member Affiliates in favor of the Agent, for the benefit of the Prepetition Lenders.

**"Confirmation"** means the Bankruptcy Court's entry of the Confirmation Order with respect to this Plan.

**"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order.

**"Confirmation Hearing"** means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Code section 1128 to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**"Confirmation Order"** means an order and related findings of fact and conclusions of law of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code section 1129 that is, in form and substance, acceptable to each of the Plan Proponents.

**"Consenting Prepetition Lenders"** mean:

(a)     those Prepetition Lenders who (i) are signatories to the Plan Support Agreement, (ii) are assignees or transferees of signatories to the Plan Support Agreement, or (iii) with respect to Prepetition Lenders who do not fall within categories "i" or "ii" above, those who vote in favor of the Plan by so indicating on their Ballots; and

(b)     all assignees and transferees of the foregoing.

## EXHIBIT 1

"**Consenting Prepetition Lenders' Participation Agreement**" means the agreement between a Prepetition Lender and the Settling Builders that memorializes the parties' respective obligations to each other as is contemplated by Section 3.4(F) of this Plan (the "**Meritage Repayment Guaranty Election**"), the form of which will be included in the Plan Supplement.

"**Contract Assumption Schedule**" means the schedule of executory contracts, unexpired leases, and other Assumed Obligations to be assumed pursuant to Bankruptcy Code sections 365(a) and 1123, which the Acquirer shall file with the Bankruptcy Court no later than ten Business Days prior to the last day for parties to object to confirmation of the Plan and to vote to accept or reject the Plan; provided, however, as set forth in Section 5.5 of this Plan, the Development Agreement and COH Acquisition Agreement shall not be included on this Schedule, and to the extent such agreement is an executory contract, shall remain subject to assumption or rejection post-Effective Date in accordance with Section 5.5 of this Plan.

"**Cure Amount**" means an amount sufficient to satisfy the Debtor's or the Trustee's obligations under Bankruptcy Code section 365(b) with respect to the assumption or assignment of an executory contract or unexpired lease in accordance with the provisions of Article V of this Plan, as either (a) set forth on the Contract Assumption Schedule, or (b) if a non-Debtor party to such an executory contract or unexpired lease objects to the amount set forth on the Contract Assumption Schedule, an amount agreed to by the Acquirer and such non-Debtor party or, absent such agreement, an amount to be determined by the Bankruptcy Court.

"**Cutoff Dates**" shall have the meaning set forth in Section 3.4(H)(a) of this Plan.

"**Debtor**" means South Edge, LLC, a Nevada limited liability company, as debtor in the Chapter 11 Case.

"**Development Agreement**" means the development plans and related City contracts and agreements with the Clark County School District for the Debtor's development known as "Inspirada".

"**Disclosure Statement**" means the disclosure statement that accompanies this Plan, as approved by the Bankruptcy Court pursuant to Bankruptcy Code section 1125, and all supplements, schedules, and exhibits thereto.

"**Disputed Claim**" means any Claim against the Debtor or its Estate to the extent that one or more of the following applies:

(a)     the allowance of such Claim or any portion thereof is the subject of a pending objection, appeal, or motion to disallow or estimate that has been timely filed by a party in interest and which objection, appeal, or motion has not been determined by a Final Order;

(b)     during the period prior to the Claims Objection Deadline, such Claim is (i) not scheduled in the Schedules, (ii) scheduled with a different status as to priority or amount than that asserted by the Holder of the Claim, or (iii) asserted by the

## EXHIBIT 1

Holder of the Claim to be in excess of the amount scheduled in the Schedules as other than disputed, contingent, and/or unliquidated; or

(c)     such Claim is filed after the applicable Claims Bar Date;

provided, however, that any Claim that is allowed by a Final Order or this Plan shall not be a Disputed Claim to the extent of such allowance.  To the extent that a Claim has been disallowed by a Final Order, it shall be neither a Disputed Claim nor an Allowed Claim.

**"Disputed Claim Reserve Account"** means a segregated, interest bearing account maintained and administered by the Estate Representative for the purpose of holding cash in an amount no greater than the amount of the General Unsecured Claim Recovery Fund or such other amount required by the Bankruptcy Court and the Plan Support Agreement for Distribution on account of Disputed Claims pursuant to Section 7.7 of this Plan.

**"Distribution"** means any distribution to the Holders of Allowed Claims pursuant to Article VII of this Plan.

**"Distribution Date"** means either the Initial Distribution Date or the Final Distribution Date and any interim Distribution between such dates.

**"Effective Date"** means the date specified by the Plan Proponents in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall not be more than thirty calendar days after the Confirmation Date, provided if such date falls on a weekend or holiday, then it shall be the first Business Day thereafter.  The deadline for the Effective Date may be extended by the written consent of all of the Plan Proponents before the expiration thereof.

**"Entity"** means any person or other entity, including, without limitation, any individual, partnership, joint venture, association, corporation, limited liability company, limited liability partnership company, trust, estate, unincorporated organization, or governmental unit.

**"Equity Interest"** means the interest of any Member or other Holder of equity securities or other ownership interests of the Debtor represented by any issued and outstanding shares of common, preferred, or convertible preferred stock, membership interests, or other equity instrument evidencing an ownership interest in the Debtor, whether or not transferable, or any options, warrants, or rights, contractual or otherwise, obligating the Debtor to issue, transfer, purchase, redeem, or sell any equity securities or other ownership rights, any rights under any operating agreements, stock option plans, voting agreements, and registration rights agreements regarding equity securities or other ownership interests of the Debtor, any claims arising from the rescission of a purchase, sale, or other acquisition of any equity security or other ownership interests of the Debtor, any Claims for the payment of dividends or other similar distributions on any shares of common, preferred, or convertible preferred stock or membership interests of the Debtor, and any Claims for damages or any other relief arising from the purchase, sale, or other acquisition of any equity securities or other ownership interests issued by the Debtor.

**"Estate"** means the estate of the Debtor created by the commencement of the Chapter 11 Case pursuant to Bankruptcy Code section 541 and consisting of all Assets of the

7

EXHIBIT 1

## EXHIBIT 1

Debtor, to the extent such Assets have not been assigned or otherwise distributed pursuant to this Plan.

"**Estate Representative**" means the Acquirer, in its capacity as representative of the Estate after the Effective Date.

"**Exculpated Parties**" has the meaning ascribed to it in Section 8.10 of this Plan.

"**Final Distribution**" means the Distribution by the Estate Representative that satisfies all remaining Allowed Claims in accordance with and in the amounts required by the Plan.

"**Final Distribution Date**" means the Distribution Date, which shall be after the date on which all remaining Disputed Claims have been resolved by Final Order, on which the Final Distribution is made by the Estate Representative.

"**Final Order**" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction:

(a)     that has not been reversed, stayed, modified, or amended and as to which (i) any right to appeal or seek certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek certiorari, review, reargument, stay, or rehearing has expired and no such appeal or petition for certiorari, review, reargument, stay, or rehearing is pending; or

(b)     as to which an appeal has been taken or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay, or rehearing was sought or (ii) the time to further appeal or seek certiorari, further review, reargument, stay, or rehearing has expired and no such further appeal or petition for certiorari, further review, reargument, stay, or rehearing is pending.

"**Final TIP Order**" means the Final Order (1) Authorizing Chapter 11 Trustee To Obtain Senior Priming Secured Postpetition Financing; (2) Authorizing Chapter 11 Trustee's Use Of Cash Collateral; And (3) Deeming Agent, Prepetition Lenders And Builders Lenders To Be Adequately Protected, entered by the Bankruptcy Court on August 12, 2011, and any extensions, amendments, additions, or other modifications thereto.

"**Gap Claim**" means a Claim arising in the ordinary course of the Debtor's business or financial affairs after the Petition Date but before the Relief Date, as allowable pursuant to Bankruptcy Code section 502(f).

"**General Unsecured Claims**" means all Claims that do not qualify as either Agent Adequate Protection Claims, Administrative Expense Claims, Gap Claims, LID Claims, Member Claims, Other Secured Claims, Prepetition Lender Claims, Priority Non-Tax Claims, Priority Tax Claims, or TIP Loan Claims.

8

EXHIBIT 1

## EXHIBIT 1

"**General Unsecured Claim Recovery Fund**" means the sum of $1,000,000 in cash, which amount shall be made available to the Estate Representative on the Effective Date for Distribution to the Holders of Allowed General Unsecured Claims under this Plan.

"**Guaranties**" means the Completion Guaranties, the Limited Guaranties, and the Repayment Guaranties.

"**Holder**" means any Entity holding a Claim or an Equity Interest.

"**Initial Distribution Date**" means (i) the Effective Date with respect to Classes S3 and U1, and (ii) the first Business Day that is at least ten calendar days after the Effective Date for Allowed Claims in all other Classes and unclassified Allowed Claims.

"**Interim Compensation Procedures Order**" has the meaning ascribed to it in Section 4.5 of this Plan.

"**LID**" means Local Improvement District T-18.

"**LID Claim**" means any Claim asserted by or on behalf of the City on account of assessments on the Estate's property relating to the LID (including, but not limited to, those Claims asserted in (a) Proof of Claim No. 9, filed by the City, and (b) indirectly, Proof of Claim No. 17, filed by The Bank of New York Mellon Trust Co., N.A., as Indenture Trustee under the LID Indenture).

"**LID Indenture**" means the Trust Indenture by and between the City and The Bank of New York Trust Company, N.A., dated as of April 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time).

"**Lien**" means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, or encumbrance of any kind affecting such interest in property.

"**Limited Guaranty**" means each respective "Limited Guaranty" made as of November 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), entered into by Members and Member Affiliates in favor of the Agent, for the benefit of the Prepetition Lenders.

"**Local Rules**" means the Local Rules of the Bankruptcy Court, as amended.

"**Member**" means any current or former member of the Debtor, including but not limited to KB Home Nevada Inc., a Nevada corporation, Coleman-Toll Limited Partnership, a Nevada limited partnership, Pardee Homes of Nevada, a Nevada Corporation, Beazer Homes Holdings Corp., a Delaware corporation, Meritage Homes of Nevada, Inc. (f/k/a MTH Homes Nevada, Inc.), Focus South Group, LLC, Alameda Investments, LLC, and Kimball Hill Homes of Nevada, Inc.

"**Member Affiliate**" means any current or former insider or affiliate of any current or former Member, including but not limited to KB Home, a Delaware corporation, Toll Brothers, Inc., a Delaware corporation, Weyerhaeuser Real Estate Company, a Washington

# EXHIBIT 1

corporation, Beazer Homes USA, Inc., a Delaware corporation, Meritage Homes Corporation, John Ritter, Holdings Manager, LLC, Landtek, LLC, Focus Property Group, LLC, Cliffs Edge, LLC, Ssorb Consulting Inc., Woodside Group, Inc., and Kimball Hill, Inc.

"**Member Claim**" means a Claim against the Debtor asserted by any Member or Member Affiliate, including, but not limited to any successor in interest to such Claim on account of any transfer, assignment, creation of a bankruptcy estate, or otherwise.

"**Meritage Parties**" means Meritage Homes of Nevada, Inc. (f/k/a MTH Homes Nevada, Inc.) and Meritage Homes Corporation.

"**Meritage Repayment Guaranty**" means the Repayment Guaranty executed by the Meritage Parties.

"**Meritage Repayment Guaranty Escrow**" has the meaning set forth in Section 3.4(F) of this Plan.

"**MI Funds**" mean the approximately $26 million in "major infrastructure" deposit funds that are the subject of the MI Litigation.

"**MI Litigation**" means the adversary proceeding titled South Edge, LLC v. Focus South Group, LLC, *et al.*, adversary proceeding number 11-01141, pending in the Bankruptcy Court.

"**Operating Agreement**" means the Amended and Restated Operating Agreement of South Edge, LLC, dated May 3, 2004 (as amended, restated, supplemented, or otherwise modified from time to time).

"**Other Secured Claims**" means Secured Claims, if any, that were senior in Lien priority to the Prepetition Lender Claims as of the Petition Date, other than LID Claims. All Secured Claims that were junior in Lien priority to the Prepetition Lender Claims as of the Petition Date shall be treated as General Unsecured Claims under this Plan.

"**Petition Date**" means December 9, 2010, the date on which the Chapter 11 Case was commenced.

"**Plan**" means this Joint Plan of Reorganization proposed by the Agent and the Settling Builders, and all addenda, exhibits, schedules, supplements, and other attachments hereto, all of which are incorporated herein by reference, as the same may be amended from time to time.

"**Plan Proponents**" means collectively the Agent and the Settling Builders, as the proponents of this Plan within the meaning of Bankruptcy Code section 1127.

"**Plan Supplement**" means the supplemental appendix to the Plan. The Plan Proponents shall file the Plan Supplement with the Bankruptcy Court at least ten Business Days prior to the last day for parties to object to confirmation of the Plan.

10

EXHIBIT 1

# EXHIBIT 1

"**Plan Support Agreement**" means the "SOUTH EDGE, LLC Support for Proposed Settlement Term Sheet" dated as of May 19, 2011, and executed by the Settling Builders, the Agent, and the Consenting Prepetition Lenders, and all exhibits thereto, a copy of which (with certain redactions) is attached as **Exhibit B** to the Disclosure Statement.

"**Prepetition Credit Agreement**" means that certain Amended and Restated Credit Agreement dated as of March 9, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among South Edge, LLC, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and the Royal Bank of Scotland PLC, as Syndication Agent.

"**Prepetition Credit Agreement Amendment**" means the amendment to the Prepetition Credit Agreement to be prepared by the Plan Proponents and filed with the Plan Supplement.

"**Prepetition Credit Documents**" means collectively, the Prepetition Credit Agreement, each of the "Loan Documents" (as such term is defined in the Prepetition Credit Agreement), and all other agreements, instruments, notes, Guaranties, and other documents executed in connection therewith (as amended, restated, supplemented, or otherwise modified from time to time), including, without limitation, all collateral and security documents executed by the Debtor in favor of the Agent or the Prepetition Lenders, which are described in greater detail in the Agent's filed proof of claim.

"**Prepetition Lenders**" means the lenders party from time to time to the Prepetition Credit Agreement.

"**Prepetition Lender Claims**" means the aggregate amount owing by the Debtor under the Prepetition Credit Agreement and the other Prepetition Credit Documents as of the Effective Date, including (a) $327,855,500 in principal obligations, (b) all accrued and unpaid interest owing on such obligations, (c) all accrued and unpaid fees and expenses (including, without limitation, professional fees and expenses of the Agent and the Prepetition Lenders) that are chargeable or reimbursable under the Prepetition Credit Documents, and (d) all other fees, charges, and expenses that are chargeable or reimbursable under the Prepetition Credit Documents.

"**Prepetition Lender Deficiency Claim**" means the balance of the Prepetition Lender Claim that is not treated under this Plan as a Prepetition Lender Secured Claim, and which shall be an Allowed Claim under this Plan in Class U1.

"**Prepetition Lender Postpetition Recoveries**" means any amount received during the Chapter 11 Case by the Agent or the Prepetition Lenders from the Debtor or the Estate on account of the Prepetition Lender Claims, whether from LID proceeds or otherwise.

"**Prepetition Lender Secured Claim**" means the portion of the Prepetition Lender Claim that is treated as a Secured Claim as provided in Section 3.4 of this Plan, and which shall be an Allowed Claim under this Plan in Class S3.

11
EXHIBIT 1

## EXHIBIT 1

"**Priority Non-Tax Claims**" means any Claims that are entitled to priority pursuant to Bankruptcy Code section 507(a) (other than Administrative Expense Claims, Gap Claims, Priority Tax Claims, and TIP Loan Claims).

"**Priority Tax Claims**" means any Claims of a governmental unit of the kind entitled to priority in payment under Bankruptcy Code section 507(a)(8).

"**Professional Compensation Claim**" means any Claims for compensation, commission, indemnification, or reimbursement of expenses incurred by the Trustee, and by any attorneys, financial advisors, and other professionals retained by the Trustee pursuant to Bankruptcy Code sections 326, 327, 328, 330, 331, or 503(b) in connection with the Chapter 11 Case, including reasonable and necessary expenses in connection with final fee applications as permitted by applicable law.

"**Proportionate Share**" means an amount equal to the ratio (expressed as a percentage) that the amount of an Allowed Claim bears to the aggregate amount of all Allowed Claims and Disputed Claims in the same Class.

"**Relief Date**" means February 3, 2011, the date upon which the Bankruptcy Court entered the order for relief granting an involuntary chapter 11 petition against the Debtor, and ordered the appointment of a chapter 11 trustee.

"**Rejection Claims**" means any Claims against the Debtor or its Estate arising from the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise, including any Claims of lessors for damages resulting from the rejection of a lease of nonresidential real property calculated in accordance with Bankruptcy Code section 502(b)(6). All Rejection Claims shall constitute General Unsecured Claims for purposes of this Plan.

"**Released Parties**" has the meaning ascribed to it in Section 8.5 of this Plan.

"**Reorganized Debtor**" means the Debtor as it will be reorganized as of the Effective Date in accordance with this Plan.

"**Repayment Guaranty**" means each respective "Repayment Guaranty" made as of November 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), entered into by Members and Member Affiliates in favor of the Agent, for the benefit of the Prepetition Lenders.

"**Resolved MI Amount**" means the amount of the funds at issue in the MI Litigation that is determined by the Bankruptcy Court to either (i) be property of the Estate, or (ii) be subject to the Agent's ability to apply such funds to the partial satisfaction of (A) the Prepetition Lender Claims, or (B) the Agent's claims against Focus arising from any liability of Focus under the Prepetition Credit Documents or the Operating Agreement.

"**Retained Actions**" means all Claims and other Causes of Action that the Trustee, the Debtor, or the Estate could assert immediately prior to the Effective Date, including but not limited to (x) Avoidance Actions, and (y) Claims and Causes of Action under the

12

EXHIBIT 1

# EXHIBIT 1

Operating Agreement, but excluding all Causes of Action released, waived, or extinguished pursuant to this Plan or a Final Order.

"**Schedules**" means the schedules of assets and liabilities filed by the Trustee on behalf of the Debtor pursuant to Bankruptcy Code section 521(1) and Bankruptcy Rule 1007(b), as such schedules have been or may be amended or supplemented by the Trustee from time to time [*see* D.E. 647, 648, and 731].

"**Secured Claims**" means any Claims secured by valid, perfected, and non-avoidable Liens on Collateral to the extent of the value of such Collateral (a) as set forth in this Plan, (b) as agreed to by the Holder of such Claim and the Plan Proponents, or (c) as determined by a Final Order of the Bankruptcy Court in accordance with Bankruptcy Code section 506(a) or, in the event that such Claim is subject to setoff under Bankruptcy Code section 553, to the extent of such setoff. All Secured Claims that do not qualify as Other Secured Claims, Prepetition Lender Claims, or LID Claims shall be treated as General Unsecured Claims under this Plan.

"**Settling Builders**" mean KB Home Nevada Inc., a Nevada corporation, Coleman-Toll Limited Partnership, a Nevada limited partnership, Pardee Homes of Nevada, a Nevada Corporation, Beazer Homes Holdings Corp., a Delaware corporation, KB Home, a Delaware corporation, Toll Brothers, Inc., a Delaware corporation, Weyerhaeuser Real Estate Company, a Washington corporation, and Beazer Homes USA, Inc., a Delaware corporation.

"**Settling Builders' Consideration**" means an agreed amount of cash payment by the Settling Builders for the benefit of the Agent and the Prepetition Lenders, as set forth in Section 3.4 of this Plan. The Settling Builders' Consideration shall be funded by (a) $31.4 million from the Term Sheet Escrow, and (b) the Settling Builders contributing additional cash for the balance on the Effective Date.

"**Settling Builders' MI Makeup**" has the meaning set forth in Section 3.4 of this Plan.

"**Settling Builders' Repayment Guaranty Amount**" means the aggregate amount owing by the Settling Builders on their respective Repayment Guaranties as of the Effective Date, after application to the Prepetition Lenders' Claims of either the Resolved MI Amount or the Settling Builders' MI Makeup. For illustration purposes only, if (i) the Prepetition Lenders' Claims as of the Effective Date equal $382 million, (ii) the Resolved MI Amount equals $26 million, and (iii) Meritage is not a Settling Builder, then the total amount of the Settling Builders' Repayment Guaranty Amount shall be $295,480,000 (($382 million - $26 million) X 83%).

"**Settling Builders' Total Plan Contribution**" means the sum of the Settling Builders' Consideration and such other amounts as shall be required to fund the Settling Builders' obligations under this Plan. All amounts of the Settling Builders' Total Plan Contribution shall be contributed by the Settling Builders severally, pursuant to their Builder Shares, and nothing in this Plan shall create any joint liability of the Settling Builders.

## EXHIBIT 1

"**Successor Agent**" means the agent to be selected to replace JPMorgan Chase Bank, N.A., if and when such replacement is made, as agent under the Prepetition Credit Agreement, as provided in Section 6.5 hereof.

"**Term Sheet Escrow**" means the escrow funded by the Settling Builders pursuant to the Plan Support Agreement.

"**TIP Loan Claims**" means the Claims of the TIP Loan Lenders on account of the Bankruptcy Code section 364 financing they provided to the Trustee, on behalf of the Estate, pursuant to the Final TIP Order.

"**TIP Loan Lenders**" mean KB Home NV Acquisition LLC, Toll Henderson II LLC, Pardee Homes, a California corporation, and Trinity Homes, LLC.

"**Trustee**" means Cynthia Nelson, in her capacity as chapter 11 trustee of the Debtor.

### 1.2.    Interpretation.

For purposes of this Plan: (a) whenever appropriate, each term stated herein, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless otherwise provided in this Plan, any reference in this Plan to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) unless otherwise specified herein, any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns, and affiliates; (e) unless otherwise specified, all references in this Plan to Sections, Articles, schedules, and exhibits are references to Sections, Articles, schedules, and exhibits of or to this Plan; (f) the words "herein", "hereto", and "hereunder" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections of this Plan are inserted for convenience of reference only and are not intended to limit or otherwise affect the provisions of this Plan; and (h) the rules of construction set forth in Bankruptcy Code section 102 shall apply to the construction of this Plan.

### 1.3.    Computation Of Time.

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), the categories of Claims and Equity Interests set forth below classify all Claims against and Equity Interests in Debtor and its Estate for all purposes, including voting and Distributions pursuant to the Plan. A

# EXHIBIT 1

Claim or Equity Interest shall be deemed classified in a particular Class for purposes of voting on, and of receiving Distributions pursuant to, this Plan only to the extent that such Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.

The classification of Claims against and Equity Interests in the Debtor and its Estate pursuant to this Plan is as follows:

| Class | Claim/Interest | Status | Entitled to Vote |
|-------|----------------|--------|------------------|
| P1 | Priority Non-Tax Claims | Unimpaired | No |
| S1 | Other Secured Claims | Unimpaired | No |
| S2 | LID Claims | Unimpaired | No |
| S3 | Prepetition Lender Secured Claims | Impaired | Yes |
| U1 | Prepetition Lender Deficiency Claims | Impaired | Yes |
| U2 | General Unsecured Claims | Impaired | Yes |
| U3 | Member Claims (including Claims of Member Affiliates) | Impaired | No |
| E1 | Equity Interests | Impaired | No |

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, Gap Claims, Priority Tax Claims, and TIP Loan Claims have not been classified and are excluded from the foregoing Classes. Such Claims are treated in Article IV of this Plan.

In addition, the Claims of C & S Company, Inc. and Merchants Bonding Company are not included in any Class, because they were determined by the Bankruptcy Court to have waived any right to receive distributions from the Debtor and its Estate. If the Bankruptcy Court's determination is reversed by a Final Order on appeal, such Claims will be treated in Class U2 to the extent they are Allowed Claims and not paid from other sources.

## ARTICLE III

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**3.1.** **Class P1 – Priority Non-Tax Claims.**

**(A)** **Classification.**

Class P1 consists of all Priority Non-Tax Claims.

**(B)** **Allowance.**

Claims in Class P1 shall be allowed or disallowed in accordance with Section 7.4 of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

ny-983388

15

EXHIBIT 1

# EXHIBIT 1

**(C)    Treatment.**

The legal, equitable, and contractual rights of the Holders of Allowed Priority Non-Tax Claims shall remain unaltered by this Plan. On the Effective Date, except to the extent a Holder of an Allowed Priority Non-Tax Claim and the Settling Builders agree to a different treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Non-Tax Claim shall receive on account of and in full and complete settlement, release, and discharge of such Claim, at the Settling Builders' election, (i) cash in the amount of such Allowed Priority Non-Tax Claim in accordance with Bankruptcy Code section 1129(a)(9) or (ii) such other treatment required to render such Claim unimpaired pursuant to Bankruptcy Code section 1124. All Allowed Priority Non-Tax Claims that are not due and payable on or before the Effective Date shall be paid by the Acquirer when such Claims become due and payable in accordance with the terms thereof.

**(D)    Impairment And Voting.**

Class P1 is unimpaired, and the Holders of Claims in Class P1 are conclusively deemed to have accepted this Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Claims in Class P1 are not entitled to vote to accept or reject this Plan.

**3.2.    Class S1 – Other Secured Claims.**

**(A)    Classification.**

Class S1 consists of all Other Secured Claims. To the extent that the Holder of an Other Secured Claim is only partially secured, such Holder's deficiency shall be treated as a General Unsecured Claim in Class U2 or a Member Claim in Class U3, as applicable.

**(B)    Allowance.**

Claims in Class S1 shall be allowed or disallowed in accordance with Section 7.4 of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

**(C)    Treatment.**

Each Allowed Other Secured Claim shall, at the sole option of the Settling Builders, be treated as follows: (i) the Holder of such Claim shall receive cash in the amount of such Claim, (ii) the Plan will leave unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder thereof, in which case the Acquirer shall assume all of the Debtor's obligations to such Holder, or (iii) the Estate shall surrender all Collateral securing such Allowed Other Secured Claim to the Holder thereof as soon as practicable after the Effective Date, without representation or warranty by or recourse against the Debtor, the Estate, the Trustee, the Agent, the Prepetition Lenders, the Acquirer, or the Settling Builders, and in full and complete settlement, release, and discharge of such Other Secured Claim.

EXHIBIT 1

**(D)   Impairment And Voting.**

Class S1 is unimpaired, and the Holders of Claims in Class S1 are conclusively deemed to have accepted this Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Claims in Class S1 are not entitled to vote to accept or reject this Plan.

**3.3.   Class S2 – LID Claims.**

**(A)   Classification.**

Class S2 consists of all LID Claims.

**(B)   Allowance.**

Claims in Class S2 shall be Allowed Secured Claims in the amount owing on account of such Claims as of the Effective Date, as determined at the Confirmation Hearing.

**(C)   Treatment.**

Pursuant to Bankruptcy Code section 1124(1), the Plan leaves unaltered the legal, equitable, and contractual rights to which the holders of the LID Claims are entitled.

**(D)   Impairment And Voting.**

Class S2 is unimpaired, and each Holder of an Allowed LID Claim in Class S2 is conclusively deemed to have accepted this Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Claims in Class S2 are not entitled to vote to accept or reject this Plan.

**3.4.   Class S3 – Prepetition Lender Secured Claims.**

**(A)   Classification.**

Class S3 consists of all Prepetition Lender Secured Claims.

**(B)   Summary Of Treatment.**

The Plan provides for a net recovery to the Agent and the Prepetition Lenders of between $330 million and $340 million, funded by (i) the Settling Builders' Consideration, (ii) the Resolved MI Amount, the Settling Builders' MI Makeup, or a combination thereof, and (iii) LID reimbursements and other recoveries that may be received by the Agent or the Prepetition Lenders during the Chapter 11 Case (i.e., the Prepetition Lender Postpetition Recoveries); <u>provided</u>, <u>however</u>, if the Agent and Prepetition Lenders (in connection with the Prepetition Lenders' effectuating the Plan) incur fees and expenses in excess of $2.0 million from and after the Cutoff Dates through the Effective Date, then the Prepetition Lender Postpetition Recoveries shall first be credited towards such excess fees until paid in full, and then credited against the Settling Builders' Consideration. In addition, the Agent and the Prepetition Lenders shall receive during the Chapter 11 Case reimbursement of accrued fees and expenses as set forth in Section 3.4(H). The treatment for Class S3 shall be in full and complete settlement,

17

EXHIBIT 1

## EXHIBIT 1

release, and discharge of the Prepetition Lender Secured Claims and Liens vis-à-vis the Estate and its Assets.

### (C)  Allowance And Treatment.

The amount of the Allowed Prepetition Lender Secured Claims in Class S3, and the treatment thereof, shall depend upon the resolution of the MI Litigation as follows:

#### (i)  Scenario 1.

If, on or before the Effective Date, the Resolved MI Amount is determined to be at least $26 million (either through a judgment of the Bankruptcy Court or a settlement of the MI Litigation), then on the Effective Date:

(a)  The Prepetition Lender Secured Claims shall be deemed allowed on the Effective Date pursuant to this Plan in the amount of $339.5 million; and

(b)  The Allowed Prepetition Lender Secured Claims shall be paid in cash and in full on the Effective Date out of (i) the Resolved MI Amount equal to $26 million, (ii) the Prepetition Lender Postpetition Recoveries, and (iii) the Settling Builders' Consideration.  The Settling Builders' Consideration shall consist of $313.5 million, less the Meritage Repayment Guaranty Escrow and the Prepetition Lender Postpetition Recoveries.

#### (ii)  Scenario 2.

In the event that the Resolved MI Amount is determined on or before the Effective Date to be less than $26 million (either by a judgment of the Bankruptcy Court or settlement), or if the Bankruptcy Court has not yet resolved the MI Litigation on or before the Effective Date, then on the Effective Date:

(a)  The Prepetition Lender Secured Claims shall be deemed allowed on the Effective Date pursuant to this Plan in the amount of $329.5 million plus any Resolved MI Amount that is between $16 million and $26 million;

(b)  The Allowed Prepetition Lender Secured Claims shall be paid in cash and in full on the Effective Date out of (i) the Resolved MI Amount, (ii) the Prepetition Lender Postpetition Recoveries (if any), and (iii) the Settling Builders' Consideration.  The Settling Builders' Consideration shall consist of:

(i)  $313.5 million, less the Meritage Repayment Guaranty Escrow and the Prepetition Lender Postpetition Recoveries, in full satisfaction of the Settling Builders' respective Repayment Guaranty obligations; and

(ii)  an amount of cash equal to the amount that the Resolved MI Amount is less than $16 million (the "Settling Builders' MI Makeup").  By way of example, (x) if the Bankruptcy Court determines that only $10 million of the MI Funds may be applied to the Allowed Prepetition Lender Secured

# EXHIBIT 1

Claims, then the Settling Builders shall pay an additional $6 million in Settling Builders' MI Makeup, or (y) if the Bankruptcy Court determines that $20 million of the MI Funds may be applied to the Prepetition Lender Secured Claims, then the Settling Builders shall pay no additional Settling Builders' MI Makeup. In the event that the Agent and the Prepetition Lenders elect to continue the MI Litigation in accordance with Section 3.4(C)(ii)(c) herein, the Settling Builders' MI Makeup shall be $16 million.

(c) Notwithstanding the foregoing, the Agent (or its designee) and the Prepetition Lenders, in their sole discretion, shall have the right, with such decision to be made on or prior to the Effective Date, to continue the MI Litigation post-Effective Date, if such litigation is not resolved by such time. The first recoveries up to the amount of $16 million (net of the Successor Agent's (or, if applicable, Agent's) and Prepetition Lenders' reasonable legal fees and expenses) will be paid to the Settling Builders as reimbursement for the Settling Builders' MI Makeup.

By way of example, if the Agent recovers $20 million in the MI Litigation (net of expenses), and the Settling Builders have made a $16 million Settling Builders' MI Makeup payment, the first $16 million shall be paid to the Settling Builders as reimbursement of the Settling Builders' MI Makeup, and the Agent shall retain $4 million. In the event the Agent and the Prepetition Lenders do not elect to continue the prosecution of any MI Fund litigation post-Effective Date, the Settling Builders' payment of the Settling Builders' MI Makeup pursuant to this Scenario 2 shall be in full satisfaction of the Agent's and Prepetition Lenders' rights to the MI Funds, and following the Effective Date, the Acquirer shall have the right to pursue any claims to such funds that the Estate, the Agent, or the Prepetition Lenders had prior to the Effective Date.

### (D) Manner Of Payments.

Of the amounts paid to the Prepetition Lenders pursuant to either Scenario 1 or 2:

(a) an amount equal to the liability of the Settling Builders under their respective Repayment Guaranties as of the Effective Date shall be treated as being paid directly by the Settling Builders to the Agent, which payment shall (x) satisfy the Settling Builders' obligations under the Repayment Guaranties in full, and (y) pursuant to section 6 of each Repayment Guaranty, entitle the Settling Builders to be subrogated to the Agent's Liens against the portion of the Debtor's project to be purchased by the Settling Builders under their respective Acquisition Agreements; and

(b) the remainder shall be treated as a portion of the Settling Builders' consideration to the Estate for the acquisition of the Assets (which consideration also shall include, among other things, (i) the Settling Builders' release of the subrogation liens obtained through the immediately preceding subparagraph, (ii) the Settling

19
EXHIBIT 1

## EXHIBIT 1

Builders' satisfaction of the TIP Loan Claims, and (iii) the Settling Builders' satisfaction of all other Allowed Claims against the Estate that they (or the Acquirer) are required to pay under this Plan).

**(E)** **Impairment And Voting.**

Class S3 is impaired, and each Holder of an Allowed Prepetition Lender Secured Claim in Class S3 shall be entitled to vote to accept or reject this Plan, pursuant to Bankruptcy Code section 1126 and any additional voting procedures approved by the Bankruptcy Court; provided, however, pursuant to the Plan Support Agreement, the Consenting Prepetition Lenders have agreed to vote in a manner consistent with the terms of the Plan Support Agreement.

**(F)** **Meritage Repayment Guaranty Election.**

The Settling Builders shall pay into an escrow account (the "**Meritage Repayment Guaranty Escrow**") an amount equal to the portion of the Settling Builders' Consideration under the Plan that is equal to the amount of the Meritage Repayment Guaranty liability as of the Effective Date (estimated to be between $12.4 million and $12.8 million). Any Prepetition Lender (either a Consenting Prepetition Lender or a non-Consenting Prepetition Lender) may elect (with such election to be reflected on its Ballot) to assign to the Settling Builders a participation in the assigning Prepetition Lender's pro rata interest in the Meritage Repayment Guaranty claim under the Prepetition Credit Agreement, and in exchange for the assignment of such participation, the assigning Prepetition Lender's pro rata interest in the Meritage Repayment Guaranty Escrow shall be delivered to such Prepetition Lender on the Effective Date. To the extent that any portion of the Meritage Repayment Guaranty Escrow is not paid to electing Prepetition Lenders, then such amount (which shall be in an amount mutually agreed to by the Plan Proponents) shall be disbursed to the Acquirer.

By electing to assign a participation in the Meritage Repayment Guaranty claim, the electing Prepetition Lender agrees to direct (consistent with the instructions of the Settling Builders) a sub-Agent (to be appointed by the Agent or Successor Agent) to pursue and, if instructed by the Settling Builders, settle the litigation concerning the Meritage Repayment Guaranty claim, which litigation shall be funded and directed solely by the Settling Builders, and the electing Prepetition Lenders shall be relieved of any obligation, financial or otherwise, including indemnity or expense reimbursement, with respect to any such litigation.

Nothing in this Section 3.4(F) affects the rights of (x) the non-Consenting Prepetition Lenders to pursue the Completion Guaranty or Limited Guaranty claims against the Settling Builders or Meritage Parties (if and to the extent such claims may be asserted by any Prepetition Lenders in their individual capacity, as opposed to by the Agent or Successor Agent on their behalf) or to instruct the Agent or Successor Agent to commence such actions under the Prepetition Credit Agreement Amendment (provided, however, that any recovery from such actions shall be subject to the turn over of any share of such recoveries otherwise payable to the Consenting Prepetition Lenders under Sections 6.5 and 8.6 hereof, and further provided that, with the exception of their obligations under Sections 6.5 and 8.6 of the Plan, the Consenting Prepetition Lenders shall have no further obligations under the Prepetition Credit Agreement or Prepetition Credit Agreement Amendment, including, without limitation, with respect to voting,

## EXHIBIT 1

indemnity, or expense reimbursement), or (y) any Prepetition Lender to receive its allocable portion of any recovery on the Meritage Repayment Guaranty (to the extent such Prepetition Lender does not elect to opt out of the Meritage Repayment Guaranty Election as provided for under this Section 3.4(F)).

The Acquirer (either on its own behalf or as Estate Representative) shall retain all of the Debtor's, the Trustee's, and the Estate's Claims and Causes of Action against the Meritage Parties, as part of the Retained Actions.

### (G) Consenting Prepetition Lender Assignment.

The Consenting Prepetition Lenders will be deemed to assign to the Settling Builders (or their designees) their rights to any additional distributions (*e.g.* distributions other than from the Debtor, its Estate, or the Settling Builders' Consideration under Section 3.4(C) of this Plan) from Members, Member Affiliates, or other Credit Parties (as such term is defined in the Prepetition Credit Agreement (whether directly or through the Agent or Successor Agent)) on account of the Prepetition Lender Claims, including, but not limited to: (a) any Claims or Causes of Action arising under the Guaranties or other Prepetition Credit Documents, (b) any related tort, breach of duty, breach of contract, or other such Claims or Causes of Action, and (c) any Claims asserted, and cash or non-cash distributions received thereon, in the bankruptcy cases of any Members or Member Affiliates. To the extent that any cash or other property is held by the Agent, Successor Agent, or Consenting Prepetition Lenders that would be subject to this Section 3.4(G), such cash or other property shall be held in trust for the benefit of the Settling Builders and promptly remitted to them.

### (H) Agent And Prepetition Lender Fees.

To the extent not already paid prior to the Effective Date, the Settling Builders shall indefeasibly pay:

(a) all accrued and unpaid fees and expenses of the Agent and the Prepetition Lenders that were incurred through the dates (the "Cutoff Dates") reflected on the itemized invoices and statements previously delivered by the Agent to the Settling Builders, in the amount of approximately $3.5 million; provided, however, that any such amount in excess of $2.4 million shall not be paid until the Effective Date, and will not be paid out of the TIP Loan, but rather out of the Settling Builders' Consideration on the Effective Date; and

(b) as provided in section 11.03(a) of the Prepetition Credit Agreement, up to $2.0 million to reimburse the reasonable fees, expenses, and charges of the Agent and the Prepetition Lenders incurred in effectuating the Plan after the Cutoff Dates. In addition, to the extent that reasonable fees, expenses, and charges of the Agent and the Prepetition Lenders incurred in effectuating the Plan after the Cutoff Dates exceed $2.0 million, then all Prepetition Lender Postpetition Recoveries shall be applied to such excess fees, expenses, and charges, as provided in Section 3.4(B).

# EXHIBIT 1

**3.5.    Class U1 – Prepetition Lender Deficiency Claims.**

**(A)    Classification.**

Class U1 consists of all Prepetition Lender Deficiency Claims.

**(B)    Allowance.**

Claims in Class U1 shall deemed allowed on the Effective Date in an aggregate amount equal to the difference between the Prepetition Lender Claims and the Prepetition Lender Secured Claims.

**(C)    Treatment.**

Each Holder of an Allowed Prepetition Lender Deficiency Claim shall receive in full and complete settlement, release, and discharge of such Claim vis-à-vis the Estate and its Assets, a ratable share of $500,000, to be funded from the Settling Builders' Total Plan Contribution.

**(D)    Impairment And Voting.**

Class U1 is impaired, and each Holder of an Allowed Prepetition Lender Deficiency Claim shall be entitled to vote to accept or reject this Plan, pursuant to Bankruptcy Code section 1126 and any additional voting procedures approved by the Bankruptcy Court.

**3.6.    Class U2 – General Unsecured Claims.**

**(A)    Classification.**

Class U2 consists of all General Unsecured Claims.

**(B)    Allowance.**

Claims in Class U2 shall be allowed or disallowed in accordance with Sections 7.4 and 7.7 of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

**(C)    Treatment.**

Each Holder of an Allowed General Unsecured Claim shall receive, on account of and in full and complete settlement, release, and discharge of such Claim on the later of (i) the Initial Distribution Date or (ii) the first Distribution Date after the date on which such General Unsecured Claim becomes an Allowed Claim, such Holder's Proportionate Share of the General Unsecured Claim Recovery Fund; provided, however, that under no circumstances shall any Holder's Proportionate Share of the General Unsecured Claim Recovery Fund exceed 100% of such Holder's Allowed General Unsecured Claim.  Any portion of the General Unsecured Claim

EXHIBIT 1

Recovery Fund that is not distributed to the Holders of Allowed General Unsecured Claims shall be retained by the Acquirer.

        **(D)**     **Impairment And Voting.**

Class U2 is impaired, and each Holder of an Allowed General Unsecured Claim in Class U2 shall be entitled to vote to accept or reject this Plan, pursuant to Bankruptcy Code section 1126 and any additional voting procedures approved by the Bankruptcy Court.

      **3.7.**    **Class U3 – Member Claims.**

        **(A)**     **Classification.**

Class U3 consists of all Member Claims.

        **(B)**     **Allowance.**

Claims in Class U3 shall be allowed or disallowed in accordance with Sections 7.4 and 7.7 of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

        **(C)**     **Treatment.**

Each Holder of an Allowed Member Claim shall receive no distribution under the Plan.

        **(D)**     **Impairment And Voting.**

Class U3 is impaired, but because the Allowed Member Claims are receiving no Distributions under this Plan, Holders of Allowed Member Claims are conclusively deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g) and are thus not entitled to vote to accept or reject the Plan.

      **3.8.**    **Class E1 – Equity Interests.**

        **(A)**     **Classification.**

Class E1 consists of all Equity Interests in the Debtor.

        **(B)**     **Allowance.**

Equity Interests in the Debtor shall be deemed allowed on the Effective Date pursuant to this Plan.

        **(C)**     **Treatment.**

Equity Interests in the Debtor shall be cancelled and duly extinguished upon the final administration of the Estate by the Estate Representative, and the Holders of Equity

23

EXHIBIT 1

Case 1:16-cv-01963-PMH-RAP Document 2 Filed 02/26/11 Page 77 of 110
Case 1:10-32996-hb Doc 1335 Entered 10/27/11 16:1...90 Page 30 of 65

EXHIBIT 1

Interests in the Debtor shall not be entitled to receive or retain any property on account of such Equity Interests.

### (D) Impairment And Voting.

Class E1 is impaired, but because the Holders of Equity Interests in the Debtor are receiving no Distributions under this Plan, Holders of Equity Interests are conclusively deemed to have rejected this Plan pursuant to Bankruptcy Code section 1126(g) and are thus not entitled to vote to accept or reject the Plan.

## ARTICLE IV

## TREATMENT OF UNCLASSIFIED CLAIMS

### 4.1. Summary.

Pursuant to Bankruptcy Code section 1123(a)(1), Agent Adequate Protection Claims, Administrative Expense Claims (including Professional Compensation Claims), Gap Claims, Priority Tax Claims, and TIP Loan Claims are not classified for purposes of voting on, or receiving Distributions under, this Plan, and the Holders of such unclassified Claims are thus not entitled to vote to accept or reject the Plan. All such Claims are instead treated separately in accordance with this Article IV.

### 4.2. TIP Loan Claims.

All TIP Loan Claims shall be allowed and paid in full in cash on the Effective Date with the proceeds of the Settling Builders' Total Plan Contribution.

### 4.3. Administrative Expense Claims And Gap Claims.

Subject to certain additional requirements for Professional Compensation Claims set forth in Section 4.5 of this Plan, each Holder of an Allowed Administrative Expense Claim or Allowed Gap Claim shall receive, on account of and in full and complete settlement, release, and discharge of such Claim, cash equal to the full unpaid amount of such Allowed Administrative Expense Claim or Allowed Gap Claim, as the case may be, on the latest of (i) the Initial Distribution Date, (ii) the date such Claim becomes an Allowed Administrative Expense Claim or Allowed Gap Claim, or (iii) such other date as may be agreed upon by the Settling Builders and the Holder of such Claim. All Allowed Administrative Expense Claims against the Estate that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Acquirer in accordance with the terms thereof or accorded such other treatment as may be permitted under Bankruptcy Code section 1129(a)(9).

### 4.4. Priority Tax Claims.

Unless otherwise agreed by the Settling Builders and the Holder of an Allowed Priority Tax Claim (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against the Debtor or its Estate that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release, and

## EXHIBIT 1

discharge of such Claim, cash equal to the amount of such Allowed Priority Tax Claim on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as practicable. All Allowed Priority Tax Claims against the Estate that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Acquirer in accordance with the terms thereof or accorded such other treatment as may be permitted under Bankruptcy Code section 1129(a)(9).

### 4.5. Professional Compensation Claims.

All Entities seeking an award by the Bankruptcy Court of a Professional Compensation Claim incurred through and including the Effective Date are required (unless otherwise ordered by the Bankruptcy Court) to file final applications for the allowance of compensation for services rendered and reimbursement of expenses incurred within sixty days after the Effective Date, provided, however, that until the hearing on the final fee applications, the Trustee's professionals may continue to seek interim monthly payments of their fees and expenses in connection with all pre-Effective Date services in accordance with the Order Pursuant To 11 U.S.C. Sections 105(a) And 331, Fed. R. Bankr. P. 2016 Authorizing And Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals [Docket No. 822] (the "Interim Compensation Procedures Order"); and provided further that the Builder Lenders shall continue to fulfill all of their obligations under the Final TIP Order that, by the terms of the Final TIP Order and TIP Loan survive the maturity date of the TIP Loan, including, without limitation, their obligations under Section 2.3(b) of the TIP Loan. Holders of Professional Compensation Claims that file final applications in accordance with the Plan shall be paid in full in cash in the amounts approved by the Bankruptcy Court that have not previously been paid: (a) on or as soon as reasonably practicable following the date on which the order relating to the allowance of any such Allowed Professional Compensation Claim is entered; or (b) on such other terms mutually agreed upon by the Settling Builders and the Holder of an Allowed Professional Compensation Claim. Allowed Professional Compensation Claims shall include reasonable and necessary expenses incurred by the Trustee and her Professionals after the Effective Date in connection with any final fee application, subject to approval by the Bankruptcy Court, and any such post-Effective Date fees and expenses of the Trustee and her professionals shall be treated as if subject to the Interim Compensation Procedures Order.

### 4.6. Agent Adequate Protection Claims.

All Agent Adequate Protection Claims shall be deemed to be satisfied in full based upon the payments to be received by the Agent and the Prepetition Lenders pursuant to Sections 3.4 and 3.5 of this Plan.

EXHIBIT 1

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 5.1. Assumption Or Rejection Of Executory Contracts And Unexpired Leases Generally.

#### (A) Rejected Contracts And Leases.

On the Effective Date (and subject to Section 5.5 hereof), all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected in accordance with the provisions and requirements of Bankruptcy Code sections 365 and 1123, <u>except</u> those executory contracts, unexpired leases, and other obligations that (i) have previously been assumed by the Trustee pursuant to an order of the Bankruptcy Court, (ii) are the subject of a motion to assume filed by the Trustee at any time prior to the Effective Date, or (iii) are Assumed Obligations listed in the Contract Assumption Schedule. Subject to Section 5.5 hereof, the Acquirer may identify additional executory contracts, unexpired leases, and other obligations to be assumed or assigned in accordance with the Plan, with such contracts, leases, and other obligations to be added to the Contract Assumption Schedule, and assumed or assigned as of the Effective Date. The Trustee shall not seek the assumption or rejection of any executory contract or unexpired lease without the approval of the Plan Proponents.

#### (B) Assumed Obligations.

Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the Debtor's or Acquirer's assumption or assignment of the Assumed Obligations listed in the Contract Assumption Schedule, as of the Effective Date pursuant to Bankruptcy Code section 365(a).

#### (C) Right To Reject Assumed Obligations.

Notwithstanding anything in this Section 5.1 to the contrary, if either (i) there is either a dispute as to the Cure Amount, or (ii) the non-Debtor party otherwise objects to assumption or assignment to the Acquirer, then in either case the Reorganized Debtor or Acquirer, as applicable, shall have the right to abandon the assumption of any such contract, lease, or other agreement listed on the Contract Assumption Schedule, and to treat such contract, lease, or other agreement as rejected under the Plan at any time during the pendency of such dispute.

### 5.2. Payment Of Cure Amounts.

The Contract Assumption Schedule shall list the proposed Cure Amount, if any, with respect to each Assumed Obligation included therein. Cure Amounts with respect to the Assumed Obligations will be satisfied, pursuant to Bankruptcy Code section 365(b)(1): (i) by payment of the Cure Amount in cash on the Initial Distribution Date or, (ii) in the event a timely objection to assumption or assignment of the Assumed Obligation or to the proposed Cure

26

EXHIBIT 1

Amount is raised in accordance with Section 5.3 of this Plan, as soon as practicable after the Cure Amount is determined by the Bankruptcy Court in a Final Order, or agreed to by the Reorganized Debtor or the Acquirer, as applicable, and the non-Debtor party to the Assumed Obligation.

### 5.3. Objections To Assumption And Proposed Cure Amounts.

#### (A) Requirement Of Timely Objection.

If any non-Debtor party to an Assumed Obligation opposes the Reorganized Debtor's or Acquirer's assumption or assignment of such Assumed Obligation for any reason (including, but not limited to, (i) the assertion of the existence of a monetary or non-monetary default under such Assumed Obligation, (ii) any dispute as to the Cure Amount set forth in the Contract Assumption Schedule, or (iii) any dispute as to the ability of the Reorganized Debtor or the Acquirer to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365)), then such non-Debtor party to the Assumed Obligation must file an objection with the Bankruptcy Court no later than the deadline for filing objections to Confirmation of this Plan. Such objection shall be served on the Plan Proponents, and shall state (w) the Cure Amount to which such non-Debtor party claims it is entitled; (x) the amount of the Rejection Claim which such non-Debtor would be able to assert if the Assumed Obligation were rejected by the Trustee; (y) the nature of any defaults with respect to such Assumed Obligation; and (z) any other basis upon which the non-Debtor party opposes the assumption or assignment of the Assumed Obligation.

#### (B) Consequences Of Failure To Object.

Failure to timely file and serve an objection in accordance with this Section 5.3 shall constitute the non-Debtor party's consent to the Debtor's or the Acquirer's assumption or assignment of the Assumed Obligation, and a determination by the Bankruptcy Court that, upon payment of the Cure Amount (if any), no defaults shall exist under such Assumed Obligation. Any non-Debtor party that fails to object timely to the proposed Cure Amount or to the assumption or assignment of any contract, unexpired lease, or other obligation to which it is a party shall be forever barred and estopped from asserting any Claims against the Reorganized Debtor, the Estate, the Acquirer, and Plan Proponents, or any Entity acting on behalf of the foregoing that arose prior to the Effective Date with respect to such contract or unexpired lease or with respect to any additional agreements, either oral or written, that may be related thereto.

### 5.4. Rejection Claims Bar Date.

All proofs of claim with respect to Rejection Claims arising from the rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise must be filed with the Bankruptcy Court within thirty days after the entry of an order by the Bankruptcy Court, which may be the Confirmation Order, authorizing the rejection of such executory contract or unexpired lease. All Rejection Claims that become Allowed Claims shall be treated as General Unsecured Claims or Member Claims, as ordered by the Bankruptcy Court. Any Rejection Claims that are not timely filed in accordance with the foregoing provision shall be forever barred and shall not be enforceable against the Reorganized Debtor, the Estate, the Acquirer, any

## EXHIBIT 1

Plan Proponent, or any property of the Reorganized Debtor, the Estate, any Plan Proponent, or the Acquirer.

### 5.5. Development Agreement And COH Acquisition Agreement.

Notwithstanding anything to the contrary in this Article V, the Plan shall defer the decision by the Settling Builders to assume or reject the Development Agreement, the COH Acquisition Agreement, and other development-related agreements with the City and Clark County School District (to the extent the Development Agreement (a portion of which is an ordinance of the City), the COH Acquisition Agreement, and such other agreements constitute executory contracts under Bankruptcy Code section 365) until after the Effective Date. The rights of the Trustee under section 365 and the Plan Proponents under section 1123(b)(2) with respect to the assumption or rejection of such contracts shall vest in the Settling Builders as of the Effective Date. The City has acknowledged that it will consider modifications to the LID T-18 and Master Plans (the Development Agreement), which modifications, if acceptable, will be made only in accordance with, and subject to the satisfaction of all requirements of all applicable laws, rules, regulations, ordinances, and statutes, as applicable, of both the City and State of Nevada, including but not limited to NRS 271, as amended, NRS 278, as amended, and all provisions of the LID T-18 documents and all other documents and agreements currently in place between the City and the Debtor related to the project or the LID bonds. If the Development Agreement, the COH Acquisition Agreement, and other related contracts, permits, and entitlements are determined to be executory contracts at the time of such decision, then such contracts shall be subject to Article V of the Plan.

Notwithstanding any other provision of the Plan, the COH Acquisition Agreement may not be assumed or assigned until such time as the City has given its consent, which consent shall not be unreasonably withheld as provided in section 6.2 of the COH Acquisition Agreement, and such consent must be received before any motion to assume or assign may be filed. All other related City contracts for Inspirada that constitute or are a part of the definition of Development Agreement shall stand alone and shall each individually be subject to the requirements of Bankruptcy Code section 365, to the extent each is an executory contract. Until such time as the COH Acquisition Agreement is assumed, assigned, or rejected, it shall remain in the Estate and be administered by the Estate Representative.

### ARTICLE VI

### MEANS FOR IMPLEMENTATION OF THE PLAN

### 6.1. Settling Builders' Funding Of The Plan.

The Settling Builders shall, through the Settling Builders' Total Plan Contribution, contribute sufficient cash (severally pursuant to their Builder Shares) to the account of the Estate Representative to fund payments required under this Plan to (a) Holders of Allowed Claims (to the extent such payments are not provided to be paid from other funds, such as the MI Funds or the LID bond funds of completed LID segments), and (b) Holders of Allowed Administrative Expenses, Gap Claims, Priority Tax Claims, and TIP Loan Claims.

EXHIBIT 1

### 6.2. Acquisition Of Assets By Acquirer.

In exchange for the consideration provided by the Settling Builders in Section 6.1 of this Plan, the Acquirer shall obtain, free and clear of all liens, claims, and encumbrances, all of the Assets of the Debtor and the Estate, including, among other things, (a) all real and personal property owned by the Debtor and the Estate not otherwise settled or released under the Plan, and (b) the Retained Actions; provided, however, that the Assets shall be subject to unimpaired Class S2 LID Claims and such other governmental rights and entitlements that run with the land. Notwithstanding the foregoing, the Settling Builders may, in their sole and absolute discretion, elect to leave certain Assets in the Estate, as may be indentified in a filing with the Bankruptcy Court prior to the Effective Date.

### 6.3. Continued Estate And Debtor Corporate Existence.

The Assets of the Estate shall not revest in the Reorganized Debtor. Rather, to the extent such Assets are not transferred to the Acquirer, such Assets shall be administered by the Estate Representative (free and clear of all liens, claims, and encumbrances) until such time as the Estate Representative determines that the Assets have been fully liquidated or abandoned by the Estate Representative to the Acquirer (such abandonment may occur without the necessity of any further order of the Bankruptcy Court). The Reorganized Debtor shall continue to exist only for as long as is necessary to complete the administration of the Estate, under the administration and control of the Estate Representative. The Estate Representative shall have the sole authority to act in the name of the Reorganized Debtor, as representative of the Estate and its attorney-in-fact, to pursue and/or liquidate any remaining Assets of, and Claims or Causes of Action of, the Debtor and the Estate, without the interference of any Member or Member Affiliate. The Reorganized Debtor shall be dissolved upon the final administration of the Estate.

### 6.4. Formation Of Acquirer.

The Acquirer shall be formed by the Settling Builders prior to the Effective Date.

### 6.5. Amendment To Prepetition Credit Agreement.

#### (A)  Filing Of Prepetition Credit Agreement Amendment.

The Prepetition Credit Agreement Amendment shall be prepared by the Plan Proponents and filed with the Plan Supplement.

#### (B)  Effect Of Plan On Prepetition Credit Agreement and Prepetition Credit Agreement Amendment.

The rights of the Prepetition Lenders shall be preserved as they exist under the Prepetition Credit Documents, except that:

    (a)    the total Distributions to be received by the Agent and the Prepetition Lenders from the Debtor and its Estate shall be in the amount provided for in (and limited by) the treatment of Class S3 and Class U1 under this Plan;

29

EXHIBIT 1

# EXHIBIT 1

(b)    the Repayment Guaranties executed by the Settling Builders shall be fully satisfied and released pursuant to the treatment of Class S3 under this Plan;

(c)    the Consenting Prepetition Lenders shall have no more executory obligations, exposures, or recoveries, including without limitation, voting, expense reimbursement or indemnification (except for those obligations expressly stated in this Plan, including the provisions of this Section 6.5, and the obligation to turn over excess proceeds to the Settling Builders pursuant to Section 8.6 hereof);

(d)    The Settling Builders shall succeed to the rights of the Consenting Prepetition Lenders for purposes of the pro rata sharing of payments required by section 2.18(c) of the Prepetition Credit Agreement. On or after the Effective Date, any such pro rata distributions to which the Consenting Prepetition Lenders would be entitled to receive from the non-Consenting Prepetition Lenders shall be assigned to the Settling Builders, pursuant to the turnover mechanism contemplated by Section 8.6 hereof. Notwithstanding the foregoing, the Settling Builders will not be treated as "Lenders" under the Prepetition Credit Agreement, and will not have voting rights thereunder; provided, however, that through the voluntary election by Prepetition Lenders under Section 3.4(F) hereof, the Settling Builders shall be entitled, on such electing Prepetition Lenders' behalf, to direct and instruct the sub-Agent with respect to the Meritage Repayment Guaranty in accordance with the terms of the Consenting Prepetition Lenders' Participation Agreement; and

(e)    Subject to the terms of this Plan (and conditioned upon the Consenting Prepetition Lenders receiving all payments to which they are entitled on the Plan's Effective Date pursuant to Article III hereof), the Agent or Successor Agent shall pay to the Settling Builders all further payments allocated to the Consenting Prepetition Lenders.

### (C)    The Agent And Successor Agent.

JPMorgan Chase Bank, N.A. shall retain its right to resign as the agent pursuant to section 10.06(c) of the Prepetition Credit Agreement, with such timing to be in JPMorgan Chase Bank, N.A.'s sole discretion. If in the event of such resignation the "Required Lenders" (as such term is defined in the Prepetition Credit Agreement) do not select a Successor Agent, then JPMorgan Chase Bank, N.A. shall appoint a Successor Agent in accordance with the terms of the Prepetition Credit Agreement.

Section 11.03(c) of the Prepetition Credit Agreement and other sections thereof to be identified (i.e., expense and reimbursement provisions) shall survive confirmation vis-à-vis the Prepetition Lenders, such that the Prepetition Lenders' obligation to indemnify the Agent shall continue to inure for the benefit of both the Successor Agent and JPMorgan Chase Bank, N.A.

To the extent necessary, the pro rata provisions in the Prepetition Credit Agreement shall be amended to reflect the arrangements contained in this Plan.

EXHIBIT 1

### 6.6. Corporate Action.

Each of the matters provided for under this Plan involving the corporate structure and eventual dissolution of the Reorganized Debtor or corporate action to be taken by or required by the Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the Trustee, Members, Member Affiliates, creditors, owners, or managers of the Reorganized Debtor.

### 6.7. Dismissal Of The Trustee.

Except as expressly provided in this Plan, as of the Effective Date, the Trustee shall be dismissed, the Trustee's bond shall be exonerated, and she shall be released and discharged of and from all powers, duties, responsibilities, and obligations related to and arising from and in connection with the Debtor, the Estate, and the Chapter 11 Case, provided, however, that the Trustee and her professionals shall have standing to file and be heard on their Professional Compensation Claims.

### 6.8. Preservation Of Retained Actions.

The Reorganized Debtor or the Acquirer (on its own behalf or as Estate Representative) shall retain and may (but shall not be required to) investigate and prosecute all of the Retained Actions, and the Reorganized Debtor or the Acquirer (on its own behalf or as Estate Representative) may assert any such Retained Action for purposes of setoff, recoupment, disallowance under Bankruptcy Code section 502(d), or as other defenses to Claims. The Acquirer (on its own behalf or as Estate Representative), in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce the Retained Actions (or decline to do any of the foregoing) without further approval of the Bankruptcy Court.

### 6.9. Exemption From Certain Transfer Taxes.

Pursuant to Bankruptcy Code section 1146, (a) the issuance, transfer, or exchange of any securities, instruments, or documents, (b) the creation of any Lien, mortgage, deed of trust, or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under this Plan or the transfer or sale of any real or personal property of the Estate or the Debtor pursuant to, in implementation of, or as contemplated in this Plan, and (d) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and

31
EXHIBIT 1

EXHIBIT 1

directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

**6.10. Dismissal Of Litigation And Appeals Relating To Involuntary Petitions.**

As soon as reasonably possible following the Effective Date, the Plan Proponents, the Consenting Prepetition Lenders, the Reorganized Debtor, the Estate Representative, and the Trustee shall take all actions necessary:

(a) to cause the dismissal without prejudice of all litigation by the Agent and the Consenting Prepetition Lenders against the Settling Builders (provided that any subsequent actions by the Agent, Successor Agent, or Prepetition Lenders shall be subject to Sections 8.6 and 8.7 hereof); and

(b) to cause the dismissal with prejudice of all appeals relating to the involuntary commencement of the Chapter 11 Case and the appointment of the Trustee.

**ARTICLE VII**

**DISTRIBUTIONS AND CLAIMS RECONCILIATION**

**7.1. Payment Of Allowed Claims.**

Unless otherwise specified herein, the Estate Representative shall make the Distributions required under this Plan on the Initial Distribution Date, or as soon as practicable thereafter, on account of all Allowed Claims in accordance with the provisions of Article III of this Plan.

**7.2. Time Of Distributions.**

Except as otherwise provided for in this Plan or ordered by the Bankruptcy Court, Distributions under this Plan shall be made on the Initial Distribution Date and on each Distribution Date thereafter.

**7.3. No Interest On Allowed Claims.**

Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a post-petition agreement in writing between the Estate Representative and a Holder of an Allowed Claim, postpetition interest shall not accrue or be paid on Allowed Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on such Claim from and after the Petition Date. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date (a) such Disputed Claim becomes an Allowed Claim or (b) the date a Final Distribution is made with respect to such Allowed Claim.

## EXHIBIT 1

**7.4.    Claims Administration Responsibility.**

**(A)    Sole Responsibility Of The Estate Representative.**

On and after the Effective Date, the Estate Representative shall have sole responsibility and authority for administering, disputing, objecting to, compromising, and settling, or otherwise resolving and making Distributions with respect to all Claims, including all Administrative Expense Claims; provided, however, that the Agent or Successor Agent shall have the sole responsibility for administering Distributions to holders of Allowed Prepetition Lender Claims.

**(B)    Objections To Claims.**

Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and filed on or before the Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if the Estate Representative effects service of such objection in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable in the Chapter 11 Case by Bankruptcy Rule 7004; (ii) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory to the applicable proof of claim or other representative identified in the proof of claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Case.

**(C)    Determination And Estimation Of Allowed Claims.**

Except as otherwise agreed to by the Estate Representative in writing or as set forth in this Plan, the Allowed amount of any Claim as to which a proof of claim was timely filed in the Chapter 11 Case, and which Claim is subject to an objection filed before the Claims Objection Deadline, shall be determined and liquidated pursuant to a Final Order. Upon such determination, the Claim shall become an Allowed Claim to the extent allowed by a Final Order, and will be satisfied in accordance with this Plan. Furthermore, the Bankruptcy Court shall have the authority to estimate the amount of Claims for the purpose of enabling Distributions.

**7.5.    Delivery Of Distributions.**

Except as provided in Section 7.4(A) of this Plan, Distributions to Holders of Allowed Claims shall be made by the Estate Representative, (a) at the addresses set forth on the proofs of claim filed by such Holders (or at the last known addresses of such holders if no proof of claim is filed), (b) at the addresses set forth in any written notice of change of address delivered to the Estate Representative, or (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Estate Representative has not received a written notice of a change of address. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Estate Representative is notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest. Amounts in respect of undeliverable Distributions made in cash shall be retained by the Acquirer until such Distributions are claimed. All cash Distributions

# EXHIBIT 1

returned to the Acquirer and not claimed within six months of return shall be irrevocably retained by the Acquirer.

Checks issued by the Estate Representative on account of Allowed Claims shall be null and void if not negotiated within ninety days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Estate Representative by the Holder of the Allowed Claim with respect to which the check was originally issued. Any Claim in respect of a voided check shall be made on or before the six month anniversary of the date of issuance of such check. After such date, all Claims and respective voided checks on account thereof shall be discharged and forever barred, and the Acquirer shall retain all moneys related thereto notwithstanding any federal or state escheat laws to the contrary.

### 7.6. Bar Date For Professional Compensation Claims And Other Administrative Expense Claims.

All applications for final allowance of Professional Compensation Claims of professional persons employed by the Trustee pursuant to orders entered by the Bankruptcy Court and on account of services rendered prior to the Effective Date, and all other requests for payment of Administrative Expense Claims shall be filed with the Bankruptcy Court no later than sixty days after the Effective Date and served on the Acquirer at the addresses set forth in Section 11.11 of this Plan. Any such Claim that is not served and filed within this time period shall be discharged and forever barred. Unless such deadline is extended by the Bankruptcy Court, objections to any application for allowance of an Administrative Expense Claim must be filed within thirty days after the filing thereof. The Acquirer and Estate Representative shall have sole responsibility for filing objections to requests for allowance of Administrative Expense Claims; provided, however, that the Office of the United States Trustee and any party in interest may be heard with respect to Professional Compensation Claims.

### 7.7. Procedures For Treating And Resolving Disputed And Contingent Claims.

#### (A) No Distributions Pending Allowance.

No Distributions shall be made with respect to any portion of a Disputed Claim unless and until such Disputed Claim has become an Allowed Claim. All objections to Claims shall be filed on or before the Claims Objection Deadline, and all Claims with respect to which objections have been filed on or before the Claims Objection Deadline shall be treated as Disputed Claims for purposes of this Plan.

#### (B) Disputed Claim Reserve Account.

The Estate Representative shall establish the Disputed Claim Reserve Account as soon as practicable after the Effective Date. The Disputed Claim Reserve Account shall hold cash in such amount as the Estate Representative reasonably determines is necessary to enable it to make the Proportionate Share Distributions required to be made to the Holders of Allowed General Unsecured Claims once the allowance or disallowance of each Disputed Claim, including any filed or anticipated Rejection Claims, is ultimately determined.

ny-983388

34

EXHIBIT 1

# EXHIBIT 1

**(C)    Distributions After Allowance.**

From and after the Effective Date, promptly after a Disputed Claim becomes an Allowed Claim, the Estate Representative shall distribute to the Holder of such Allowed Claim any cash or other property that would have been distributed to the Holder of such Allowed Claim on the dates Distributions were previously made to Holders of other Allowed Claims in the same Class, had such Claim been an Allowed Claim on such dates.

**(D)    Limitation On Distributions.**

Notwithstanding anything to the contrary in this Plan, under no circumstances shall any Holder of an Allowed Claim be entitled to receive Distributions that exceed, on a cumulative basis, the lesser of (i) the Allowed amount of such Claim, or (ii) the amount that such Claim was estimated by the Bankruptcy Court for purposes of establishing reserves.

**(E)    No Recourse.**

No Holder of a Disputed Claim shall have any recourse against the Debtor, the Reorganized Debtor, the Estate, the Estate Representative, the Agent, the Prepetition Lenders, the Trustee, the Settling Builders, the Acquirer, or any of their respective directors, officers, employees, agents, partners, members, attorneys, investment bankers, restructuring consultants, and financial advisors, in the event that the Disputed Claim Reserve Account established by the Estate Representative pursuant to this Plan is insufficient to pay the portion of such Disputed Claim that becomes an Allowed Claim.

**7.8.    Compromises And Settlements.**

From and after the Effective Date, the Estate Representative shall be authorized to compromise and settle any Disputed Claim and to execute all necessary documents, including a stipulation of settlement or release, in its sole discretion, without notice to any party, and without the need for Bankruptcy Court's approval.

**7.9.    De Minimis Distributions.**

On or after the Effective Date, the Estate Representative shall have no obligation to make a Distribution on account of an Allowed Claim from the Disputed Claim Reserve Account or otherwise if the amount to be distributed on account of such Allowed Claim is less than $20.00. In the event a Holder of an Allowed Claim is entitled to a Distribution that is not a whole dollar amount, the actual payment made may reflect a rounding of such fractional portion of such Distribution down or up to the nearest whole dollar.

**7.10.    Setoffs And Recoupment.**

On or after the Effective Date, the Estate Representative may, but shall not be required to, setoff or recoup against any Allowed Claim and the Distributions to be made pursuant to this Plan on account of such Claim, Causes of Action of any nature that the Debtor, the Reorganized Debtor, or the Acquirer (on account of having acquired the Debtor's Assets)

35

EXHIBIT 1

may have against the Holder of such Allowed Claim, except to the extent such Causes of Action are released by this Plan.

### 7.11. Compliance With Tax Requirements.

In connection with this Plan, to the extent applicable, the Estate Representative shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to this Plan that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of this Plan, each Entity that has received any Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

## ARTICLE VIII

## EFFECT OF THIS PLAN ON CLAIMS AND INTERESTS

### 8.1. Vesting Of Assets.

On the Effective Date, all property of the Estate and any and all other rights and Assets of the Debtor of every kind and nature (including the Retained Actions and Avoidance Actions) shall vest in the Acquirer free and clear of all Liens, Claims, and Equity Interests, except as specifically provided for in this Plan or the Confirmation Order. As of the Effective Date, the Acquirer shall be authorized to operate its business and to use, acquire, and dispose of property and settle and compromise Claims, Equity Interests, or Causes of Action (either in its own right or as Estate Representative) without supervision of the Bankruptcy Court and without notice to any party, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except those restrictions explicitly imposed by this Plan and the Confirmation Order.

### 8.2. Treatment Of Retained Actions And Avoidance Actions.

#### (i) Retained Actions.

Except as otherwise set forth in this Plan and the Confirmation Order, pursuant to Bankruptcy Code section 1123(b)(3)(B), on the Effective Date, all Retained Actions of any kind or nature whatsoever against third parties arising before the Effective Date shall become property of the Acquirer, or remain in the Estate to be administered by the Estate Representative. From and after the Effective Date, the Estate Representative or the Acquirer may commence any suit or other proceeding for the enforcement of Retained Actions (other than with respect to the Released Parties), and furthermore, the Estate Representative or the Acquirer shall be authorized to assert such Retained Actions (other than with respect to the Released Parties) for purposes of objecting to the allowance of any Claim pursuant to Bankruptcy Code section 502(d). **Except as specifically provided herein and in Sections 8.5 through 8.10 of this Plan, nothing contained in this Plan shall constitute a release, satisfaction, or settlement of the Retained Actions, nor shall it constitute a waiver of the rights, if any, of any party to a jury trial with respect to any Retained Action, and nothing in this Plan or the Confirmation Order shall constitute a waiver or release of any Retained Action under the doctrine of *res judicata* nor shall any**

36

EXHIBIT 1

## EXHIBIT 1

Retained Action be barred or limited by any doctrine of estoppel, whether judicial, equitable, or otherwise. **The Acquirer and Estate Representative have the full right to pursue all Retained Actions, subject to the option of the Agent and the Prepetition Lenders to pursue the MI Litigation pursuant to Section 3.4(C)(ii)(c) of this Plan, including but not limited to pursuing Claims and Causes of Action against Members and Member Affiliates that are not Settling Builders.**

Among other things, the Acquirer and the Estate Representative reserve the right to pursue:

1. All Claims and Causes of Action against non-Settling Builder Members and non-Settling Builder Member Affiliates (including all Claims and Causes of Action against Focus South Group, Holdings Manager, Landtek, the Meritage Parties, Kimball Hill, Alameda, Woodside, and their affiliates and insiders) under the Operating Agreement, the Members' Acquisition Agreements with the Debtor, and any other agreements between such Members/Member Affiliates and the Debtor (and regardless of whether such agreements are assumed or rejected under the Plan); moreover, the Agent (or Successor Agent) may pursue Claims and Causes of Action against such parties (including actions on guarantees not otherwise satisfied under the Plan), the proceeds of which may benefit the Settling Builders pursuant to the terms of the Plan.

2. Avoidance actions, including the fraudulent transfer claims the Trustee has brought against Focus South Group and Holdings Manager (except to the extent such Avoidance Actions are expressly released by the terms of the Plan).

3. Non-bankruptcy Claims and Causes of Action that arose in the ordinary course of the Debtor's business, including Claims and Causes of Action against suppliers, contractors, and other parties that provided goods or services to the Debtor.

Confirmation of the Plan shall not prejudice the Debtor's, Estate Representative's, or Acquirer's ability to pursue such Retained Actions and Avoidance Actions. Nor shall confirmation prejudice any party's ability to assert defenses to such Retained Actions and Avoidance Actions (provided, however, that confirmation of the Plan shall constitute a final determination by the Bankruptcy Court, which shall be binding on all parties-in-interest, that the proposing, confirmation, and consummation of the Plan by each of the Plan Proponents was in good faith and in accordance with law).

(ii) **Avoidance Actions.**

Except as otherwise set forth in this Plan, pursuant to Bankruptcy Code section 1123(b)(3)(B), on the Effective Date all Avoidance Actions of any kind or nature whatsoever against third parties (other than Released Parties) arising before the Effective Date shall become property of the Acquirer. **The Acquirer and Estate Representative have the full right to pursue all Avoidance Actions, including but not limited to pursuing Claims and Causes of Action against Members and Member Affiliates that are not Settling Builders.**

## EXHIBIT 1

**8.3.    Post-Confirmation Injunction And Discharge.**

Because the Debtor will be liquidating its Assets, the Debtor will not receive a discharge under this Plan.  However, **until all remaining Assets of the Reorganized Debtor and the Estate are administered, and except as otherwise provided in this Plan or the Confirmation Order, all Entities shall be barred from asserting against the Debtor, the Estate, or the Reorganized Debtor, or their respective successors or property, any other or further Claims, demands, debts, rights, Causes of Action, liabilities, or Equity Interests based upon any act, omission, cause, transaction, state of facts, or other activity of any kind or nature that occurred prior to the Effective Date.**

**8.4.    Compromise And Settlement Of Claims, Interests, And Controversies.**

Pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all specified Claims, Interests, Causes of Action that are being settled among the Agent, the Consenting Prepetition Lenders, the Settling Builders, the Debtor, the Estate, and their specified related parties under the Plan, and controversies relating to the contractual and legal rights that such specified Holders of a Claim or Interest may have with respect to any specified Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, Holders of Claims and Interests, and other parties in interest, and that the same is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Estate Representative may compromise and settle Claims against the Debtor and Causes of Action of the Debtor or its Estate against other Entities.  Moreover, because the Plan is a good-faith settlement as to the Released Parties, no co-defendant or joint tortfeasors shall have any indemnity or contribution claims, which shall be disallowed by the application of Bankruptcy Code section 502(e), by California Code of Civil Procedure section 877.6 (which shall apply to the maximum extent permitted by applicable law), Nevada Revised Statute 17.245, and any similar law of any other jurisdiction.

**8.5.    Release Of Certain Parties By The Debtor, The Estate, And The Trustee.**

Except for the obligations created by or arising under the Plan, on the Effective Date, the Debtor, the Estate, and the Trustee release unconditionally, and are hereby deemed to release unconditionally, (a) the Settling Builders; (b) the TIP Loan Lenders; (c) the Agent, (d) the Prepetition Lenders; and (e) with respect to each of the foregoing Entities, each of their respective directors, officers, employees, agents, representatives, shareholders, partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such (collectively, the **"Released Parties"**) from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever (including, without limitation, those arising under the Bankruptcy Code or

nonbankruptcy law, and those assertable by the Debtor, its Estate, or the Trustee), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, taking place at any time through and including the Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the Debtor, (iii) the Prepetition Loan Documents, (iv) the management, operation, or financing of the Debtor, or (v) the formulation, negotiation, implementation, confirmation, or consummation of this Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case, or otherwise created in connection with this Plan or the Debtor.

The foregoing release of the Released Parties includes, but is not limited to, any Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities that might be asserted derivatively on behalf of the Debtor or its Estate.

**8.6.    Covenants Regarding Turnover Of Recoveries, Cooperation, And Not To Sue By The Agent And Consenting Prepetition Lenders.**

From and after the Effective Date:

(a)    each Consenting Prepetition Lender shall pay to the Settling Builders any proceeds payable to such Consenting Prepetition Lender from the Debtor, Reorganized Debtor, Estate, Settling Builders, Members, Member Affiliates, other Consenting Prepetition Lenders, non-Consenting Prepetition Lenders, Agent, Successor Agent, Prepetition Lenders' Collateral, or otherwise in connection with or on account of the Prepetition Lender Claims or otherwise relating to the Debtor, to the extent that such payment is in excess of such Consenting Prepetition Lender's ratable share of its Distributions under Classes S3 and U1 of this Plan (including, but not limited to, any payment that the Consenting Prepetition Lender would otherwise be entitled to under section 2.18(c) of the Prepetition Credit Agreement), but shall not pay to the Settling Builders any recovery from (y) the MI Litigation pursued by the Agent after the Effective Date (subject to Section 3.4(C) of this Plan and the Settling Builders receiving all reimbursements of the Settling Builders' MI Makeup required thereunder), and (z) to the extent any Prepetition Lender does not assign its interest in the Meritage Repayment Guaranty to the Settling Builders, then any such recovery from the Meritage Repayment Guaranty.

(b)    the Consenting Prepetition Lenders irrevocably instruct the Agent and Successor Agent to remit promptly any payments that would be subject to this Section directly to the Settling Builders, and the Agent and Successor Agent are bound thereby. Moreover, any payments received by the Consenting Prepetition Lenders that are subject to this Section shall be held in trust for the benefit of the Settling Builders and promptly paid to them.

(c)    the Consenting Prepetition Lenders shall not independently of the Agent or Successor Agent seek to enforce any remedies against the Prepetition Lenders' Collateral, the Members, or the Member Affiliates in connection with the Debtor,

EXHIBIT 1

leaving the Agent or Successor Agent as the party exclusively in charge as far as the Consenting Prepetition Lenders are concerned.

(d)    the non-Consenting Prepetition Lenders shall not be bound by subparagraphs "a", "b", and "c" of this Section 8.6, and nothing in those subparagraphs shall require the non-Consenting Prepetition Lenders to turn over their recoveries to the Settling Builders (provided, however, that the non-Consenting Prepetition Lenders shall remain subject to the pro rata sharing provisions in the Prepetition Credit Agreement, and the turnover of any distributions required by such provisions and Section 6.5 of this Plan).

(e)    in the event that any non-Consenting Prepetition Lender commences an action relating to the Prepetition Credit Documents against any Member, Member Affiliate, or other Credit Party (as that term is used in the Prepetition Credit Agreement) independent of the Agent, Successor Agent, or sub-Agent, and the standing of such non-Consenting Prepetition Lender to pursue such an action is sustained, then the Settling Builders and the Acquirer shall have the right to seek to intervene in such action so as to effectuate their rights to recover from such Member, Member Affiliate, or other Credit Party the amounts they otherwise would be entitled to vis-à-vis the rights of the Consenting Prepetition Lenders under this Section 8.6.

The refund mechanism set forth in subparagraphs "a" and "b" above shall be accomplished through the Prepetition Credit Agreement Amendment, which shall provide for the Consenting Prepetition Lenders to assign to the Settling Builders their recovery rights under the Prepetition Credit Agreement and the Guaranties, as well as, but not limited to, any payments from the Agent's or Successor Agent's Claims and/or Causes of Action against the Members and Member Affiliates. When and if future recoveries occur, the Agent or Successor Agent will handle the distribution to non-Consenting Prepetition Lenders and the Settling Builders in accordance with this Section and the Prepetition Credit Agreement Amendment.

8.7.    **Release Of The Settling Builders And The TIP Loan Lenders By The Agent And Prepetition Lenders.**

On the Effective Date, in consideration for the Settling Builders' payment of the Settling Builders' Repayment Guaranty Amount, the settlements contained in this Plan, and the releases to be granted by the Settling Builders and the TIP Loan Lenders:

(a)    **all obligations of the Settling Builders to the Agent and the Prepetition Lenders on account of the Repayment Guaranties shall be released and discharged, on account of the treatment of Classes S3 and U1 herein, which provide for the Settling Builders' full payment of the Repayment Guaranties; and**

(b)    **The Agent and the Consenting Prepetition Lenders release unconditionally, and are hereby deemed to release unconditionally, the Settling Builders, the TIP Loan Lenders, and each of their respective directors, officers, employees,**

EXHIBIT 1

EXHIBIT 1

agents, representatives, shareholders, partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such, from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever (including, without limitation, those arising under the Bankruptcy Code or nonbankruptcy law), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, taking place on or prior to the Petition Date through and including the Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the Debtor (including, but not limited to, any claims on account of the Guaranties), (iii) the management, operation, or financing of the Debtor, or (iv) the formulation, negotiation, implementation, confirmation, or consummation of this Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case, or otherwise created in connection with this Plan or the Debtor.

Notwithstanding the foregoing subparagraph (b):

(x) the Agent and the Consenting Prepetition Lenders shall not be deemed to release Claims against or obligations of the Settling Builders arising under the Plan, the Confirmation Order, or the Prepetition Credit Documents (other than the Settling Builders' Repayment Guaranties, which shall be satisfied in full pursuant to Section 3.4 of this Plan). Rather, any such Claims against the Settling Builders shall be subject to the covenant not to sue and turnover provisions contained in Section 8.6 hereof, such that in any action by the Agent or Successor Agent against the Settling Builders, a percentage of any recovery equal to the Prepetition Consenting Lenders' percentage of the total Prepetition Lender Claims shall be subject to turnover to the Settling Builders pursuant to Section 8.6; and

(y) the release contained in this Section 8.7 shall not be interpreted to be a release by the Agent and the Prepetition Lenders of (i) obligations created by this Plan, (ii) any claims against a Settling Builder that do not arise under or relate to the Prepetition Credit Documents or the Debtor, and (iii) with respect to Highland Capital and its affiliates, any claims relating to properties purchased in relation to the Inspirada development by Essex Real Estate Partners, LLC and/or Las Vegas Developments Associates, Inc.

### 8.8. Release Of The Agent And The Consenting Prepetition Lenders By The Settling Builders And The TIP Loan Lenders.

On the Effective Date, in consideration for the settlement contained in this Plan and the releases to be granted by the Agent and the Consenting Prepetition Lenders, the Settling Builders and the TIP Loan Lenders release unconditionally, and are hereby deemed to release unconditionally, the Agent and the Consenting Prepetition Lenders, and each of their respective directors, officers, employees, agents, representatives, shareholders,

## EXHIBIT 1

partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such, from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever (including, without limitation, those arising under the Bankruptcy Code or nonbankruptcy law), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, taking place on or prior to the Petition Date through and including the Effective Date in connection with, relating to, or arising out of (i) the Chapter 11 Case, (ii) the Debtor (including, but not limited to, any claims on account of the Guaranties), (iii) the Prepetition Loan Documents, (iv) the management, operation, or financing of the Debtor, or (v) the formulation, negotiation, implementation, confirmation, or consummation of this Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case, or otherwise created in connection with this Plan or the Debtor.

Notwithstanding the foregoing:

(x) To the extent that actions are brought or continued by or for the benefit of the non-Consenting Prepetition Lenders against the Settling Builders, the Settling Builders shall not be deemed to have released any counterclaims or defenses arising under or relating to the Prepetition Credit Documents; and

(y) the release contained in this Section 8.8 shall not be interpreted to be a release by the Settling Builders or the TIP Loan Lenders of (i) obligations created by this Plan, (ii) any claims that do not arise under or relate to the Prepetition Credit Documents or the Debtor, and (iii) with respect to KB Home and its affiliates, claims relating to properties purchases in relation to the Inspirada development by Essex Real Estate Partners, LLC and/or Las Vegas Developments Associates, Inc.

**8.9.    Release Of The Agent And The Consenting Prepetition Lenders By The Successor Agent.**

Effective as of the Effective Date, in consideration for the settlement contained in this Plan, in the event a Successor Agent is appointed, the Successor Agent shall, and shall be deemed to, release any Claims against the Agent and Consenting Prepetition Lenders under the Prepetition Credit Agreement or otherwise, including for future indemnity or expense reimbursement, except with respect to the Consenting Prepetition Lenders: (a) Claims relating to the costs to prosecute the MI Litigation (assuming the election to prosecute is made under the Plan), provided; however, that the Successor Agent may only offset unpaid fees and expenses against the proceeds of the MI Litigation, and (b) Claims, including counter claims or cross claims, asserted by the Meritage Parties against JPMorgan Chase Bank, N.A., in any capacity, including as Agent, which do not directly address the Meritage Parties' liability for, and amount of damages with respect to, the Meritage Repayment Guaranty. In all other respects, pursuant to the Prepetition Credit Agreement and the Consenting Lenders' Prepetition Participation Agreement, the Successor Agent shall only be entitled to seek indemnity and expense reimbursement from the non-Consenting Prepetition Lenders and, with respect to the

42

## EXHIBIT 1

Case 2:16-cv-01363-PMR-PAL Document 2 Filed 06/23/16 Page 96 of 110
Case 10-32968-bam ... Doc 1309 Entered 10/27/11 16:0 ... Page 92 of 105

EXHIBIT 1

Meritage Repayment Guaranty action, the Settling Builders. Nothing set forth herein, shall relieve nor be deemed to relieve, the Consenting Prepetition Lenders from their obligations under the Prepetition Credit Agreement as amended by the First Amendment to Prepetition Credit Agreement, to the Agent, and JPMorgan Chase Bank, N.A. in the event of the Appointment of a Successor Agent, including, without limitation, their obligations for expense reimbursement and indemnification.

### 8.10.   Exculpation And Limitation Of Liability.

None of (a) the Debtor, the Reorganized Debtor, or the Estate Representative, (b) the Agent, (c) the Consenting Prepetition Lenders, (d) the Settling Builders, (e) the TIP Loan Lenders, (f) the Trustee, and (g) with respect to each of the foregoing Entities, each of their respective directors, officers, employees, agents, representatives, shareholders, partners, members, affiliates, attorneys, investment bankers, restructuring consultants, and financial advisors in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any Entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the formulation, negotiation, implementation, confirmation, or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case or otherwise created in connection with this Plan; provided, however, that nothing in this Section 8.10 shall be construed to release or exculpate any Exculpated Party from (i) its obligations set forth in this Plan, or (ii) willful misconduct or gross negligence as determined by a Final Order.

### 8.11.   Meritage-Related Indemnification.

If the Meritage Parties do not become Settling Builders before the Effective Date, then the Settling Builders agree to indemnify the Agent (including, without limitation, following the Agent's resignation) and the Consenting Prepetition Lenders, with such indemnity to be set forth as a Plan Supplement, which is satisfactory, in form and substance, to the Agent, in its sole discretion, for any claims relating to the Debtor, the Prepetition Loan Documents, the Guaranties, or the Plan asserted by the Meritage Parties against the Agent or the Consenting Prepetition Lenders.

### 8.12.   Several Liability Of Settling Builders.

Each Member that is a Settling Builder and its affiliated parent/guarantor Settling Builder together shall be liable only for its respective pro rata share of any obligation of "Settling Builders" under this Plan, per the pro rata Builder Shares to be filed in the Plan Supplement, which pro rata shares of all Settling Builders collectively shall equal 100% of the Settling Builders' obligations hereunder.

### 8.13.   Effect Of Confirmation.

#### (A)   Binding Effect.

On the Confirmation Date (and subject to the occurrence of the Effective Date), the provisions of the Plan shall become binding on the Debtor, the Estate, the Trustee, the

# EXHIBIT 1

Reorganized Debtor, all Holders of Claims against or Equity Interests in the Debtor, and all other parties in interest in the Chapter 11 Case whether or not such Holders of Claims or Equity Interests are impaired and whether or not such Holders of Claims or Equity Interests have accepted this Plan.

### (B)  Filing Of Reports.

The Estate Representative shall file all reports and pay all fees required by the Bankruptcy Code, the Bankruptcy Rules, the United States Trustee guidelines, and the rules and orders of the Bankruptcy Court.

## ARTICLE IX

## CONDITIONS PRECEDENT

### 9.1.  Conditions To Confirmation.

The following are conditions precedent to confirmation of this Plan that may be satisfied or waived in accordance with Section 9.3 of this Plan:

(a)  The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Plan Proponents, as containing adequate information with respect to the Plan within the meaning of Bankruptcy Code section 1125;

(b)  The proposed Confirmation Order shall be in form and substance reasonably acceptable to the Plan Proponents; and

(c)  The Plan and the Plan Supplement, and all of the schedules, documents, and exhibits contained therein, shall be in form and substance reasonably acceptable to the Plan Proponents.

### 9.2.  Conditions To Occurrence Of The Effective Date.

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Section 9.3 of this Plan:

(a)  The Confirmation Date shall have occurred on or before October 31, 2011, and the Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay and shall otherwise be in full force and effect; provided, that the Plan Proponents may mutually agree (each in their sole discretion) to extent this period up to an additional thirty days;

(b)  No request for revocation of the Confirmation Order under Bankruptcy Code section 1144 has been made or, if made, remains pending;

(c)  Each exhibit, document, or agreement to be executed in connection with this Plan (including each document or agreement included in the Plan Supplement) shall be reasonably acceptable to the Plan Proponents; and

44

# EXHIBIT 1

## EXHIBIT 1

(d)    The Settling Builders shall provide to the Agent account statements evidencing that the Settling Builders have severally funded the account of the Estate Representative with their Effective Date monetary obligations under the Plan, including, without limitation, the full amounts of (x) the Settling Builders' Consideration, (y) the Settling Builders' Total Plan Contribution, and (z) to the extent necessary, the Settling Builders' MI Makeup.

### 9.3.    Waiver Of Conditions Precedent.

The conditions precedent set forth in Sections 9.1 or 9.2 of this Plan may be waived jointly, but not unilaterally, by the Plan Proponents, in whole or in part, without notice to any other parties in interest and without the need for the Bankruptcy Court's approval. A waiver under this subsection is effective only upon the Plan Proponents filing with the Bankruptcy Court a written notice of waiver.

### 9.4.    Confirmation Deadline.

If either:

(a)    the Plan is not confirmed on or before October 31, 2011, for any reason (subject to the option of the Plan Proponents to extend this deadline for a period of no more than thirty days pursuant to the Plan Support Agreement); or

(b)    the Effective Date does not occur on or before November 30, 2011 (or December 30, 2011, if the confirmation deadline is extended pursuant to the preceding clause);

then in the sole discretion of either the Agent or the Settling Builders (i) the Plan and Disclosure Statement shall be withdrawn and have no continuing force or effect, and (ii) the funds remaining in the Term Sheet Escrow (net of $10 million if to be paid to the Agent in accordance with the Plan Support Agreement) shall be returned to the Settling Builders, subject to retaining a balance in the "Builder Lenders' Account" as provided in section 2.3 of the TIP Loan Agreement. Upon termination pursuant to this section, all parties' rights, defenses, and claims are reserved, and all litigation stays created by the Plan Support Agreement shall terminate, provided, however, that nothing in this Section 9.4 shall prejudice in any way the rights of the TIP Loan Lenders or the Estate in connection with the TIP Loans.

### ARTICLE X

### RETENTION AND SCOPE OF JURISDICTION OF THE BANKRUPTCY COURT

### 10.1.    Retention Of Jurisdiction.

On and after the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

(a)    To adjudicate objections concerning the allowance, priority, or classification of Claims and Equity Interests;

## EXHIBIT 1

(b)    To liquidate the amount of any disputed, contingent, or unliquidated Claim and to estimate the amount of any disputed, contingent, or unliquidated Claim;

(c)    To resolve all matters related to the rejection, assumption, and/or assumption and assignment of any executory contract or unexpired lease of the Debtor, including the determination of Cure Amounts;

(d)    To resolve all matters relating to the redemption and/or defeasance of LID-related obligations pursuant to the terms of the LID Indenture by the Acquirer or the Estate Representative after the Effective Date, and all matters relating to the Development Agreement and COH Acquisition Agreement as contemplated by Section 5.5 of this Plan;

(e)    To hear and rule upon all Retained Actions, Avoidance Actions, and other Causes of Action commenced and/or pursued by the Estate Representative, the Reorganized Debtor, or the Acquirer (but only to the extent that such Causes of Action are not released or otherwise prohibited by the terms of this Plan);

(f)    To hear and rule upon all applications for allowance of Administrative Expense Claims and Professional Compensation Claims;

(g)    To modify this Plan pursuant to Bankruptcy Code section 1127, to remedy any apparent defect or omission in this Plan, or to reconcile any inconsistency in this Plan as may be necessary to carry out its intent and purposes;

(h)    To construe or interpret any provisions of this Plan and to issue such orders as may be necessary for the implementation, execution, and consummation of the Plan, to the extent authorized by the Bankruptcy Code;

(i)    To adjudicate controversies arising out of the administration of the Estate or the implementation of this Plan, including any dispute relating to the Plan Support Agreement;

(j)    To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including the enforcement of releases and injunctions, the Distribution of funds from the Estate, and the payment of Allowed Claims;

(k)    To hear and determine any matters concerning local, state, and federal tax liabilities of the Debtor in accordance with Bankruptcy Code sections 346, 505, and 1146, and to determine any tax claims that may arise against the Debtor, the Estate, the Acquirer, or the Reorganized Debtor as a result of the transactions contemplated by this Plan;

(l)    To determine such other matters as may be provided for in the Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

46

## EXHIBIT 1

(m)     To determine any controversies, actions, or disputes that may arise under the provisions of this Plan or any document contained in the Plan Supplement, or the rights, duties, or obligations of any Entity under the provisions of this Plan;

(n)     To determine all matters that may be pending before the Bankruptcy Court on or before the Effective Date, to the extent that such matters are not released or otherwise finally resolved by this Plan; and

(o)     To enter a final decree closing the Chapter 11 Case pursuant to Bankruptcy Code section 350.

### 10.2. Alternative Jurisdiction.

In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then such matter may be brought before any court having jurisdiction with regard thereto.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

### 11.1. Modification Of The Plan.

Any modification, alteration, or amendment to the Plan shall be agreed to by all of the Plan Proponents.  The Plan Proponents jointly reserve the right to modify this Plan at any time to the extent permitted by, and in accordance with, the Plan Support Agreement, Bankruptcy Code section 1127, and Bankruptcy Rule 3019.

### 11.2. Effect Of Non-Occurrence Of Conditions To Confirmation.

If the Confirmation Order is vacated for any reason, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the compromise and allowance of Claims and termination of Interests pursuant to the Plan and Bankruptcy Code section 1141, and the assumptions, assignments, or rejections of executory contracts or leases pursuant to Article V of the Plan, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claim, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Plan Proponents, the Prepetition Lenders, the Debtor, the Trustee, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponents, the Prepetition Lenders, the Debtor, the Trustee, or any other Entity.

### 11.3. Revocation Or Withdrawal Of The Plan.

Subject to the terms of the Plan Support Agreement, the Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date or the Effective Date and to file subsequent plans of reorganization.  If the Plan is revoked or withdrawn by either the Agent or all of the Settling Builders, or if Confirmation or consummation of the Plan does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or

# EXHIBIT 1

Interest or Class of Claims or Interests), assumption and assignment or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity. Nothing herein shall impair the rights and obligations existing under the Plan Support Agreement.

### 11.4. Terms Binding.

Upon the entry of the Confirmation Order, all provisions of this Plan, including all agreements, instruments, and other documents filed in connection with this Plan and executed by the Trustee or the Debtor in connection with this Plan, shall be binding upon the Debtor, its Estate, the Trustee, the Reorganized Debtor, all Holders of Claims and Equity Interests, and all other Entities that are affected in any manner by this Plan. All agreements, instruments, and other documents filed in connection with this Plan, including the agreements incorporated in the Plan Supplement, shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtor, the Trustee, or the Reorganized Debtor, or shall be issued, delivered, or recorded on the Effective Date or thereafter.

### 11.5. Successors And Assigns.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor, or assignee of such Entity.

### 11.6. Confirmation Order And Plan Control.

Except as otherwise provided in this Plan, in the event of any inconsistency between this Plan and the Disclosure Statement, any exhibit to this Plan, or any other instrument or document created or executed pursuant to this Plan, this Plan shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

### 11.7. Governing Law.

The rights, duties, and obligations arising under this Plan shall be governed in accordance with the substantive laws of the United States of America and, to the extent federal law is not applicable, the laws of the State of Nevada.

### 11.8. Severability.

If the Bankruptcy Court determines at the Confirmation Hearing that any material provision of this Plan is invalid or unenforceable, such provision, subject to Bankruptcy Code section 1127, shall be severable from this Plan and shall be null and void, and, in such event, such determination shall in no way limit or affect the enforceability or operative effect of any or all other portions of this Plan.

# EXHIBIT 1

**11.9. Incorporation By Reference.**

Each exhibit or schedule to this Plan, including each document included in the Plan Supplement, is incorporated herein by reference.

**11.10. Payment Of Statutory Fees.**

All fees payable pursuant to section 1930(a)(6) of title 28 of the United States Code shall be paid by the Acquirer on a quarterly basis until the Chapter 11 Case is dismissed or closed, whichever occurs first. Following confirmation of the Plan, the Estate Representative shall file with the Bankruptcy Court and serve on the United States Trustee quarterly financial reports regarding all income and disbursements, including all Distributions under the Plan, for each quarter (or portion thereof) the Chapter 11 Case remains open.

**11.11. Notices.**

For any notice, request, or demand to or upon the Agent, the Settling Builders, the Trustee, the Estate Representative, the Reorganized Debtor, or the Acquirer to be effective, it shall be in writing (including by facsimile transmission or electronic mail) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission or electronic mail, when received and telephonically or electronically confirmed, addressed as follows:

If to the Agent:

> JPMorgan Chase Bank, N.A.
> Attn: William A. Austin
> 383 Madison Avenue, 23rd Floor
> New York, New York 10179
> Telephone: (212) 622-4507
> Facsimile: (212) 622-4556
> E-mail: William.A.Austin@jpmchase.com

With a copy to:

> Morrison & Foerster LLP
> Attn: G. Larry Engel
> 425 Market Street
> San Francisco, California 94105-2482
> Telephone: (415) 268-7000
> Facsimile: (415) 268-7522
> E-mail: lengel@mofo.com

> – and –

49

EXHIBIT 1

# EXHIBIT 1

> Norman S. Rosenbaum and Jordan A. Wishnew
> 1290 Avenue of the Americas
> New York, New York 10104
> Telephone:  (212) 468-8000
> Facsimile:  (212) 468-7900
> E-mail:      nrosenbaum@mofo.com
> E-mail:      jwishnew@mofo.com

If to the Settling Builders, the Estate Representative, the Reorganized Debtor, or the Acquirer:

> KB Home
> Attn:  Albert Praw and Ross Kay
> 10990 Wilshire Boulevard, Floor 7
> Los Angeles, CA 90024
> Telephone:  (310) 231-4000
> Facsimile:  (310) 231-4280
> E-mail:      apraw-x@kbhome.com
> E-mail:      RKay@kbhome.com

> Toll Brothers, Inc.
> Attn:  Mark J. Warshauer and Kristine Maciolek Small
> Toll Brothers, Inc.
> 250 Gibralter Road
> Horsham, PA 19044
> Telephone:  (215) 938-8260
> Facsimile:  (215) 938-8255
> E-mail:      mwarshauer@tollbrothersinc.com
> E-mail:      kmacioleksmall@tollbrothersinc.com

> Beazer Homes Holdings Corp.
> Attn:  Ken Khoury
> 1000 Abernathy Rd., #1200
> Atlanta, GA  30328
> Telephone:  (770) 829-3728
> Facsimile:  (770) 350-4337
> E-mail:      kkhoury@beazer.com

> Pardee Homes
> Attn:  Christopher J. Hallman, Esq.
> Senior Vice President, General Counsel
> 10880 Wilshire Blvd, Suite 1900
> Los Angeles, CA 90024
> Telephone:  (310) 475-3525 x370
> Facsimile:  (253) 446-1292
> E-mail:      Chris.Hallman@pardeehomes.com

# EXHIBIT 1

With a copy to:

> Stutman, Treister & Glatt PC
> Attn:  Robert A. Greenfield, K. John Shaffer, and Anthony Arnold
> 1901 Avenue of the Stars, 12th Floor
> Los Angeles, California  90067
> Telephone:  (310) 228-5600
> Facsimile:  (310) 228-5788
> E-mail:      rgreenfield@stutman.com
> E-mail:      jshaffer@stutman.com
> E-mail:      aarnold@stutman.com

If to the Trustee:

> Cynthia Nelson
> Chapter 11 Trustee of South Edge, LLC
> 633 West 5th Street, 16th Floor
> Los Angeles, CA  90071-2027
> Telephone:  (213) 689-1200
> Facsimile:  (213).689-1220
> E-mail:      cynthia.nelson@fticonsulting.com

With a copy to:

> Milbank, Tweed, Hadley & McCloy LLP
> Attn:  Robert J. Moore and David B. Zolkin
> 601 South Figueroa Street, 30th Floor
> Los Angeles, California  90017
> Telephone:  (213) 892-4000
> Facsimile:  (213) 629-5063
> E-mail:      rmoore@milbank.com
> E-mail:      dzolkin@milbank.com

## 11.12.  Reservation Of Rights.

Except as expressly set forth herein, the Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order.  If the Plan is not Confirmed or does not become effective:

(a)    the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action with respect to the Plan shall not be and shall not be deemed to be an admission or waiver of any rights with respect to the Plan Proponents or the Holders of Claims and Equity Interests; and

# EXHIBIT 1

    (b)    the rights of the Plan Proponents vis-à-vis each other (including but not limited to the disposition of the funds in the Term Sheet Escrow) shall be as set forth in the Plan Support Agreement.

Respectfully submitted,

  /s/ Robert M. Charles, Jr.
LEWIS AND ROCA LLP
Robert M. Charles, Jr.
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169-5996
Telephone:  (702) 949-8320
Facsimile:  (702) 949-8321
E-mail:     rcharles@LRLaw.com

MORRISON & FOERSTER LLP
G. Larry Engel (admitted *pro hac vice*)
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
E-mail:     lengel@mofo.com

Norman S. Rosenbaum (admitted *pro hac vice*)
Jordan A. Wishnew (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
E-mail:     nrosenbaum@mofo.com
E-mail:     jwishnew@mofo.com

Attorneys for JPMorgan Chase Bank, N.A., as Administrative Agent

  /s/ Richard McKnight
LAW OFFICES OF RICHARD McKNIGHT
Richard McKnight (Nevada Bar No. 001313)
330 S. Third Street #900
Las Vegas, Nevada 89101
Telephone:  (702) 388-7185
Facsimile:  (702) 388-0108
E-mail:     rmcknight@lawlasvegas.com

STUTMAN, TREISTER & GLATT PC
Robert A. Greenfield (admitted *pro hac vice*)
K. John Shaffer (admitted *pro hac vice*)
Anthony Arnold (admitted *pro hac vice*)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone:  (310) 228-5600
Facsimile:  (310) 228-5788
E-mail:     rgreenfield@stutman.com
E-mail:     jshaffer@stutman.com
E-mail:     aarnold@stutman.com

Attorneys for the Settling Builders

52

EXHIBIT 1

EXHIBIT 2

**Endorsement #**

**This endorsement, effective 12:01 a.m.:**

**Forms a part of policy no.:**

**Issued to:**

**By:**

### EXCESS LIABILITY POLICY FORM

### <u>Vertical Construction Exclusion Endorsement</u>
### (Limited Exception)

This policy is amended as follows:

**Section IV. Exclusions**, is amended to include the following additional exclusion:

This insurance does not apply to:

> Ultimate Net Loss arising out of any Vertical Construction. This exclusion applies whether or not the Vertical Construction Operations have been completed or are ongoing.

> However, this exclusion does not apply to the erection of two (2) water towers to be placed within the boundaries of this project.

**Section II. Definitions**, is amended to include the following additional definition:

> Vertical Construction Operations means the construction of, any above ground, structures or buildings whether for residential (such as tract homes, residential condominiums, residential townhouses, residential duplexes, multi-unit residential buildings, structures or homes in subdivisions and/or buildings, structures or homes in master planned residential communities), commercial, public or mix use.

All other terms, definitions, conditions and exclusions of this policy remain unchanged.

_____
Authorized Representative

Manuscript (10/11)

EXHIBIT 2

# EXHIBIT 2

**Endorsement _____**

**This endorsement effective 12:01 a.m.:**

**Forms a part of Policy No.:**

**Issued to:**

**By:**

### Excess Liability Policy Form

### Changes In Followed Policy Endorsement

The policy is amended as follows:

**Section III. Conditions, Paragraph B.** is deleted in its entirety and replaced by the following:

Changes

You must promptly notify us in writing of any coverage or limit changes made after the inception date of this policy to the First Underlying Insurance Policy as shown in Item 4 of the Declarations. Subject to the terms, definitions, conditions and exclusions of this policy, the coverage provided by this policy shall follow such changes on the effective date of the changes in the First Underlying Insurance Policy, but only if:

1.       We agree to amend this policy by endorsement to reflect such changes; and

2.       You agree to and pay any additional premium relating to such changes when due.

All other terms and conditions of this policy remain unchanged.

_____
Authorized Representative

Manuscript (10/10)

EXHIBIT 2

## EXHIBIT 2

ARBITRATION PROVISION FOR VERTICAL CONSTRUCTION
EXCLUSION ENDORSEMENT AND CHANGES IN FOLLOWED POLICY
ENDORSEMENT

       1.     This Arbitration Agreement (the "Agreement") applies only to the Vertical Construction Exclusion Endorsement in connection with the 1st Excess Liability Policy No. 7532913 (the "1st Excess Policy") and the 2nd Excess Liability Policy No. 1061104 (the "2nd Excess Policy", collectively with the 1st Excess Policy, the "Policies") issued by Insurance Company of the State of Pennsylvania and Lexington Insurance Company respectively.

       2.     In the event of any dispute between the parties concerning the Vertical Construction Exclusion Endorsement, such dispute upon the written request of any party, will be submitted to three arbitrators, one to be chosen by each party, and the final arbitrator to be chosen by the other two arbitrators. If any party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of written notice from any other party so requesting it to do so, the requesting party may appoint arbitrators on behalf of the refusing or neglecting party. If the chosen arbitrators fail to agree on the selection of the additional arbitrator within thirty (30) days of their appointment, any party may make an application to a Court of competent jurisdiction in the State of New York, County of New York and the Court will appoint the additional arbitrator. Unless otherwise agreed to by the Parties hereto, all arbitrators shall be executive officers or former executive officers of property or casualty or reinsurance companies domiciled in the U.S. not under the control of any of the parties.

       3.     The arbitrators will interpret this Agreement as an honorable engagement and not merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law, and they will make their award with a view toward effecting the general purpose of this Agreement in a reasonable manner.

       4.     Each party will submit its case to its arbitrator within thirty (30) days of the appointment of the final arbitrator. The arbitrators will render their decision, in writing, based upon a hearing in which evidence may be introduced without following the strict rules of evidence, but in which cross-examination and rebuttal will be allowed. The arbitrators will make their decision within sixty (60) days following the termination of the hearing, unless the parties consent to an extension. The majority decision of the arbitrators, when filed with the parties, will be final and binding on all parties to the proceeding. The arbitrators will have the power to award compensatory money damages, and interest thereupon, and will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. The parties agree that no punitive damages shall arise from this Agreement.

       5.     Each party will bear the expense of its own arbitrator and jointly and equally bear with the other party the expense of the third arbitrator and of the arbitration.

## EXHIBIT 2

EXHIBIT 2

6.      Said arbitration will take place in New York, New York unless otherwise agreed to by the Parties hereto.  The arbitration will be governed by the United States Arbitration Act, 9 U.S.C. 1, et seq., and judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

 10-32968-bam Appeal Documents Forwarded to BNC for Noticing
USBC_NEVADA
to:
Courtmail
11/15/2011 08:06 AM
Show Details

Follow Up:
Normal Priority.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30-page limit do not apply.

### U.S. Bankruptcy Court

### District of Nevada

Notice of Electronic Filing

The following transaction was received from Brearey, MR entered on 11/15/2011 at 8:04 AM PST and filed on 11/15/2011
Case Name:        SOUTH EDGE, LLC
Case Number:      10-32968-bam
Document Number: 1377

Docket Text:
Clerk Forwarded Appeal Documents to BNC for Noticing to: BAP (Related document(s)[1370] Notice of Appeal filed by Interested Party MERITAGE HOMES OF NV, Interested Party MERITAGE HOMES CORPORATION.)(mrb)

The following document(s) are associated with this transaction:

Document description:Main Document
Original filename:L:\Case Administration\Scanned Docs\CA II Scan\Melissa B\10-32968-notofapp.pdf

Electronic document Stamp:
[STAMP bkecfStamp_ID=989277954 [Date=11/15/2011] [FileNumber=21086604-0] [8a89fd52e88296e4b848ba128a3d14a04bfc049fecc820b9bd797395d5071e30e0 00d5d6f620d23dc586986a8ec9d82cb054970c97e199eced2254f2f7e8d2b8]]

10-32968-bam Notice will be electronically mailed to:

ATHANASIOS E. AGELAKOPOULOS on behalf of U.S. Trustee U.S. TRUSTEE - LV - 11
athanasios.agelakopoulos@usdoj.gov

ANTHONY ARNOLD on behalf of Interested Party BEAZER HOMES HOLDING CORP.
aarnold@stutman.com

MARTIN R BARASH on behalf of Debtor SOUTH EDGE, LLC
mbarash@ktbslaw.com

ROBERT J. BERENS on behalf of Creditor MERCHANTS BONDING COMPANY
rberens@mbvlaw.com, amelton@mbvlaw.com,charrington@mbvlaw.com,khall@mbvlaw.com

BMC GROUP, INC. (1)
jmyers@bmcgroup.com

J SCOTT BOGATZ on behalf of Cross Defendant FOCUS SOUTH GROUP, LLC
rpoli@isbnv.com

ROBERT M. CHARLES on behalf of Creditor ALTRIUM CDO
rcharles@lrlaw.com, cjordan@lrlaw.com

DAVID A. COLVIN on behalf of Creditor Essex Real Estate Partners, LLC
dcolvin@maclaw.com, mwalters@maclaw.com;kgallegos@maclaw.com;tszostek@maclaw.com

NATALIE M. COX on behalf of Creditor CITY OF HENDERSON
ncox@klnevada.com, bankruptcy@klnevada.com;kdunn@klnevada.com

LAUREL E. DAVIS on behalf of Interested Party MERITAGE HOMES CORPORATION
ldavis@fclaw.com, mhurtado@fclaw.com

CRAIG S. DUNLAP on behalf of Interested Party MERITAGE HOMES CORPORATION
cdunlap@fclaw.com, cdunlap7@gmail.com;mhurtado@fclaw.com

GREGORY E GARMAN on behalf of Interested Party BEAZER HOMES HOLDING CORP.
bankruptcynotices@gordonsilver.com, bknotices@gordonsilver.com

KEVIN R. HANSEN on behalf of Creditor C & S COMPANY, INC.
kevin@shumwayvan.com