1  LEWIS AND ROCA LLP
   Robert M. Charles, Jr.
2  3993 Howard Hughes Parkway, Suite 600
   Las Vegas, Nevada  89169-5996
3  Telephone:   (702) 949-8320
   Facsimile:    (702) 949-8321
   E-mail:        rcharles@lrlaw.com
4

   MORRISON & FOERSTER LLP
   G. Larry Engel (admitted *pro hac vice*)
   425 Market Street
   San Francisco, California  94105-2482
   Telephone:    (415) 268-7000
   Facsimile:     (415) 268-7522
   E-mail:         lengel@mofo.com

   Norman S. Rosenbaum (admitted *pro hac vice*)
5  Jordan A. Wishnew (admitted *pro hac vice*)
   Erica J. Richards (admitted *pro hac vice*)
6  1290 Avenue of the Americas
   New York, New York  10104
7  Telephone:    (212) 468-8000
   Facsimile:     (212) 468-7900
8  E-mail:nrosenbaum@mofo.com
                  jwishnew@mofo.com
                  erichards@mofo.com

9  *Attorneys for JPMorgan Chase Bank, N.A., as Administrative Agent*

10 LAW OFFICES OF RICHARD McKNIGHT
      Richard McKnight (Nevada Bar No. 001313)
11 330 S. Third Street #900
   Las Vegas, Nevada  89101
12 Telephone:    (702) 388-7185
   Facsimile:     (702) 388-0108
13 E-mail:         rmcknight@lawlasvegas.com

   STUTMAN, TREISTER & GLATT PC
   Robert A. Greenfield (admitted *pro hac vice*)
   K. John Shaffer (admitted *pro hac vice*)
   1901 Avenue of the Stars, 12th Floor
   Los Angeles, California  90067
   Telephone:   (310) 228-5600
   Facsimile:    (310) 228-5788
   E-mail:        rgreenfield@stutman.com
                   jshaffer@stutman.com

14

15  *Attorneys for the Settling Builders*

16  **UNITED STATES DISTRICT COURT**
    **DISTRICT OF NEVADA**

17

18  In re

    SOUTH EDGE, LLC,
19

              Debtor.
20

21

22

23  MERITAGE HOMES OF NEVADA, INC. and
    MERITAGE HOMES CORPORATION,
24

              Appellants,
25

         v.
26
    JPMORGAN CHASE BANK, N.A., et al.,
27

              Appellees.
28

Case No. 2:11-cv-01963-PMP -PAL

(BK-S-10-32968-BAM)

(Appeal from the United States Bankruptcy Court, District of Nevada)

Chapter 11

**APPELLEES' OPENING BRIEF**

1

# TABLE OF CONTENTS

2

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

I.       STATEMENT OF JURISDICTION ..................................................................... 1

II.      STATEMENT OF THE CASE .............................................................................. 1

III.     STATEMENT OF FACTS ..................................................................................... 5

IV.      ARGUMENT ......................................................................................................... 26

         A.       The Plan Does Not Contain Improper Third Party Releases. ................. 26

                  1.       The Plan's Exculpation Provisions Are Consistent With Numerous
                           Decisions From Within And Outside The Ninth Circuit Approving
                           Similar Exculpations For Actions Taken In Furtherance Of A
                           Bankruptcy Reorganization........................................................ 26

                  2.       The Record Fully Supports The Inclusion Of The Section 8.10
                           Exculpation Provisions. ............................................................. 35

                  3.       The Plan's Exculpation Provisions Are Consistent With Ninth
                           Circuit Law That Bars State Court Lawsuits Based Upon Actions
                           Parties Take In Prosecuting A Bankruptcy Case. .................... 36

         B.       The Bankruptcy Court Did Not Err In Ruling That Confirmation Of The
                  Plan Shall Not Affect Or Satisfy Liability On The Guaranties............ 41

         C.       The Bankruptcy Court Did Not Err In Granting A Post-Confirmation
                  Injunction To Protect The Debtor's Estate. ......................................... 47

V.       CONCLUSION ...................................................................................................... 50

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Case**                                                                       **Page**

**CASES**

*Ad Hoc Comm. v. Delta Air Lines, Inc.*,
309 Fed. Appx. 455 (2d Cir. Feb. 9, 2009) ................................. 35

*Astor Holdings v. Roski*,
325 F. Supp. 2d 251 (S.D.N.Y. 2003) ................................. 38

*Davis v. Yageo Corp.*,
481 F.3d 661 (9th Cir. 2007).................................. 39

*Gonzales v. Parks*,
830 F.2d 1033 (9th Cir. 1987)................................. 37, 38

*Hillis Motors v. Hawaii Auto. Dealers' Ass'n (In re Hillis Motors)*,
997 F.2d 581 (9th Cir. 1993) ................................. 47, 48, 49

*In re 944 Media, LLC*,
2010 Bankr. LEXIS 3904  (Bankr. C.D. Cal. May 7, 2010)................................. 28

*In re Aloha Airlines, Inc.*,
2008 Bankr. LEXIS 3971 (Bankr. D. Haw. Nov. 26, 2008) ................................. 28

*In re American Hardwoods, Inc.*,
885 F.2d 621 (9th Cir. 1989)................................. 29, 42, 44

*In re Applewood Chair Co.*,
203 F.3d 914, 918 (5th Cir. 2000)................................. 42

*In re Birting Fisheries, Inc.*,
300 B.R. 489 (B.A.P. 9th Cir. 2003)................................. 27

*In re Delta Air Lines, Inc.*,
374 B.R. 516 (Bankr. S.D.N.Y. 2007) ................................. 35

*In re Excel Innovations, Inc.*,
502 F.3d 1086 (9th Cir. 2007)................................. 29

*In re Extended Stay, Inc.*,
435 B.R. 139 (S.D.N.Y. 2010)................................. 39

*In re Hawaiian Telcom Communs., Inc.*,
430 B.R. 564 (Bankr. D. Haw. 2009)................................. 28

*In re In re Xyience Incorporated*,
Case No. 08-10474 (MKN), Docket No. 321 at ¶ 11 (Bankr. D. Nev.
Oct. 23, 2008)................................. 49

*In re Lighthouse Lodge, LLC*,
2010 Bankr. LEXIS 3663 (Bankr. N.D.Cal. Oct. 14, 2010) ................................. 33

*In re Lowenschuss*,
67 F.3d 1394 (9th Cir. 1995)................................. 29

*In re Mega-C Corp.*,
Case No. 04-50962 (GWZ), Docket. No. 1166 at Ex. 1 §§ 10.3 & 10.4
(Bankr. D. Nev. Nov. 8, 2006)................................. 49

*In re Morning Treat Coffee Co.*,
77 B.R. 62 (Bankr. M.D. La. 1987) ................................. 44

**APPELLEES' OPENING BRIEF**

*In re Pac. Energy Res. Ltd.*,
    2010 Bankr. LEXIS 5300 (Bankr. D. Del. Dec. 15, 2010) .......................... 49

*In re PTL Holdings LLC*,
    2011 Bankr. LEXIS 4436 (Bankr. D. Del. Nov. 10, 2011)......................... 35

*In re Rohnert Park Auto Parts, Inc.*,
    113 B.R. 610 (B.A.P. 9th Cir. 1990)...................................................... 42

*In re Speciality Trust, Inc.*,
    Case No. 10-51432, Docket No. 1001 (Bankr. D. Nev. June 27, 2011) .............. 28

*In re Station Casinos, Inc.*,
    2010 Bankr. LEXIS 5380 (Bankr. D. Nev. Aug. 27, 2010)........................... 28, 29, 30

*In re Tribune Co.*,
    2011 Bankr. LEXIS 4128 (Bankr. D. Del. Oct. 31, 2011) .......................... 35

*In re USA Commercial Mortgage Company*,
    Case No. 06-10725 (LBR), Docket No. 2376  (Bankr. D. Nev. Jan. 8,
    2007) ................................................................................... 49

*In re W.R. Grace & Co.*,
    446 B.R. 96 (Bankr. D. Del. 2011), *reh'g granted in part on other
    grounds*, 2011 Bankr. LEXIS 709 (Bankr. D. Del. Mar. 4, 2011), *aff'd*,
    2012 U.S. Dist. LEXIS 11289 (D. Del., Jan. 30, 2012)............................ 35

*In re Washington Mutual, Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ..................................................... 35

*In re WCI Cable, Inc.*,
    282 B.R. 457 (Bankr. D. Or. 2002) ..................................................... 33

*In re Woodside Group, LLC*,
    Case No. 08-20682, Docket No. 2124 (Bankr. C.D. Cal. Nov. 25, 2009)................ 28

*In re Yellowstone Mountain Club, LLC*,
     460 B.R. 254 (Bankr. D. Mont. 2011) ................................................ 28, 31, 32, 33

*JPMorgan Chase Bank, N.A. v. Meritage Homes Corp. et al.*,
    Case No. 11-1364-PMP ................................................................ 20, 46

*Martinez- Serrano v. INS*,
    94 F.3d 1256 (9th Cir. 1996)......................................................... 4

*Micro-Waste Corp. v. Sanitec Indus., Inc. (In re Sanitec Indus., Inc.)*,
    2009 Bankr. LEXIS 4532 (B.A.P. 9th Cir. Dec. 21, 2009)........................... 27

*Miles v. Okun (In re Miles)*,
    430 F.3d 1083 (9th Cir. 2005)........................................................ 37

*MSR Exploration, Ltd v. Meridian Oil, Inc.*,
    74 F.3d 910 (9th Cir. 1996).......................................................... 37, 38

*Rowland v. Lepire*,
    99 Nev. 308, 662 P.2d 1332 (1983) ................................................... 50

*South Edge, LLC v. JPMorgan Chase Bank, N.A.*,
    2011 U.S. Dist. LEXIS 49621 (D. Nev. Apr. 28, 2011) .............................. 2, 9

*Underhill v. Royal*,
    769 F.2d 1426 (9th Cir. 1985)........................................................ 29

**APPELLEES' OPENING BRIEF**

1

**8**

2 *JPMorgan Chase Bank, N.A. v. Meritage Homes Corp., et al.,*
    Case No. 11-1364-PMP ......................................................................... 6

3 *JPMorgan Chase Bank, N.A. v. Meritage Homes Corp. et al.,*
    Case No. 11-1364-PMP ........................................................... 6, 20, 46

4

**Page**

5

6 **OTHER AUTHORITIES**

7 11 U.S.C. § 1101(2) .............................................................................. 26

11 U.S.C. § 1141(b) .............................................................................. 47

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPELLEES' OPENING BRIEF**

1    Appellees JPMorgan Chase Bank, N.A., as Administrative Agent ("JPMorgan" or

2  "Agent"), and KB Home, Inc., KB Home Nevada, Inc., Toll Brothers, Inc., Coleman-Toll

3  Limited Partnership, Beazer Homes USA, Inc., Beazer Homes Holdings Corp.,

4  Weyerhaeuser Real Estate Company, and Pardee Homes of Nevada, Inc. (collectively,

5  "Settling Builders," and with the Agent, "Plan Proponents") respectfully submit this

6  Appellees' Opening Brief in opposition to the appeal by Meritage Homes of Nevada, Inc.

7  and Meritage Homes Corporation (collectively, "Meritage").

8  **I.    STATEMENT OF JURISDICTION**

9    Appellees respectfully submit that Meritage's appeal is moot and therefore must be

10  dismissed, as set forth in the *Appellees' Motion for Dismissal of Appeal* [Docket No. 17]

11  (the "Motion to Dismiss").

12  **II.    STATEMENT OF THE CASE**

13    This is an appeal from the Bankruptcy Court's *Order Confirming Joint Plan of*

14  *Reorganization Proposed by JPMorgan Chase Bank, N.A., as Administrative Agent under*

15  *the Prepetition Credit Agreement, and the Settling Builders (Amended as of October 21,*

16  *2011)* (the "Confirmation Order"), Tab 8, AER 733.[1]

17    As this Court is aware, the chapter 11 debtor, South Edge, LLC ("South Edge" or

18  the "Debtor") has been the subject of litigation for more than three years.  The litigation

19  has wound its way through this Court, the United States District Court for the Southern

20  District of New York, the Nevada Bankruptcy Court, the Ninth Circuit, state and

21  bankruptcy courts in Ohio (the "Ohio Action"),[2] and a three-judge arbitration panel.

22    The parties have debated extensively about what caused South Edge's financial

23  and legal troubles.  But what cannot be debated is that, by the effective date of South

24  Edge's chapter 11 plan, South Edge was in default on more than $380 million in

25  ─────────────

26  [1] "Tab __, AER __" refers to the *Appellants' Excerpts of Record*, and "Tab __, SER __" (starting with Tab 25) refers to the *Appellees' Supplemental Excerpts of Record*.

27  [2] *See* Tab 31, SER 1801.

28

1   obligations to JPMorgan and its lender group.  Tab 15, AER 1112-13 & 1119.  Moreover,

2   South Edge's financial problems and member disputes directly affected the City of

3   Henderson, hundreds of residents within South Edge's "Inspirada" master planned

4   community, contractors, suppliers, and the holders of nearly $90 million in Local

5   Improvement District ("LID") bonds issued by the City to finance the construction of

6   public infrastructure within the development.  *See* Tab 32, SER 1861-62, 1870.

7          JPMorgan, in its capacity as a lender, and two other lenders in its group filed an

8   involuntary bankruptcy petition against South Edge in December, 2010 [Tab 9, AER 838],

9   in order to try to bring the litigation to an end, and to remedy the deadlock and financial

10  problems that had plagued South Edge and its Inspirada development.  At first, the

11  Settling Builders opposed the bankruptcy, as did Meritage.  But while the parties

12  continued to litigate, all of them (except Meritage) also tried to negotiate in good faith a

13  global settlement that would end the litigation among them once and for all.  Tab 14, AER

14  1085-91; Tab 15, AER 1116-21.  These negotiations became more intense following this

15  Court's dismissal of the appeals of the involuntary petition, *see South Edge, LLC v.*

16  *JPMorgan Chase Bank, N.A.*, 2011 U.S. Dist. LEXIS 49621 (D. Nev. Apr. 28, 2011), and

17  the recognition that the bankruptcy was the only effective way to resolve the parties'

18  disputes.

19          The Settling Builders and JPMorgan entered into a settlement in May, 2011, and

20  then proceeded to consummate that settlement as co-proponents of their *Joint Plan of*

21  *Reorganization Proposed by JPMorgan Chase Bank, N.A., as Administrative Agent under*

22  *the Prepetition Credit Agreement, and the Settling Builders* (as amended, the "Plan").

23  Tab 8, AER 776.  Pursuant to the Plan, the Settling Builders agreed to pay nearly $330

24  million to, among other things, satisfy their repayment guaranty obligations, pay South

25  Edge's unsecured creditors, finance the costs of administering South Edge's bankruptcy

26  case, and end all pending and threatened litigation relating to the South Edge bankruptcy

27  case.  JPMorgan, in its capacity as Agent, in turn, agreed to release its liens against South

28

**APPELLEES' OPENING BRIEF**

1    Edge's property, notwithstanding not having been paid in full, and also agreed to a

2    settlement of litigation with South Edge and the Settling Builders.

3       The Plan was supported by the chapter 11 trustee ("Chapter 11 Trustee") [Tab 12,

4    AER 935], and by *every* secured and unsecured creditor to cast a ballot.  Tab 8, AER 740-

5    41.  The Plan also was supported by every one of South Edge's members, except

6    Meritage, *id.*, representing more than 96% of the total equity in South Edge.  Meritage, the

7    sole objector, held only an approximate 3.5% equity interest in South Edge.  Tab 1, AER

8    25.  The Plan further resolved initial concerns raised by the City and the holders of the

9    LID bonds.  Even South Edge's pre-bankruptcy manager, Focus South Group, LLC

10   ("Focus"), which had been in bitter litigation with South Edge's other members, reached a

11   settlement under which it agreed to the Plan and the settlements it embodied.

12      The Bankruptcy Court entered the Confirmation Order on October 27, 2011.  Tab

13   8, AER 733.  Twenty-two days later, the Plan went effective [Bankr. D.E. 1385][3] when

14   the Chapter 11 Trustee, the Settling Builders, JPMorgan, Focus, and other parties-in-

15   interest effectuated a series of contemporaneous transactions that resulted in (i) a transfer

16   of ownership of substantially all of South Edge's real property and business assets to a

17   new entity formed by the Settling Builders, Inspirada Builders, LLC ("Inspirada

18   Builders"), (ii) the transfer of more than $380 million in cash (including the nearly $330

19   million contributed by the Settling Builders and additional funds to settle the Focus

20   litigation), and (iii) the consummation of an array of interconnected settlements, releases,

21   and injunctions contemplated by the Plan, including the settlement of all litigation and

22   disputes among JPMorgan, the Settling Builders, the Chapter 11 Trustee, and two of

23   South Edge's other members, Focus and Alameda Investments, LLC ("Alameda").  The

24   Plan was intended to bring closure and, for all parties except Meritage, it did.  Since the

25   Plan's effective date, dozens of creditors have received payments, and more than $14

26   million in LID public works improvement projects have been delivered to the City.

27   _____

[3] References to the Bankruptcy Court docket are cited herein as "Bankr. D.E. __".

28

**APPELLEES' OPENING BRIEF**

1       Meritage filed the instant appeal of the Confirmation Order on November 10,

2   2011.  Bankr. D.E. 1370.  At no time did Meritage seek a stay pending appeal.

3       Since filing this appeal, Meritage has presented three different statements of its

4   issues on appeal.  On November 23, 2011, Meritage designated 14 different issues,

5   including virtually every objection it had raised to Plan confirmation in the Bankruptcy

6   Court.  Bankr. D.E. 1388.  At the same time, Meritage was opposing transfer of its Ohio

7   Action against JPMorgan to Nevada, even though the Ohio Action relates to the South

8   Edge bankruptcy.[4]  Meritage argued to the U.S. Bankruptcy Court for the Southern

9   District of Ohio that, in light of the Confirmation Order, the South Edge bankruptcy case

10  was done, and thus resolution of the Ohio Action could have no conceivable effect on

11  South Edge's bankruptcy estate.[5]  When JPMorgan's counsel questioned the validity of

12  that argument in light of Meritage's pending appeal of the Confirmation Order, Meritage

13  quickly assured the Ohio bankruptcy court that it intended to file an amended statement of

14  issues on appeal so as to limit the scope of this appeal, thereby allegedly preserving the

15  finality of the Plan Confirmation Order.[6]

16      On January 6, 2012, Meritage filed its Amended Statement of Issues on Appeal in

17  which Meritage still contended, among other things, that the settlement upon which the

18  Plan was based was not in good faith, and that actions taken pursuant to the Plan were

19  unlawful.  Bankr. D.E. 1445.  Undoubtedly recognizing that its issues on appeal still

20  [4] As discussed further *infra*, Meritage alleges in the Ohio Action that JPMorgan acted in
21  bad faith by commencing the South Edge bankruptcy case and negotiating the Plan with
    the Settling Builders.  Meritage seeks damages and a declaration that it owes nothing on
22  account of its Repayment Guaranty obligations.

23  [5] *Supplemental Statement of Meritage Homes of Nevada, Inc. and Meritage Homes
    Corporation in Support of its Motion (A) for Remand [etc.]*, at 2, *Meritage Homes
    of Nevada, Inc. v. JPMorgan Chase Bank, N.A.*, Case No. 2:11-ap-2388 (Bankr. S.D. Ohio)
24  ("Ohio Bankr. Case"), D.E. 53, attached as Exhibit 3 to Declaration of Norman S.
    Rosenbaum [D.E. 20] ("Rosenbaum Decl.") filed in support of, and contemporaneously
25  with, the Appellees' Motion to Dismiss.

26  [6] Transcript of Hearing from the Ohio Bankr. Case held on Jan. 5, 2012 at 57:2-5; 98:25-
    99:5, attached as Exhibit 4 to Rosenbaum Decl.  *See also Martinez- Serrano v. INS*, 94
27  F.3d 1256, 1259-60 (9th Cir. 1996) (issues not raised and argued in opening brief are
    waived).

28

**APPELLEES' OPENING BRIEF**

1    threatened to upset the entire Plan (and thus were contrary to the representations Meritage

2    made in the Ohio Action), Meritage once again amended its statement of issues in its

3    Appellants' Opening Brief [D.E. 16] (hereinafter, "Meritage Op. Br."). Yet, as set forth in

4    the Plan Proponents' Motion to Dismiss Meritage's appeal as moot, Meritage's appeal –

5    even in its third iteration – still challenges fundamental aspects of the Plan. As set forth

6    below and in Appellees' Motion to Dismiss, Meritage's appeal does, in fact, go to the

7    heart of the Debtor's reorganization and the Plan that the Bankruptcy Court confirmed.

8    **III.    STATEMENT OF FACTS**

9         South Edge began as a joint venture by eight experienced builders and developers

10   (the "Members") to build "Inspirada," a nearly 2,000 acre "new urbanism" community in

11   the City of Henderson. Tab 12, AER 939. South Edge acquired land from the Bureau of

12   Land Management at auction for $557 million, and then proceeded to entitle that land and

13   begin construction of development-wide infrastructure, including streets, parks, and water

14   and sewer systems. Tab 14, AER 1083.

15        South Edge was initially funded by (1) a $535 million secured credit facility with

16   JPMorgan, as Agent for a group of lenders (the "Prepetition Lenders"), which was later

17   increased to $585 million, (2) public LID bonds in the original principal amount of $102

18   million, and (3) capital contributions by its Members. Tab 14, AER 1083. The

19   obligations due the Agent and Prepetition Lenders were to be satisfied as South Edge's

20   Members "took down" (acquired) land from South Edge for development. In addition,

21   over time, South Edge would realize additional income as public improvements ("LID

22   Segments") were completed and deeded to the City in exchange for bond proceeds.

23        Not surprisingly, the Members of South Edge would have preferred to have been

24   completely isolated from the financial risks of the Inspirada project. That, however, was

25   not the case. As a condition to the financing, the Agent, on behalf of the Prepetition

26   Lenders, required each of South Edge's Members, and their corporate parents, to execute

27   guaranties of South Edge's obligations to JPMorgan and the Prepetition Lenders,

28   specifically *Repayment Guaranties*, *Limited Guaranties* (triggered by certain "bad acts"),

and *Completion Guaranties*.  Tabs 28-30.  Pursuant to the *Repayment Guaranties*, each

Member and its parent:

> hereby absolutely, irrevocably and unconditionally, jointly and severally, as primary obligor and not as surety, guarantee and agree to pay upon demand by the Administrative Agent [JPMorgan] following the occurrence of a Bankruptcy Event,[7] for the benefit of the Lenders . . . , an amount equal to the Guaranteed Share of all principal of the Loans, all interest on the Loans and all commitment fees and Letter of Credit fees now owing or which may in the future be owing by the Borrower under the Credit Agreement . . . , when such sums are due and payable, whether on demand, at stated maturity, by acceleration or otherwise . . . .

Tab 28, SER 1775.

Each Member's "Guaranteed Share" was based upon a fraction, where the

numerator was determined by how much the Member owed on its remaining "take downs"

of property within Inspirada, while the denominator was all Members' remaining take

downs.  Thus, at any given time, all of the Members' Guaranteed Shares added up to 100

percent.   Tab 22, AER 152-53.  Each Guaranteed Share also was several, such that no

Member was responsible for any other Member's share, and conversely, so that the

payment by one Member of its share would not reduce the amount owed by any other

guarantor.  Tab 28, SER 1774-75 ("The obligations of the Guarantor hereunder shall not

be reduced by amounts paid by any other guarantor."); *see also* Tab 22, 1576-77

---

[7] Each *Repayment Guaranty* defines a "Bankruptcy Event" as that:

> (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed against Borrower seeking liquidation, reorganization or other relief under any bankruptcy law now or hereafter in effect and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered; or (ii) Borrower shall voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy law now or hereafter in effect.

TAB 28, SER 1774-75.  As this court is aware, whether the South Edge bankruptcy constitutes a "Bankruptcy Event" is currently pending before this Court, and thus the Plan Proponents will not brief the issue further here.  *See JPMorgan Chase Bank, N.A. v. Meritage Homes Corp., et al.*, Case No. 11-1364-PMP.

6

**APPELLEES' OPENING BRIEF**

1   (unrefuted testimony of Mr. Praw that "if one guarantor paid on its guarantee the other

2   guarantors would not receive a benefit from that payment").

3         By early 2008, the real estate market had begun a dramatic decline.  Two of South

4   Edge's Members, Kimball Hill and Alameda, defaulted on their own credit lines and

5   eventually ended up in their own chapter 11 cases.  Tab 14, AER 1083-84.  Virtually all

6   development stopped at Inspirada in the spring of 2008.  Tab 12, AER 941.  The financial

7   problems led to disputes among the Members, and between the Members and the Agent.

8   Tab 12, AER 941.  Those disputes, in turn, precipitated a decision-making gridlock and

9   funding shortfalls that, ultimately, led to litigation among JPMorgan, South Edge's

10  managing Member (Focus), the Settling Builders, and Meritage.  *Id.*

11        In April, 2008, various South Edge Members did not complete their take downs

12  and/or did not fund interest reserves.  Despite Meritage's contentions that it did not breach

13  any obligations at that time, an arbitration panel expressly found that "Meritage breached

14  these duties under the Operating Agreement by failure to seek tender of financing interest

15  and interest reserves payments into the appropriate account."  Tab 27, SER 1755.

16  Meritage "committed an event of default.  Thus, it cannot be said to have performed all of

17  its obligations under the Operating Agreement."  Tab 27, SER 1766-67.

18        Negotiations to restructure South Edge's obligations were unsuccessful.  Tab 15,

19  AER 1113.  In July, 2008, JPMorgan notified South Edge's Members that they were in

20  default.  *Id.*  JPMorgan subsequently commenced actions against the Members in both

21  New York and Nevada, which actions eventually were consolidated before this Court.

22  Tab 15, AER 1114.  South Edge's managing Member, Focus, also commenced an

23  arbitration proceeding against South Edge's five other non-bankrupt Members.  Tab 12,

24  AER 943.  A three-judge arbitration panel found that the five defendants – including the

25  Settling Builders and Meritage – breached their obligations to South Edge and awarded

26  Focus more than $36.8 million in damages.  *Id.*, Tab 27, SER 1773.  This Court entered an

27  order confirming the arbitration award on November 2, 2010 [Tab 12, AER 943], which

28  order Meritage is appealing to the Ninth Circuit.

**APPELLEES' OPENING BRIEF**

On December 9, 2010, JPMorgan, in its capacity as a lender, and two other Prepetition Lenders (collectively, "Petitioning Creditors")[8] filed an involuntary chapter 11 petition against South Edge for relief under section 303 of title 11 of the U.S. Code ("Bankruptcy Code").  Tab 9, AER 838.  JPMorgan, as Agent for the Prepetition Lenders and in its individual capacity as a lender, concurrently moved for the appointment of a chapter 11 trustee to replace existing management and administer South Edge's bankruptcy estate.  Bankr. D.E. 7.

Following a four-day trial, on February 3, 2011, the Bankruptcy Court granted the involuntary petition ("Order for Relief"), Tab 10, AER 888, and directed the appointment of the Trustee ("Trustee Order"), Tab 24, AER 1663.  The Bankruptcy Court found that Inspirada was "a significant and a serious development that has been stopped probably for good business reasons, but stopped, nonetheless, leaving approximately 600 homeowners . . . plus the City of Henderson and many others in limbo until the matters work out."  Tab 32, SRE 1861.  "There does need to be resolution of this . . . sooner, rather than later."  Tab 32, SRE 1870.  Among other things, the Bankruptcy Court found that South Edge's management was deadlocked, Tab 31, SRE 1871, and that its land was worth far less than what the Prepetition Lenders and other creditors were owed.  Tab 32, SRE 1865.

The Bankruptcy Court also found that creditors needed "an independent fiduciary running South Edge" in the form of a chapter 11 trustee.  Tab 32, SRE 1872; *see also* Tab 23, AER 1662.  In response to the Court's mandate, the Office of the United States Trustee appointed Cynthia Nelson (the "Chapter 11 Trustee"), an experienced financial advisor with extensive real estate experience.  Tab 24, AER 1663; Tab 12, AER 937-38.  The Chapter 11 Trustee immediately assumed control of South Edge's assets and began an investigation of the estate's affairs.

---

[8] The Prepetition Lenders financed South Edge pursuant to a credit agreement secured by substantially all of South Edge's assets ("Prepetition Credit Agreement") and guarantied by South Edge's Members and their parents.  As of the bankruptcy filing, the Prepetition Lenders were owed more than $367 million, Tab 15, AER 1116, which amount grew to approximately $382 million by the time the Plan became effective, Tab 15, AER 1119.

**APPELLEES' OPENING BRIEF**

1      The Settling Builders, South Edge, and Meritage appealed the Order for Relief

2  granting the involuntary petition and the Trustee Order.  This Court, on motion of the

3  Trustee and Agent, dismissed the appeals.  *South Edge, LLC v. JPMorgan Chase Bank,*

4  *N.A.*, 2011 U.S. Dist. LEXIS 49621 (D. Nev. Apr. 28, 2011).

5      Immediately after the Bankruptcy Court entered its Order for Relief, the Settling

6  Builders and JPMorgan resumed negotiations to try to reach a global settlement of the

7  bankruptcy, the obligations due under the Prepetition Credit Agreement, and all other

8  litigation relating to South Edge.  Tab 14, AER 1085; Tab 15, AER 1116.  A significant

9  goal of those negotiations was to achieve finality, including an end to all litigation

10  between the Settling Builders and JPMorgan.  Tab 15, AER 1117.

11      The parties engaged in more than three months of intensive negotiations.

12  Although Meritage was invited to participate in these negotiations, it soon became clear

13  that Meritage's position was irreconcilable with those of the other parties.  Tab 14, AER

14  1085-86.

15      The negotiations ultimately resulted in a settlement among the Settling Builders

16  (who hold a supermajority interest in South Edge) and JPMorgan in its capacity as Agent.

17  The settlement provided for a global resolution of the outstanding disputes and issues

18  amongst the parties related to obligations of South Edge and the Settling Builders under

19  the Prepetition Credit Agreement and required comprehensive releases among all of the

20  participants.  The settlement would be implemented through a plan of reorganization in

21  South Edge's chapter 11 case, with the Settling Builders and the Agent as Plan

22  Proponents. Tab 14, AER 1089; Tab 15, AER 1121.  The terms of the settlement were set

23  forth in a term sheet and plan support agreement dated May 19, 2011 (together, the "Plan

24  Support Agreement").  Tab 12, AER 962-1063.  Among other issues expressly addressed

25  by the Plan Support Agreement was that the plan would include express exculpation in

26  favor of the Settling Builders, the Trustee, the Agent, and the consenting Prepetition

27  Lenders, recognizing their collective efforts to bring South Edge out of chapter 11.  Tab

28  12, AER 988.  By June 10, 2011, the Plan Support Agreement had been executed by more

9

1   than 92% in dollar amount and 94% in number of the Prepetition Lenders and by each of

2   the Settling Builders.  Tab 15, AER 1121.

3           After further negotiations, the Chapter 11 Trustee also agreed to the Plan Support

4   Agreement, determining that the proposed settlement was in the best interests of South

5   Edge and its creditors.  Tab 12, AER 942-43 & 947-52.  The Chapter 11 Trustee's support

6   enabled the parties to work cooperatively together on issues such as bankruptcy financing,

7   construction of LID Segments, negotiations with the City of Henderson, and otherwise

8   administering the South Edge bankruptcy.  Tab 14, AER 1090.

9           A key component of the settlement and the Plan Support Agreement was the

10  Settling Builders' agreement to provide the South Edge bankruptcy estate with up to $21.4

11  million in interest free, trustee-in-possession financing pursuant to Bankruptcy Code

12  section 364 (the "TIP Facility"), and the Prepetition Lenders' agreement to permit their

13  liens on LID proceeds to be "primed" by that financing.  Tab 33, SER 1883.  The

14  financing enabled the Chapter 11 Trustee to pay the costs of administering the bankruptcy

15  estate, resume construction of Inspirada's infrastructure (including LID public

16  improvements), and preserve the value of the estate.  *Id.*  As explained by the Chapter 11

17  Trustee, "the TIP Facility is an essential element to the Settlement and is critical to my

18  ability to administer the Estate pending confirmation of the Plan of Reorganization

19  contemplated under the Settlement."  Tab 33, SER 1884.  The Chapter 11 Trustee warned

20  that, without the TIP Facility:

21          (a) the Estate very likely would be rendered administratively insolvent,
        (b) the partially and yet-to-be completed major Project infrastructure
22      would remain partially or completely unfinished, (c) unpaid property taxes
        and LID assessments would accrue as senior liens against the Project,
23      (d) the value of the Estate's property would be significantly impaired,
        (e) the Estate would have to rely on Bankruptcy [Code] Section 506(e)
24      surcharge rights . . . to address accrued and unpaid Trustee and
        professional fees, (f) I might be required to convert the Chapter 11 Case to
25      a liquidation case under chapter 7, and (g) **a largely consensual exit from
        bankruptcy premised on resolution of significant litigation and
26      continuation of the development of the Inspirada Project would be
        frustrated and lost**.
27

28  Tab 33, SER 1884 (emphasis added).  The Chapter 11 Trustee further testified that:

**APPELLEES' OPENING BRIEF**

**the TIP Facility is critical to the implementation of the Settlement, as it will bridge the Estate to a near-term exit from this Chapter 11 Case through a confirmed plan of reorganization that will have the consent of the Estate's largest creditor group and a super-majority of the equity constituents in the Chapter 11 Case, provide necessary consideration for the fair and appropriate treatment of all other constituencies, resolve protracted and expensive litigation, and get the Project back on track after languishing to the detriment of the City of Henderson and other parties in interest over the past few years.**

Tab 33, SER 1884-85 (emphasis added).

Meritage and Focus both objected to the TIP Facility, and they took extensive discovery in connection with their objections. *See* Bankr. D.E. 810, 840 & 886. The Bankruptcy Court overruled Meritage's and Focus' objections, finding that the TIP Facility was appropriate and "essential for the continued operation of the Debtor's business and the preservation of the Estate's value." Tab 34, SER 1961. Neither Meritage nor Focus appealed the order approving the TIP Facility, and the Settling Builders proceeded to finance all of the costs of the South Edge bankruptcy. The Settling Builders' TIP Facility enabled the Chapter 11 Trustee to proceed with the administration of the South Edge bankruptcy estate, which included resuming work on the LID public improvement projects for delivery to the City of Henderson.

On August 1, 2011, the Plan Proponents filed the Plan, seeking the Bankruptcy Court's approval of their settlement. Bankr. D.E. 844 (*see also* Tab 8, AER 776, for the version of the Plan as confirmed by the Bankruptcy Court). The Plan also addressed a multitude of other financial and legal issues facing South Edge, including the payment of numerous suppliers and vendors and the treatment of their contracts with South Edge.

The Plan provided that the Agent and the Prepetition Lenders would receive between $330 million and $340 million in payments. Tab 8, AER 798-803.[9] Although

---

[9] The precise amount of cash that the Prepetition Lenders would receive within this range depended upon the outcome of litigation with Focus over approximately $26 million "major infrastructure" funds that Focus had deposited with JPMorgan prior to the bankruptcy. Based upon a settlement of this litigation in connection with Plan confirmation [Bankr. D. E. 1295 & 1337], the Prepetition Lenders received a total of $335 million in cash (in addition to fees paid to the Agent) under the Plan.

**APPELLEES' OPENING BRIEF**

this would be a substantial recovery, it was still far short of the approximately $382

million in total principal and interest that the Prepetition Lenders were projected to be

owed on the Plan's contemplated effective date.  Tab 8, AER 743.  In addition, all

administrative, priority, and non-insider unsecured creditors of South Edge would be paid

in full.  Tab 8, AER 796-97, AER 803-06.[10]  The nearly $90 million in outstanding LID

bond obligations would be unimpaired, Tab 8, AER 798, with the Settling Builders

agreeing to fund any shortfalls in LID assessment payments and other budgeted items for

at least three years after the Plan became effective.  Tab 35, SER 2081, 2086-88, 2122.

The Plan required the Settling Builders to contribute all cash necessary to fund the

Plan, including payments to secured, priority, and unsecured creditors.  Tab 8, AER 809.

In total, the Settling Builders paid nearly $330 million to resolve South Edge's financial

problems (in addition to approximately $35 million they paid to settle with Focus).

Approximately $305 million of this was on account of the Settling Builders' own

Repayment Guaranty obligations and the Prepetition Lenders' fees.  Tab 8, AER 799 &

802.  Another approximately $11 million was paid for South Edge's administrative,

priority, and general unsecured creditors.  Tab 8, AER 809; Tab 1, AER 43.

The Settling Builders also paid approximately $12.5 million into the "Meritage

Repayment Guaranty Escrow."  Tab 8, AER 801-02.  As part of the settlement, JPMorgan

insisted that the Prepetition Lenders receive cash at least equal to the full Repayment

Guaranty amounts of all of South Edge's non-bankrupt Members, including the Settling

Builders and Meritage.  Tab 14, AER 1087.  While it was initially hoped that Meritage

---

[10] Article II of the Plan placed claims and interests in eight different classes—namely, Class P1 (Priority Non-Tax Claims); Class S1 (Other Secured Claims); Class S2 (LID Claims); Class S3 (Prepetition Lender Secured Claims); Class U1 (Prepetition Lender Deficiency Claims); Class U2 (General Unsecured Claims); Class U3 (Member Claims); and Class E1 (Equity Interests).  Class P1 Priority Claims and other creditors entitled to priority under the Bankruptcy Code received cash payment, in full.  Tab 8, AER 796 & 805-06.  Non-insider General Unsecured Claims in Class U2 receive a pro rata share of the $1 million General Unsecured Claims Recovery Fund.  Tab 8, AER 790 & 803-04.  It was anticipated that the total allowed amount of General Unsecured Claims would be less than that – approximately $850,000 (Tab 1, AER 43), although the actual allowed amount could differ, in part because one creditor is appealing the disallowance of its claim.

**APPELLEES' OPENING BRIEF**

would join the settlement and pay its Guaranteed Share, Meritage refused to do so.  *Id.*

Thus, JPMorgan and the Settling Builders negotiated a settlement under which Prepetition

Lenders could elect to assign to the Settling Builders participations in any recovery they

would otherwise receive on account of the Meritage Repayment Guaranty, in exchange for

a pro rata share of the Mertiage Repayment Guaranty Escrow.  Tab 14, AER 1087-88.

This was in accordance with Section 16 of the Meritage Repayment Guaranty, which

provides that "**any Lender may assign, sell participations in or otherwise transfer its**

**rights under the Facilities to any other person or entity on and subject to the terms**

**set forth in the Credit Agreement, and the other person or entity shall then become**

**vested with all the rights and benefits granted to the Lenders in this Guaranty or**

**otherwise**."  Tab 28, SER 1779.  The participations were memorialized in the form of a

"Participation Agreement," which the Bankruptcy Court approved as part of the Plan.  Tab

8, AER 750-51; Tab 35, SER 2034-45.  The participations had the effect of shifting all

risks of collection to the Settling Builders.  Tab 14, AER 1087-88; Tab 15, AER 1122-23.

They were not, however, intended to give Meritage a windfall release from all of its

obligations, given that Meritage paid nothing into the Plan settlement.   As explained by

Mr. Albert Praw, one of the Settling Builders' witnesses at the confirmation hearing:

> The Settling Builders were neither required nor willing to make a gift to
> Meritage by paying its share, without retaining the ability to recover that
> amount in the future if Meritage were found liable on its Repayment
> Guaranty.  Every other Settling Builder was paying its Repayment
> Guaranty amount plus additional consideration . . . . .

Tab 14, AER 1100.

In exchange for the Settling Builders' substantial financial contributions, the Plan

provided that the Inspirada development would be transferred to a new entity formed by

the Settling Builders, Inspirada Builders.  Inspirada Builders would acquire the land free

and clear of all liens, claims, and encumbrances.  Tab 8, AER 745, 763-64 & 810.  As

explained by the manager of South Edge's day-to-day operations, it was "very important

for the City of Henderson, its residents, and the construction community to know that,

13

1    when Inspirada emerges from bankruptcy, it is doing so free of the financial problems and

2    delays that plagued the Debtor during the last few years." Tab 13, AER 1075.

3         The City of Henderson insisted that certain assets remain in the bankruptcy estate

4    until the completion of negotiations with the City and the LID bondholders regarding the

5    future development of Inspirada. Accordingly, the Plan provides that South Edge's

6    Development Agreement, LID Segment acquisition agreement, and other related City

7    contracts remain in the South Edge bankruptcy estate, notwithstanding confirmation of the

8    Plan. Tab 8, AER 767-68. In addition, all claims arising under South Edge's Operating

9    Agreement (including claims against Meritage, based upon its defaults) remain in the

10   bankruptcy estate. Tab 8, AER 764. Following confirmation of the Plan, the bankruptcy

11   estate of South Edge:

12        shall have the full authority to pursue the Retained Actions after the
          Effective Date, and confirmation of the Plan shall not in any way release,
13        impair, or otherwise prejudice the Estate Representative's pursuit of such
          Retained Actions, including, but not limited to, causes of action against
14        the Meritage Parties for unfunded capital calls and other claims and causes
          of action arising under or relating to the Debtor's Operating Agreement.
15

16   Tab 8, AER 764.

17        Because assets were remaining in the Debtor's bankruptcy estate, it was critical

18   that those assets remain protected from creditor claims that were otherwise being satisfied

19   under the Plan. Accordingly, Section 8.3 of the Plan provides that, until the bankruptcy

20   estate is fully administered, and:

21        except as otherwise provided in this Plan or the Confirmation Order, all
          Entities shall be barred from asserting against the Debtor, the Estate, or the
22        Reorganized Debtor, or their respective successors or property, any other
          or further Claims, demands, debts, rights, Causes of Action, liabilities, or
23        Equity Interests based upon any act, omission, cause, transaction, state of
          facts, or other activity of any kind or nature that occurred prior to the
24        Effective Date.

25   Tab 8, AER 819. Thus, a creditor could receive its distributions under the Plan and

26   otherwise receive the benefits of being a "creditor" (including asserting rights of setoff as

27   Class S1 secured claims), but the creditor could not also attempt to end-run the Plan by

28   seeking additional distributions from the bankruptcy estate beyond those afforded to other

14

**APPELLEES' OPENING BRIEF**

1   creditors under the Plan.  Nor could a creditor seek to collect its claims from Inspirada

2   Builders, which as noted purchased the Inspirada project free and clear of all liens, claims,

3   and encumbrances.  Tab 8, AER 763 & 810.

4        The Plan also includes a narrow exculpation and limitation of liability provision

5   (Section 8.10) of the type that is commonly found in chapter 11 plans.  Tab 8, AER 824.

6   The provision bars parties from pursuing actions against the Chapter 11 Trustee and the

7   Plan Proponents for their efforts to restructure South Edge in the Bankruptcy Court,

8   absent a showing of gross negligence or willful misconduct.  This provision was an

9   essential part of the Plan, because of Meritage's litigious posture, and was a subject of the

10  parties' pre-Plan negotiations and expressly included in the Plan Support Agreement.  The

11  goal of the parties was to achieve as much finality as possible, Tab 15, AER 1117, and not

12  to have matters resolved by the Bankruptcy Court relitigated in other forums.

13       The Plan Proponents' concerns about Meritage's collateral litigation were not

14  unfounded.  On August 19, 2011, Meritage filed a state court action against JPMorgan as

15  Agent in the Franklin County, Ohio Common Pleas Court (the "Ohio Action").  Tab 31,

16  SER 1801-18.  Meritage's complaint in the Ohio Action sought both monetary damages

17  and a declaration that Meritage was not liable to JPMorgan on its Repayment Guaranty.

18  The Ohio Action was premised in part on allegations that sought to collaterally attack the

19  Plan Proponents' settlement in the South Edge chapter 11 case and this Court's affirmance

20  of the Order for Relief approving the involuntary bankruptcy, including (1) that JPMorgan

21  acted in bad faith "by filing the involuntary petition against South Edge for the purpose of

22  triggering Meritage's liability under the Repayment Guaranty," and (2) that by negotiating

23  and proposing the settlement Plan, "JPMorgan is colluding with other Members of South

24  Edge to harm Meritage and deprive it of substantial rights."  Tab 31, SER 1810, 1813.

25       On September 8, 2011, the Bankruptcy Court entered an order [Tab 11, AER 889]

26  approving a Disclosure Statement that was sent to all creditors to inform them of the Plan

27  and how it would affect their rights [Tab 1, AER 1].  Thereafter, the Disclosure Statement

28  and other solicitation materials were distributed to parties in interest, and eligible creditors

were asked to vote on the Plan.  Those parties that submitted ballots voted unanimously in favor of the Plan.  Specifically, **every voting Prepetition Lender with secured claims and unsecured deficiency claims (who collectively made up over 99.69% in number of the total lending syndicate) voted in favor of the Plan, and voting general unsecured creditors unanimously approved the Plan**.  Tab 8, AER 741; Bankr. D.E. 1275.[11]  **Seven out of eight of South Edge's Members also supported the Plan, together holding more than 96% of the total Membership interests in South Edge**. Tab 8, AER 740-41.[12]

Initially, a number of parties raised objections and/or informal concerns about the Plan, including South Edge Members Meritage, Focus, and Alameda, the City of Henderson, and the Indenture Trustee for the LID bondholders.  However, with the exception of Meritage, all of these objections were resolved.

JPMorgan, the Chapter 11 Trustee, and the Settling Builders entered into a comprehensive settlement with Focus, which the Bankruptcy Court approved in connection with the confirmation hearing.  Bankr. D.E. 1295 & 1337.  This settlement, among other things, resolved all disputes between the Settling Builders and Focus in the arbitration, and also settled litigation in the Bankruptcy Court over the ownership of approximately $26 million in "major infrastructure" money that Focus had contributed to South Edge.  Similarly, the settlement with Alameda (which the Bankruptcy Court also approved in connection with confirmation) resolved all disputes among Alameda, JPMorgan, South Edge, and the Settling Builders, and fixed the amount of South Edge's claim in Alameda's own chapter 11 case based upon Alameda's unsatisfied guaranty obligations and breaches of the South Edge Operating Agreement.  Bankr. D.E. 1343 &

---

[11] Classes P1, S1, and S2 were unimpaired under the Plan and, pursuant to Bankruptcy Code section 1126, were deemed to accept it.  Classes U3 and E1 received no distributions under the Plan and were deemed to reject it.

[12] The ownership interests of each of South Edge's Members was set forth in the Disclosure Statement.  Tab 1, AER 25.  Meritage's interest was 3.53%.

**APPELLEES' OPENING BRIEF**

1349.  Finally, the concerns of the City and the LID bondholders were addressed through additional language in the Plan and Confirmation Order outlining the process they would undertake post-confirmation to continue working together on the future of Inspirada.  Tab 8, AER 767-68.

Unlike every other creditor and Member, Meritage was unwilling to participate in a global settlement of South Edge's financial problems.  Rather, Meritage expanded its litigation, taking extensive discovery, including depositions of representatives of JPMorgan, the Settling Builders, and the Chapter 11 Trustee.

On October 11, 2011, Meritage filed both its *Objection to Joint Plan of Reorganization* [Tab 3, AER 361] ("Meritage Plan Obj.") and the *Memorandum of Points and Authorities in Support of Meritage's Objection to the Joint Plan of Reorganization* [Tab 4, AER 375] ("Plan Obj. Br.").  Meritage raised a litany of objections to the Plan, many (but not all) of which it has abandoned on appeal.  Of relevance to this appeal, Meritage objected to (i) exculpation and limitation of liability provisions in the Plan which were intended to prevent Meritage's collateral attacks on the bankruptcy process (including the Ohio Action), which Meritage mischaracterizes as "improper releases" of the Plan Proponents, (ii) the fact that South Edge's assets, to the extent not transferred to Inspirada Builders, would remain in South Edge's bankruptcy estate, and thus would not be subject to claims by Meritage, except in accordance with the Plan, and (iii) the fact that the Plan provided for participations in the Prepetition Lenders' Repayment Guaranty claims against Meritage, and that the Plan was not drafted in such a way as to enable Meritage to argue that its guaranty obligations were fully satisfied and released, notwithstanding the fact that Meritage was contributing nothing to the Plan settlement.

In its objection, Meritage included a lengthy criticism of the Plan because, according to Meritage, the Plan was not "bankruptcy neutral."  Tab 3, AER 367.  What Meritage meant by "neutrality," however, was anything but that.

On the one hand, Meritage contended that the Plan could not affect its rights in South Edge in any way, notwithstanding the fact that every other creditor and Member of

APPELLEES' OPENING BRIEF

1    South Edge was to be bound by the Plan (indeed, Bankruptcy Code section 1141(a) makes

2    clear that "the provisions of a confirmed plan bind the debtor . . . and any creditor, equity

3    security holder, or general partner in the debtor . . . , whether or not such creditor, equity

4    security holder, or general partner has accepted the plan").  In this vein, Meritage objected

5    to the restructuring of South Edge, including the free and clear transfer of South Edge's

6    development to Inspirada Builders, and the Settling Builders' acquisition of participations

7    in the Prepetition Lenders' recovery rights vis-à-vis Meritage.

8           On the other hand, Meritage wanted the Plan to be modified so that it could argue

9    that the Plan *benefitted* Meritage.  Meritage demanded that a lengthy provision be added

10   to the Plan that would have permitted Meritage to argue, among other things, that the Plan

11   resulted in a "satisfaction" of its obligations, a "release of guarantors," or a "breach of

12   covenants of good faith and fair dealing" allegedly owed to Meritage.  Tab 3, AER 373.

13   Thus, although Meritage was paying *nothing* into the Plan settlement, Meritage wanted to

14   be able to argue that confirmation of the Plan resulted in a windfall release of all of its

15   guaranty obligations.

16          The Bankruptcy Court held a three-day trial on confirmation, commencing

17   October 17, 2011.  *See* Tab 22, AER 1424; Tab 6, AER 434; Tab 7, AER 526.  Per

18   agreement of the parties, the Bankruptcy Court accepted declaration testimony from seven

19   witnesses for the Plan Proponents: Ms. Cynthia Nelson, the Chapter 11 Trustee and a

20   Senior Manager of FTI Consulting, Inc. [Tab 12], Mr. Robert McGibney, an officer of one

21   of the Settling Builders who was active in Inspirada's day-to-day operations [Tab 13], Mr.

22   Albert Praw, an officer of one of the Settling Builders who negotiated the Plan [Tab 14],

23   Mr. William Austin, Executive Director of JPMorgan who also negotiated the Plan [Tab

24   15], Mr. Carter D. Morrison, a Senior Vice President of National Valuation Consultants,

25   Inc., who appraised South Edge's real property to be worth less than $40 million, a small

26   fraction of what the Prepetition Lenders were owed [Bankr. D.E. 1149], Mr. Jeffrey R.

27   Truitt, a Principal of XRoads Solutions Group, LLC, whose expert report showed that

28   creditors would do much better under the Plan than in a liquidation of South Edge that

1   would have occurred but for the Plan [Bankr. D.E. 1151], and Ms. Julia G. Osborne, a

2   Director of BMC Group, Inc., whose analysis of the voting on the Plan showed the

3   creditors' overwhelming support for the restructuring [Bankr. D.E. 1275].  All of the

4   witnesses were made available for cross-examination in open court.  Tab 8, AER 734-35.

5          The evidence presented in support of confirmation was substantial and compelling.

6   The Chapter 11 Trustee testified that "the Plan is in the best interest of the Estate and its

7   creditors."  Tab 12, AER 937.  The only alternative to the Plan was more litigation, which

8   "would necessarily involve substantial delay in the Estate's ability to exit from

9   bankruptcy, and certainly in the ability to make a meaningful distribution on account of

10   claims."  Tab 12, AER 950.  Litigation "likely would not be resolved for several years,"

11   during which time South Edge "very likely would be rendered administratively insolvent,"

12   with no ability to pay its bills and to continue to deliver LID improvements to the City of

13   Henderson and for the benefit of more than 600 homeowners.  *Id.*  According to the

14   Chapter 11 Trustee, if the Plan was not confirmed, "a largely consensual exit from

15   bankruptcy premised on resolution of significant litigation and continuation of the

16   development of the Inspirada Project would be frustrated and lost."  *Id.*

17          Mr. Praw similarly explained that "the Plan embodies months of negotiations

18   between the vast majority of the stakeholders in this Chapter 11 Case that culminated in a

19   global settlement."  Tab 14, AER 1096.

20          [T]he Plan offers the best result for all creditors because (1) it enables
        substantial, and prompt, distributions to non-insider general unsecured
21        creditors, (2) ends years of expensive and complex litigation in a multitude
        of forums, and (3) brings stability to a fragile project and creates a
22        platform for the future development of and home sales in Inspirada.

23   Tab 14, AER 1098.

24          Mr. Austin's testimony made clear that the Plan benefitted not only the Prepetition

25   Lenders, who were owed the lion's share of South Edge's debt, but also creditors and the

26   community generally.

27          The Plan also confers substantial benefits on South Edge's other
        stakeholders.  Under the Plan, Inspirada will be under the stewardship [of]
28        the Settling Builders – parties who first conceived of Inspirada – and who,

1

2

3

4

> free from the enormous debt and litigation resolved under the Plan, are those best suited to manage the future development of the Project. I am informed and believe that the Settling Builders are committed to working with the City to map out and implement a feasible development plan for Inspirada and its underlying infrastructure. This effort will benefit the City, the local community, Inspirada's residents and the holder of the LID bonds as it will address fiscal, and health and safety issues.

5   Tab 15, AER 1123.

6       Meritage offered no alternative to the Plan. Instead, Meritage devoted most of its

7   evidence and argument at the confirmation hearing to why, in its view, it should not have

8   to pay anything on account of its Repayment Guaranty, either because of events that

9   happened long before bankruptcy, or because of the Plan settlement itself.

10      Meritage first cross-examined the Settling Builders' principal witness, Mr. Albert

11  Praw, regarding events that occurred in April, 2008, more than two years before the South

12  Edge bankruptcy. Tab 22, AER 1517. Meritage's apparent goal was to demonstrate that

13  it was not liable on its Repayment Guaranty because it purportedly had "performed" on its

14  obligations to "take down" land from South Edge – the very issue that is pending before

15  this Court in JPMorgan's action against Meritage.[13] Meritage repeated its line of cross-

16  examination with Mr. William Austin, again seeking to establish that Meritage owed

17  nothing on its Repayment Guaranty. Tab 22, AER 1607.

18      At the end of the first day of trial, when Meritage's cross-examination of Messrs.

19  Praw and Austin was completed, counsel had a colloquy with the Court regarding the

20  ordering of the remaining witnesses and how long the rest of the trial would take. Tab 22,

21  AER 1650-59. Meritage's sole witness, Mr. Larry Seay, had included in his declaration

22  testimony regarding Meritage's purported "take down" in April 2008 [Tab 5, AER 428-

23  31], and the Plan Proponents wished to cross examine him on that testimony, just as

24  Meritage had examined the Plan Proponents' witnesses. The Court, however, made clear

25  that what happened in 2008 was not relevant to the Plan confirmation.

26

27  [13] *See JPMorgan Chase Bank, N.A. v. Meritage Homes Corp. et al.*, Case No. 11-1364-PMP.

28

**APPELLEES' OPENING BRIEF**

1
2
3
4

> Let me be clear, and it's one of the reasons why I almost immediately sustained Mr. Engel's objection [regarding the cross-examination of Mr. Praw and Mr. Austin in relation to events that occurred in 2008]. I do not intend this confirmation hearing to be a mini-trial with respect to Meritage's claims or defenses as against South Edge or as against any of the settling builders or as against [JPMorgan] as agent.

5
6
7

> In my mind, **the issue is whether or not whatever claims they have are preserved, not whether they have any to begin with**, and I think it would be a fool's errand to try and prove that they had none or that the ones that they have are absolute winners; otherwise, my experience would be is that they would have been worked out by now.

8   *See* Tab 22, AER 1652 (emphasis added).

9        What was important to the Bankruptcy Court, however, was what effect Plan

10   confirmation itself would have on Meritage's Repayment Guaranty liability, and

11   specifically whether the Bankruptcy Court should accept Meritage's argument that Plan

12   confirmation could result in a "satisfaction" or "release of guaranties."

13
14
15
16
17

> So my concern and **the reason I let that in is to allow evidence with respect to the effect of the plan on future prosecution of those claims** and because I believe -- I mean, as I understand [Meritage's] argument from their objection, [Meritage's] contention is to the extent that those claims are altered, A, it's impermissible under the bankruptcy code, and, B, it shows bad faith because that's contrary to what the plan proponents have testified, but **that properly looked at is a relatively narrow range of questions**.

18   Tab 22, AER 1652 (emphasis added). *See also* Tab 7, AER 559 (Judge Markell: "[A]s I

19   have said, I think the issue under bankruptcy law is the effect, if any, of confirmation of

20   this plan on their rights vis-à-vis the repayment guarantee or any other obligation as to any

21   other nondebtor."). Even Meritage's own counsel acknowledged that the issue at

22   confirmation was whether or not claims against Meritage would be affected by

23   confirmation of the Plan. Tab 7, AER 578-79 (Meritage counsel agreeing to Court's

24   statement that "the issue is whether or not those rights are affected by any proposed

25   confirmation order as opposed to having to determine or estimate what those claims are

26   for purposes of entering a confirmation order").

27        Meritage liberally quotes the Bankruptcy Court for the proposition that it was not

28   holding a "mini-trial" on whether Meritage performed its "take down" obligations in April

**APPELLEES' OPENING BRIEF**

1   2008.  *See, e.g,* Meritage's Opening Brief at 13.  Meritage, however, never once

2   acknowledges the Bankruptcy Court's clear statement that the Court was deciding the

3   very issue that Meritage raised – whether the Plan could result in a satisfaction or release

4   of Meritage's Repayment Guaranty obligations.

5           Following the three-day contested evidentiary hearing on confirmation of the Plan,

6   the Bankruptcy Court overruled Meritage's objections to the Plan, and also overruled the

7   vast majority of Meritage's objections to the proposed form of Confirmation Order.   The

8   Bankruptcy Court noted that, while Meritage's objections to confirmation were not in

9   "bad faith," "the majority if not all of the objections tend to turn on overgeneralizations or

10  mischaracterizations of the plan."  Tab 7, AER 671.

11          On October 27, 2011, the Bankruptcy Court entered the Confirmation Order

12  confirming the Plan.  Tab 8, AER 733.  The Bankruptcy Court held that "[t]he Plan

13  provides the greatest opportunity to maximize the value of the Estate, and the Trustee and

14  the Plan Proponents have exercised sound and reasonable business judgment through the

15  Plan."  Tab 8, AER 748.  The Bankruptcy Court also approved the transfer of assets to

16  Inspirada Builders under the Plan, free and clear of liens, claims, and encumbrances (other

17  than liens securing LID assessments and other governmental rights and entitlements that

18  run with the land), holding that "the Acquirer shall not be liable for any Claims against the

19  Debtor."  Tab 8, AER 764.  The Bankruptcy Court also found that:

20          The Acquirer [Inspirada Builders] is a good faith purchaser, as that term is
            used in Bankruptcy Code section 363(m), and the Acquirer is entitled to
21          the full protections of section 363(m).

22  *Id.*

23          The Bankruptcy Court rejected all of Meritage's objections to confirmation of the

24  Plan, including specifically Meritage's contention that it was somehow being unfairly

25  harmed or singled out under the Plan.  "The Plan is not being used by the Plan Proponents

26  as an improper 'litigation tactic' against the Meritage Parties.  The Plan is a good faith

27  resolution of the Debtor's financial problems."  Tab 8, AER 751.  As explained by the

28  Bankruptcy Court:

The Settling Builders, the Agent, the Prepetition Lenders, and the Debtor's Estate are entering into a good faith settlement of disputes that have existed for more than three years. The Settling Builders, the Agent, and the Prepetition Lenders are making substantial contributions to the settlement. The Settling Builders are paying more than $330 million, which amount will include all Allowed Administrative Expense Claims and Priority Claims of the Chapter 11 Case, and a $1 million General Unsecured Claim Recovery Fund, which is expected to provide Holders of Allowed General Unsecured Claims in Class U2 with a substantial dividend. The Settling Builders also are agreeing to fund all future LID assessments, property taxes, maintenance, and security expenses for the project while negotiations continue with the City of Henderson regarding the future development of the project, as set forth on the budget included as Exhibit "C" to the Acquirer's Operating Agreement (Exhibit "G" to the Plan Supplement). The Agent and the Prepetition Lenders are consenting to the Plan, notwithstanding a deficiency of approximately $47 million (including postpetition interest). The settlement of these disputes is in good faith, at arms' length, and not for the purpose of prejudicing any other party. Finally, in furtherance of the Plan, the Agent, the Trustee, and the Settling Builders entered into a Settlement Agreement and Mutual Release with the Focus Parties, which was approved by the Court on October 17, 2011 [see D.E. 1295].

Tab 8, AER 753. The Bankruptcy Court further found:

The evidence at the Confirmation Hearing demonstrates that the Plan was negotiated by the Plan Proponents in good faith and at arms' length. The purpose of the Plan was not to take unfair advantage of the Meritage Parties, but rather to achieve a fair and reasonable resolution of the Debtor's complex financial and legal problems. With the exception of the Meritage Parties, all parties that have been involved in years of litigation – the Settling Builders, the Agent, the Focus Parties, and the Debtor – will be achieving peace. In addition, the Plan Proponents have resolved their, and the Estate's, claims against Alameda in connection with Plan confirmation, and in turn Alameda has agreed to support the Plan. The Plan thus will end the years of deadlock and litigation that have plagued the Debtor and its development, and avoid the significant expense, great uncertainties, and potentially extensive delays and materially lesser recoveries for creditors that would be occasioned by denial of confirmation of the Plan. The Plan will benefit not only the Debtor, but also the community, the hundreds of residents who currently live within the Debtor's project, and the City of Henderson.

Tab 8, AER 749.

With respect to Meritage's remaining issues on appeal, the Bankruptcy Court found that the exculpation and limitation of liability provisions in Section 8.10 of the Plan were consistent with Ninth Circuit law and the general rule that actions taken in the Bankruptcy Court should not be subject to collateral attack in other forums. Tab 8, AER 747. The Bankruptcy Court also found that "[t]here is a compelling need for [the exculpation and limitation of liability provisions in] Section 8.10 of the Plan, because the

23

Meritage Parties already brought actions against the Plan Proponents in non-bankruptcy forums based upon actions they have taken in this Chapter 11 Case." *Id.*  The limitations on liability:

> (i) are within the jurisdiction of the Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan; (iii) confer material benefit on, and are in the best interests of, the Plan Proponents, Debtor, the Estate, and Holders of Claims against the Debtor, and are important to the overall objectives of the Plan; (iv) are consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code; (v) are in exchange for valuable consideration; and (iv) were properly noticed to Holders of Claims and Equity Interests.

Tab 8, AER 747; *see also* Tab 8, AER 762 (finding that "the settlements, compromises, releases, and injunctions set forth in the Plan among the Debtor, the Estate, the Plan Proponents, and their related parties are approved as integral parts of the Plan, were negotiated at arms' length and in good faith, are fair, equitable, reasonable, and are in the best interest of the Debtor, its Estate, and the Holders of Claims and Equity Interests").

The Bankruptcy Court also found the Plan's provisions regarding the Meritage Repayment Guaranty Escrow to be appropriate.  Contrary to Meritage's contentions, the Bankruptcy Court made clear that confirmation of the Plan would not result in a windfall to Meritage by releasing it from its third-party guaranty obligations.

> Other than the four Repayment Guaranties of the Settling Builders, which are being satisfied in full under the Plan, the Plan and its confirmation shall not in any way discharge or otherwise release in any way the Agent's or the sub-Agent's claims under the Guaranties against the Members and Member Affiliates.  *See American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*, 885 F.2d 621, 625-26 (9th Cir.1989); *Seaport Automotive Warehouse, Inc. v. Rohnert Park Auto Parts, Inc. (In re Rohnert Park Auto Parts, Inc.)*, 113 B.R. 610, 614-17 (9th Cir. BAP 1990) . . . .  The Plan's treatment of the Class S3 and U1 Claims will not affect the Meritage Parties' liability on their Repayment, Completion, and Limited Guaranties, which are not being satisfied or released under the Plan.  *See American Hardwoods*, 885 F.2d at 625 ("'Generally, discharge of the principal debtor in bankruptcy will not discharge the liabilities of codebtors or guarantors . . . .'") (quoting *Underhill v. Royal*, 769 F.2d 1426 (9th Cir. 1985)); *see also* Meritage Repayment Guaranty § 2(a) ("the obligations of the Guarantor hereunder shall not be reduced by amounts paid by any other guarantor"); *id* §§ 3 & 4 (the obligations of the Meritage Parties under the Repayment Guaranty are absolute and irrevocable); *id.* § 16 ("any Lender may assign, sell participations in or otherwise transfer its rights under the Facilities [as defined in the Prepetition Credit Agreement] to any other person or entity

24

on and subject to the terms set forth in the [Prepetition] Credit Agreement, and the other person or entity shall then become vested with all the rights and benefits granted to the Lenders in this Guaranty or otherwise").

Tab 8, AER 764-65.  The Bankruptcy Court further found that the Meritage Repayment Guaranty provisions were in good faith and consistent with the terms of the guaranty:

> Nor are the Meritage Repayment Guaranty Escrow provisions (Section 3.4(F) of the Plan) lacking in good faith.  Section 16 of the Meritage Repayment Guaranty expressly provides that each Prepetition Lender "may assign, sell participations in or otherwise transfer its rights under the Facilities to any other person or entity . . . ."  Section 3.4(F) of the Plan comports with this provision.  The Court finds nothing to be unfair or lacking in good faith as to the Meritage Parties, as to the Plan's treatment of the Meritage Repayment Guaranty.

Tab 8, AER 751.

Finally, the Bankruptcy Court held that, because assets were remaining in the South Edge bankruptcy estate, creditors could not seek to end-run the Plan's provisions by pursuing those assets outside of the Plan.

> The Debtor is not entitled to a discharge because it is liquidating under the Plan.  *See* Bankruptcy Code section 1141(d)(3).  In accordance with this requirement, the Plan does not contain a discharge provision.  However, some assets will remain in the Debtor's Estate post-confirmation (as section 1141(b) allows), including the Development Agreement, the COH Acquisition Agreement, other development-related agreements with the City and Clark County School District, and the Retained Actions.  After the Plan's Effective Date, the Debtor's Estate will remain subject to the protections of the automatic stay of Bankruptcy Code section 362 until the Estate's assets are fully administered.  *See Hillis Motors v. Hawaii Auto. Dealers' Ass'n (In re Hillis Motors)*, 997 F.2d 581 (9th Cir. 1993).  The injunction provisions in Section 8.3 of the Plan implement these protections and are thus appropriate.  They are of limited duration and protect only the Debtor and its Estate through the completion of the liquidation of the Estate's assets, at which time the Debtor will be dissolved.

Tab 8, AER 758-59.

As of November 18, 2011 (the "Effective Date"), each of the conditions precedent to occurrence of the effectiveness of the Plan was satisfied, and the Plan went effective.  Bankr D.E. 1385.  Concurrent with the Plan's closing, the related settlement with Focus also closed, thus bringing an end to nearly three years of litigation among JPMorgan, Focus, and the Settling Builders.  Among other things, on the Effective Date: (i) more

25

than $380 million in funds changed hands, most of which was funded by the Settling

Builders; (ii) all of South Edge's real estate and other business assets were transferred to a

new entity owned by the Settling Builders, Inspirada Builders; (iii) various contracts

relating to the construction and operation of the development were assigned to Inspirada

Builders; (iv) the Settling Builders satisfied their own Repayment Guaranty obligations,

and acquired participations in any future recoveries from Meritage on account of its

unsatisfied Repayment Guaranty; (v) Inspirada Builders, as the Trustee's successor under

the Plan (the "Estate Representative"), became the sole party entitled to act on behalf of

the Debtor and its Estate; and (vi) the Trustee was discharged and her bond was

exonerated. *See* Plan at § 6.3.  In short, as of November of last year, the Plan was

substantially consummated, within the purview of Bankruptcy Code section 1102(2).[14]

Since the Effective Date, Inspirada Builders has continued to operate the

development, including delivering to the City of Henderson more than $14 million in

public improvements that had been worked on during the bankruptcy case.  The parties

have taken other actions in reliance on the Plan and settlement as well, including

dismissing the appeals to the Ninth Circuit of the Order for Relief and the Trustee Order,

and dismissing various actions that were pending in this Court.

## IV.   ARGUMENT

### A.   The Plan Does Not Contain Improper Third Party Releases.

#### 1.   The Plan's Exculpation Provisions Are Consistent With Numerous Decisions From Within And Outside The Ninth Circuit Approving Similar Exculpations For Actions Taken In Furtherance Of A Bankruptcy Reorganization.

Meritage contends that the "Bankruptcy Court erred in approving a release of third

party claims against non-debtors."  Meritage Op. Br. at 15.  Although Meritage repeatedly

---

[14] "[S]ubstantial consummation" means—(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."  11 U.S.C. § 1101(2).

**APPELLEES' OPENING BRIEF**

1  uses the term "release," Meritage actually is referring to a limited exculpation clause that

2  bars collateral attacks on the bankruptcy process itself.  Specifically, the exculpation

3  clause in the Plan (Section 8.10) protects the Plan Proponents, the Chapter 11 Trustee, the

4  Consenting Prepetition Lenders, and other parties who actively participated and

5  contributed to the bankruptcy process from being held liable for such participation, absent

6  findings of gross negligence or willful misconduct.

7       Meritage does not dispute that exculpation clauses in bankruptcy plans are

8  commonplace.  According to Meritage, however, the South Edge Plan's exculpation

9  clause is improper because exculpation can extend "only to non-debtors who are estate

10  fiduciaries."  Meritage Op. Br. at 15.  Because the Plan Proponents were creditors and

11  Members of South Edge (and not fiduciaries), Meritage asserts that they cannot be

12  protected by the exculpation clause.  Meritage is wrong.

13       Courts in the Ninth Circuit routinely approve exculpations that are

14  indistinguishable from the one contained in the South Edge Plan, whether as part of a plan

15  or in connection with other significant bankruptcy transactions.  *See Micro-Waste Corp. v.*

16  *Sanitec Indus., Inc. (In re Sanitec Indus., Inc.)*, 2009 Bankr. LEXIS 4532 (B.A.P. 9th Cir.

17  Dec. 21, 2009) (stating that "[a]n exculpation clause excusing a debtor and its officers,

18  members, directors, and professionals from liability resulting from any act taken or not

19  taken in connection with the chapter 11 process is not per se against public policy or

20  unreasonable" and upholding the determination by a bankruptcy court that a plan

21  exculpation clause was reasonable where it "was neither overbroad nor overreaching" and

22  it did not apply to gross negligence, willful misconduct, or fraud (citation omitted)); *In re*

23  *Birting Fisheries, Inc.*, 300 B.R. 489, 504 n.16 (B.A.P. 9th Cir. 2003) ("The trend among

24  bankruptcy courts . . . has been to confirm chapter 11 plans with express discharge or

25  indemnification provisions for nondebtors if they meet certain tailored criteria or overall

26  necessity.").

27       Contrary to Meritage's assertion, exculpation clauses in the Ninth Circuit are not

28  limited to debtors or other "estate fiduciaries."  Rather, exculpations can and do include

**APPELLEES' OPENING BRIEF**

creditors, such as JPMorgan and the Settling Builders, who actively participate in and contribute to the reorganization process, especially when they also assume the additional burden of serving as official proponents of the Plan under 11 U.S.C. § 1121(c):

- *In re Yellowstone Mountain Club, LLC,* 460 B.R. 254, 267-77 (Bankr. D. Mont. 2011) (approving a plan of reorganization's exculpations of the agent for the pre-bankruptcy credit facility, the bankruptcy lender, and the acquirer of the debtor's assets);

- *In re Station Casinos, Inc.*, 2010 Bankr. LEXIS 5380 at *58-61, 94-99 (Bankr. D. Nev. Aug. 27, 2010) (approving exculpation of various creditors who negotiated the plan of reorganization);

- *In re 944 Media, LLC*, 2010 Bankr. LEXIS 3904 at *12-13 (Bankr. C.D. Cal. May 7, 2010) (approving exculpation for third parties that provided bankruptcy financing to the debtor);

- *In re Hawaiian Telcom Communs., Inc.*, 430 B.R. 564, 593-94 (Bankr. D. Haw. 2009) (approving exculpation of creditor plan proponents);

- *In re Aloha Airlines, Inc.*, 2008 Bankr. LEXIS 3971 at *12-13 (Bankr. D. Haw. Nov. 26, 2008) (approving exculpation for a union and its members that negotiated a settlement with the chapter 7 trustee).

Indeed, Meritage's own counsel has proposed and obtained approval of exculpations of creditors in cases within the Ninth Circuit. *See, e.g.*, *In re Speciality Trust, Inc.*, Case No. 10-51432, Docket No. 1001 at p. 18 (Bankr. D. Nev. June 27, 2011) (confirming plan [Docket No. 718] that contained exculpations of, among others, third party lenders); *In re Woodside Group, LLC*, Case No. 08-20682, Docket No. 2124 at 28-29 (Bankr. C.D. Cal. Nov. 25, 2009) (confirming plan that included exculpations for certain creditors (including South Edge), based upon arguments by Meritage's counsel that "[s]uch exculpation clauses are customarily included in plans of reorganization and routinely approved," *see* Docket No. 1677 at p. 25).

Meritage contends that the exculpation clause violates the Ninth Circuit's prohibition on extending the discharge of Bankruptcy Code section 524 to non-debtors,

**APPELLEES' OPENING BRIEF**

1    citing *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), *In re American Hardwoods, Inc.*,

2    885 F.2d 621 (9th Cir. 1989), *Underhill v. Royal*, 769 F.2d 1426 (9th Cir. 1985), and *In re*

3    *Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007).  None of those cases are applicable

4    here, however, because each of them (i) involved attempts to release non-debtor parties

5    from debts that they were co-liable for with the debtor (which section 524(e) expressly

6    prohibits), and (ii) none of them involved narrow exculpations that, as provided in the

7    South Edge Plan, were limited to acts taken directly in connection with a bankruptcy case.

8         In *American Hardwoods*, the issue was whether confirmation of the debtor's plan

9    could release a non-debtor guarantor of the debtor's obligations; the Ninth Circuit held

10   that it could not, noting that Bankruptcy Code "Section 524(e) states that the 'discharge of

11   a debt of the debtor does not affect the liability of any other entity on, or the property of

12   any other entity for, such debt.'"  885 F.2d at 625.  Similarly, in *Lowenschuss*, *Underhill*,

13   and *Excel*, the Ninth Circuit held that plan confirmation could not release non-debtor

14   parties from their co-liability with the debtor for torts, securities law violations, and other

15   acts that had nothing to do with the bankruptcy case.  None of the Ninth Circuit authorities

16   Meritage cites involved exculpations that were limited to actions taken in furtherance of

17   the bankruptcy process.

18        In *Station Casinos,* the United States Bankruptcy Court for the District of Nevada

19   approved an exculpation provision that was even broader than that in South Edge's Plan,

20   in that it protected creditors for their efforts to restructure the debtor *before as well as*

21   *during* the *Station Casinos* chapter 11 case.  In approving this broader exculpation, the

22   *Station Casinos* court expressly rejected the argument advanced here by Meritage that the

23   exculpation of creditors violated Bankruptcy Code section 524(e) and Ninth Circuit

24   prohibitions on "third party releases."  In particular, the *Station Casinos* court found that a

25   limited exculpation was very different from a "third party discharge" of the type that

26   concerned the Ninth Circuit in *Lowenschuss* or *American Hardwoods*, because the

27   exculpation was not relieving the exculpated parties of any liability for debts *of the debtor.*

28        As explained by the *Station Casinos* court:

Section 524(e) provides in relevant part that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." In [*Lowenschuss*], the Court of Appeals for the Ninth Circuit held that Section 524(e) applies to chapter 11 plan bankruptcy discharges.  However, bankruptcy courts generally recognize that Section 524(e) is silent on whether a chapter 11 plan or confirmation order could affect the liability of a non-debtor on statutory grounds other than a bankruptcy discharge.  Here the exculpation provision of Article X.D. does not violate section 524(e) because it is based upon the more limited exculpation provisions that are expressly contemplated and permitted by Bankruptcy Code section 1125(e).

Section 1125(e) provides a grant of immunity from liability not only under the securities laws, but also under any law, rule, or regulation governing solicitation or acceptance of a plan, to any person that participates in good faith in the solicitation of acceptances of a plan or the offer, issuance, sale or purchase of a security offered or sold in connection with the plan.

2010 Bankr. LEXIS 5380 at *94-96.

In upholding the specific exculpations in the *Station Casinos* plan, the court held:

The Court is of the view that, as long as the pre-petition restructuring efforts were made in good faith and in compliance with the applicable provisions of chapter 11 (as expressly required by Section 1125(e)), such conduct is precisely the type of activity that section 1125(e) is designed to protect.  It would be inequitable, and would not comport with the plain intent of Section 1125(e) if, after confirmation of the Plan and implementation of the Restructuring Transactions, the Exculpated Parties — the Persons and Entities on the Debtor and creditor sides that actively participated in the process of reaching a consensual chapter 11 plan could then be sued for their good faith prepetition and post-petition restructuring efforts.  Accordingly, the Court concludes that each of the Exculpated Parties is entitled to the protections afforded them by Section 1125(e) and Article X.D. of the Plan.

*Id.* at *97-98.

Meritage fails to cite *Station Casinos*, instead wrongly representing to this Court that no decision within the Ninth Circuit has held precisely what *Station Casinos* (and other cases in this Circuit) hold.

Meritage instead relies upon the district court's opinion in *Yellowstone Mountain Club* for the proposition that exculpations of non-debtor parties are inappropriate.  *See* 2010 WL 4371368 (D. Mont. 2010).  **Meritage fails to discuss, however, subsequent proceedings in that case in which the same exculpations were approved**, despite a published opinion to that effect that Meritage relegates to a cryptic footnote.  *See* Meritage Op. Br. at 19 n.11.

30

1       In *Yellowstone*, the district court reversed the bankruptcy court's order confirming

2    a plan of reorganization on the grounds that the objecting party (the debtor's former

3    principal) had inadequate notice of the confirmation hearing.  In reversing, the district

4    court also remanded to the bankruptcy court for further explanation as to whether an

5    exculpation clause was consistent with Bankruptcy Code section 524(e).

6       On remand, the bankruptcy court approved the exculpation.  *See In re Yellowstone*

7    *Mountain Club, LLC,* 460 B.R. 254, 267-77 (Bankr. D. Mont. 2011).  The bankruptcy

8    court devoted nearly ten pages to explaining in detail why the arguments Meritage makes

9    in this appeal regarding the exculpation are entirely without merit (none of which is

10    mentioned in Meritage's Opening Brief).  As explained by the *Yellowstone* court:

11         [T]he exculpation clause, which was a "highly negotiated" component of
           the resolution between the Debtors, the Committee, [and the creditors who
12         supported the plan] does not violate Ninth Circuit precedent.  The Ninth
           Circuit, in *In re American Hardwoods, Inc.*, 885 F.2d 621, 626 (9th
13         Cir.1989), and *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67
           F.3d 1394 (9th Cir.1995), held that under § 524(e), a bankruptcy court does
14         not have the authority to permanently enjoin a creditor from continuing
           with and enforcing a state court judgment against non-debtor guarantors.
15         The ruling articulated in *American Hardwoods*, as reiterated in
           *Lowenschuss*, is not implicated here.

16

17    460 B.R. at 268 (footnote omitted).

18       The *Yellowstone* court proceeded with a detailed analysis of the Ninth Circuit's

19    opinions in *American Hardwoods*, *Lowenschuss*, and *Underhill v. Royal*.  The court noted

20    that in each of those cases, the issue was whether a nondebtor party could be discharged

21    from the debts of the debtor – the very type of third-party discharge that Bankruptcy Code

22    section 524(e) proscribes.  The court, however, recognized that a narrow exculpation for

23    liabilities incurred in connection with actions taken in the bankruptcy case itself was very

24    different from a release of all obligations to third parties, whether or not they had anything

25    to do with the bankruptcy.  The *Yellowstone* court explained, "[t]his court is bound by,

26    and does not dispute the legal precedent established in *Lowenschuss*, *American*

27    *Hardwoods*, and *Underhill*, that liabilities of nondebtors cannot be discharged through a

28    plan.  Such legal precedent, however, is inapplicable here because, unlike in *Lowenschuss*,

31

*American Hardwoods*, and *Underhill*, [the exculpation provision in the confirmed plan] is

not a broad sweeping provision that seeks to discharge or release nondebtors from any and

all claims that belong to others." *Id.* at 270.

> The release provision in this case is narrow in both scope and time, and applies only to an "act or omission in connection with, relating to or arising out of the Chapter 11 cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan [.]"

460 B.R. at 272-73.

> Unlike the exculpation clauses in *American Hardwoods* and *Lowenschuss*, the exculpation clause in the Debtors' confirmed Third Amended Joint Plan of Reorganization does not implicate 11 U.S.C. § 524(e). The exculpation clause in the case *sub judice* is not barred by Ninth Circuit Law. The exculpation clause is temporal in nature and covers those parties who were closely involved with drafting the Settlement Term Sheet, which became the cornerstone of the Debtors' Third Amended Joint Plan of Reorganization. As the testimony clearly shows, without the Settlement Term Sheet, it is doubtful the Debtors could have achieved confirmation of a Chapter 11 plan, and indeed it is very likely the Debtors' bankruptcies would have been converted to Chapter 7 and the assets liquidated.

460 B.R. at 277.

The *Yellowstone* court noted that the party opposing the plan's exculpation clause

had, as with Meritage, threatened litigation against the parties that had proposed the plan.

"An exculpation clause in this case was certainly advisable given the litigious posture of

the parties." 460 B.R. at 277. "[T]here needs to be repose at the end of the case. And the

professionals, and the debtor, and the committee members, and the acquirer, the DIP

lender, and [the other creditor parties to the exculpation] need to know at the end of the

case that everything about their behavior has been exposed, has been vetted, has been

considered, and it's over." *Id.* (quoting the testimony of creditors' committee counsel,

explaining the need for the exculpation clause).

Contrary to Meritage's contention, the *Yellowstone* court did not limit the scope of

the exculpation to "estate professionals" or "fiduciaries." Rather, the court made clear

that non-fiduciary, third-party participants in the plan process were entitled to protection.

"The Court agrees that CrossHarbor [the lender and acquirer] should be included in the

32

exculpation clause because of its involvement in this case by providing debtor in

possession financing and because it served as the stalking horse bidder."  460 B.R. at 275.

CrossHarbor is indistinguishable from the Settling Builders, who also through their

affiliates provided the Chapter 11 Trustee financing and formed the Acquirer of South

Edge's assets, negotiated the Plan, and became official Plan Proponents.  Similarly, the

*Yellowstone* court held that Credit Suisse, the agent for the debtor's secured lender group,

and the lenders in that group (which are indistinguishable from the Agent and the

Prepetition Lenders in South Edge's case), were entitled to exculpation because of their

agreement to settle litigation that made plan confirmation possible.  *Id.*

Meritage's reliance on *In re Lighthouse Lodge, LLC*, 2010 Bankr. LEXIS 3663

(Bankr. N.D.Cal. Oct. 14, 2010), was similarly rejected by the *Yellowstone* court.

Meritage cites *Lighthouse Lodge* for the proposition that exculpations can be effective

"*only* as to any liability as to the estate."  Meritage Op. Br. at 19 (emphasis in original).

However, while the exculpation was so limited in *Lighthouse Lodge*, nothing in the

*Lighthouse Lodge* decision requires such a limitation.  To the contrary, *Lighthouse Lodge*

relied on *In re WCI Cable, Inc.*, 282 B.R. 457 (Bankr. D. Or. 2002), which authorized

exculpations of non-debtor parties in light of the "legitimate concern" that exculpation of

non-debtor parties was needed "because the cases were bitterly contested."  282 B.R. at

479-80.

The *Yellowstone* court held that "*Lighthouse Lodge* provides support for approval

of the instant exculpation clause."  460 B.R. at 275.  "Applying that *Lighthouse Lodge*

analysis to the facts of this case," the Court found that "the specific facts of this case

compel approval of the exculpation clause as drafted and originally approved in the Third

Amended Joint Plan of Reorganization."  *Id.*  The exculpated parties (including the bank

agent, the bankruptcy lenders, and the acquirer) "were all major stakeholders in this case

and each party was vigorously negotiating issues they deemed [significant] and positions

important to the respective parties."  *Id.*  The exculpated parties settled pursuant to a

"Settlement Term Sheet" that "became a collaborative effort of the Debtors, Committee,

1    Credit Suisse and CrossHarbor, who all became, in essence, plan proponents.  Because the

2    Settlement Term Sheet and exculpation clause were the cornerstones of the Plan and were

3    highly negotiated, the ruling in *Lighthouse Lodge* would suggest that the plan proponents,

4    namely the Debtors, the Committee, CrossHarbor and Credit Suisse, should be released

5    pursuant to [the exculpation clause] of the Plan."  *Id.*

6        Here, the Bankruptcy Court properly approved the exculpation provisions in the

7    South Edge Plan for the same reasons that the courts approved exculpations in

8    *Yellowstone*, *Station Casinos*, and other cases.  The exculpation provision was the subject

9    of the parties' pre-Plan negotiations and included in the Plan Support Agreement.  The

10   exculpation provisions in Section 8.10 of the Plan were designed to prevent parties from

11   undermining the reorganization process by suing the Plan Proponents for actions they took

12   in helping to successfully complete South Edge's chapter 11 case.  The exculpation

13   provisions do not release the Plan Proponents or any other party from actions that

14   occurred prior to the bankruptcy, or that do not relate directly to the bankruptcy.  Rather,

15   they are narrowly tailored to address actions that advanced the reorganization process, and

16

17

18

19

20

21

22

23

24

25

26

27

28

34

**APPELLEES' OPENING BRIEF**

1    they contain appropriate carve-outs for willful misconduct and gross negligence,

2    consistent with Ninth Circuit authority.[15]

3            **2.      The Record Fully Supports The Inclusion Of The Section 8.10
                     Exculpation Provisions.**
4

5            Meritage erroneously contends that the Bankruptcy Court made insufficient

6    findings to support the Plan's exculpation clause.  Meritage Op. Br. at 25.  The

7    Bankruptcy Court made extensive findings that (1) the Plan was negotiated and proposed

8    in good faith [Tab 8, AER 749], (2) one of the principal purposes of the Plan was to end

9    litigation and achieve peace [*id.*], and (3) the Plan Proponents made material contributions

10   to the reorganization.

11           The Settling Builders, the Agent, the Prepetition Lenders, and the Debtor's
             Estate are entering into a good faith settlement of disputes that have existed
12           for more than three years.  The Settling Builders, the Agent, and the
             Prepetition Lenders are making substantial contributions to the settlement.
13           The Settling Builders are paying more than $330 million, which amount
             will include all Allowed Administrative Expense Claims and Priority
14           Claims of the Chapter 11 Case, and a $1 million General Unsecured Claim
             Recovery Fund, which is expected to provide Holders of Allowed General
15           Unsecured Claims in Class U2 with a substantial dividend.  The Settling
             Builders also are agreeing to fund all future LID assessments, property
16           taxes, maintenance, and security expenses for the project while negotiations
             continue with the City of Henderson regarding the future development of
17
     ───────────────────────────────
18   [15] Meritage's reliance on *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del.
     2011), *In re Tribune Co.*, 2011 Bankr. LEXIS 4128 (Bankr. D. Del. Oct. 31, 2011), and
19   other decisions from the Delaware bankruptcy court is unpersuasive.  In *In re W.R. Grace
     & Co.*, 446 B.R. 96, 132-33 (Bankr. D. Del. 2011), *reh'g granted in part on other
20   grounds*, 2011 Bankr. LEXIS 709 (Bankr. D. Del. Mar. 4, 2011), *aff'd*, 2012 U.S. Dist.
     LEXIS 11289 (D. Del., Jan. 30, 2012), another Delaware court approved exculpation of
21   non-debtors over the objection of other creditors, expressly rejecting *Washington Mutual*.
     Moreover, *Washington Mutual* and *Tribune* contain scant analysis of the issue, and both
22   found numerous (and substantial) other problems with the plans they did not confirm.  The
     court in *In re PTL Holdings LLC*, 2011 Bankr. LEXIS 4436 (Bankr. D. Del. Nov. 10,
23   2011), followed *Washington Mutual* with little additional analysis.  None of these
     Delaware decisions applied Ninth Circuit law, and none considered the factors addressed
24   by the courts in *Yellowstone* and *Station Casinos*.  Other courts outside the Ninth Circuit
     have approved plan provisions exculpating or releasing creditors' claims against third
25   parties that actively participated in the plan.  *See, e.g., In re Delta Air Lines, Inc.*, 374 B.R.
     516, 525-26 (Bankr. S.D.N.Y. 2007) (settlement agreement in plan released claims by
26   bondholders against debtor, indenture trustee, and lessor; court held that "[a] Bankruptcy
     Court may approve the release of claims against third parties where those releases played
27   an 'important part' in a debtor's reorganization plan"), *aff'd sub nom.*, *Ad Hoc Comm. v.
     Delta Air Lines, Inc.*, 309 Fed. Appx. 455 (2d Cir. Feb. 9, 2009).

28

**APPELLEES' OPENING BRIEF**

1

2

3

4

> the project, as set forth on the budget included as Exhibit "C" to the Acquirer's Operating Agreement (Exhibit "G" to the Plan Supplement). The Agent and the Prepetition Lenders are consenting to the Plan, notwithstanding a deficiency of approximately $47 million (including postpetition interest).  The settlement of these disputes is in good faith, at arms' length, and not for the purpose of prejudicing any other party.

5   Tab 8, AER 753.  These findings were amply supported by the testimony of William

6   Austin, Albert Praw, and the Chapter 11 Trustee, all of whom were subject to cross

7   examination by Meritage.

8          The Bankruptcy Court also found that "[t]here is a compelling need for Section

9   8.10 of the Plan, because the Meritage Parties already brought actions against the Plan

10   Proponents in non-bankruptcy forums based upon actions they have taken in this Chapter

11   11 Case."  Tab 8, AER 747.  The exculpation clause was intended to preclude such a

12   collateral attack on actions taken in furtherance of the reorganization process.

13          The exculpation clauses were not simply thrown-in at the last minute.  They were

14   an integral part of the Settlement Term Sheet, and a material part of the parties' bargain.

15   Tab 8, AER 747; Tab 8, AER 762; Tab 12, AER 988.  The Bankruptcy Court expressly

16   found that the exculpation clause was part of the complex negotiations that led to the

17   development of the Plan and the settlement embodied therein.  As in *Yellowstone* and

18   *Station Casinos*, the South Edge bankruptcy was hard fought.  Not only did Meritage

19   threaten suits against the Plan Proponents, Meritage actually sued JPMorgan in Ohio state

20   court, contending, among other things, that the South Edge involuntary bankruptcy was

21   improper (notwithstanding this Court's dismissal of the appeal of the Order for Relief

22   granting the involuntary petition) and that JPMorgan should not have negotiated the

23   settlement Plan with the Settling Builders.  The exculpation provision was appropriate and

24   necessary to prevent any collateral attack on the bankruptcy process.

25                    **3.      The Plan's Exculpation Provisions Are Consistent With Ninth Circuit Law That Bars State Court Lawsuits Based Upon Actions Parties Take In Prosecuting A Bankruptcy Case.**

26

27          As discussed above, Meritage has sued JPMorgan in the Ohio Action, alleging that

28   JPMorgan's filing of the involuntary bankruptcy petition against South Edge and Plan

**APPELLEES' OPENING BRIEF**

1   negotiations were improper based on accusations that JPMorgan colluded with other

2   Members of South Edge to harm Meritage and deprive it of substantial rights.[16]  Meritage

3   seeks damages from JPMorgan for that alleged misconduct in excess of $8 million.

4   Similarly, Meritage has threatened to sue the Settling Builders because the Plan allegedly

5   violated South Edge's Operating Agreement by providing for the assignment of South

6   Edge's real property to Inspirada Builders, notwithstanding (i) the Bankruptcy Court's

7   express findings to the contrary [Tab 8, AER 749-51], and (ii) Meritage's dropping of this

8   issue on appeal.  The foregoing are just two examples of actions that are clearly barred by

9   Ninth Circuit authorities establishing the breadth of bankruptcy preemption.

10          The Ninth Circuit has made clear that "it is for Congress and the federal courts, not

11  the state courts, to decide what incentives and penalties are appropriate for use in

12  connection with the bankruptcy process and when those incentives and penalties should be

13  utilized."  *Gonzales v. Parks*, 830 F.2d 1033, 1036 (9th Cir. 1987) (holding that a state

14  court action alleging that a bankruptcy filing was an "abuse of process" was preempted);

15  *see also MSR Exploration, Ltd v. Meridian Oil, Inc.*, 74 F.3d 910 (9th Cir. 1996) (holding

16  that a malicious prosecution claim based upon the filing of a claim in bankruptcy is

17  preempted); *Miles v. Okun (In re Miles)*, 430 F.3d 1083 (9th Cir. 2005) (holding that a

18  state law action based upon the filing of an involuntary petition was preempted).

19          Congress has expressed its intent that bankruptcy matters be handled in a federal forum by placing bankruptcy jurisdiction exclusively

20  in the district courts as an initial matter, 28 U.S.C. § 1334(a) . . . . [A] mere browse through the complex, detailed, and comprehensive provisions

21  of the lengthy Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, demonstrates Congress's intent to create a whole system under federal control which is

22  designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike.  While it is true that bankruptcy

23  law makes reference to state law at many points, **the adjustment of rights and duties within the bankruptcy process itself is uniquely and

24  exclusively federal.  It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities

25  that might be undertaken in the management of the bankruptcy process.**

26  _____

27  [16] Tab 31, SER 1810.

28

**APPELLEES' OPENING BRIEF**

> Debtors' **petitions**, creditors' claims, **disputes over reorganization plans**, disputes over discharge, and innumerable other proceedings, would all lend themselves to claims of malicious prosecution. These possibilities might gravely affect the already complicated processes of the bankruptcy courts. . . . The highly complex laws needed to constitute the bankruptcy courts and regulate the rights of debtors and creditors also underscore the need to jealously guard the bankruptcy process from even slight incursions and disruptions brought about by state malicious prosecution actions.

*MSR*, 74 F.3d at 913-14 (emphasis added); *see also Gonzales v. Parks*, 885 F.2d at 1035. ("The ability collaterally to attack bankruptcy petitions in the state courts would also threaten the uniformity of federal bankruptcy law, a uniformity required by the Constitution. U.S. Const. art. 1 § 8, c. 4.").

In short, "Congress wished to leave the regulation of parties before the bankruptcy court in the hands of the federal courts alone." *MSR*, 74 F.3d at 915. This applies to Meritage's claims that the bankruptcy Plan was improperly proposed, and to its claims that JPMorgan improperly filed the involuntary petition. If a party disagrees with an involuntary petition or a bankruptcy plan, the appropriate remedy is to challenge those pleadings in the Bankruptcy Court and, if successful, to seek whatever sanctions may be available under bankruptcy law. It is not to bring an action in state court contending that actions in connection with a bankruptcy were improper.

Meritage contends that the preemption cases are limited to disputes between debtors and creditors, and thus would not apply to its claims against JPMorgan or the Settling Builders. Meritage Op. Br. at 23. Meritage is wrong. In *Miles v. Okun*, the Ninth Circuit held that **non-debtor relatives** could not sue a creditor in state court based upon an allegedly improper involuntary bankruptcy petition. Similarly, in *Astor Holdings v. Roski*, 325 F. Supp. 2d 251, 262-63 (S.D.N.Y. 2003), the court held to be preempted a lawsuit between two non-debtor parties over whether a bankruptcy was improperly prosecuted in order to take over a business.

Meritage also tries to make the classic "straw man" argument – that bankruptcy cannot preempt all state law simply because it may relate to a bankruptcy. Meritage Op.

**APPELLEES' OPENING BRIEF**

1   Br. at 4.  But that is not what the Bankruptcy Court was concerned with or held.  What the

2   Bankruptcy Court addressed were collateral attacks on the bankruptcy process itself, such

3   as Meritage suing JPMorgan for allegedly having acted in bad faith by filing the

4   bankruptcy petition.  That, the Bankruptcy Court held, was an improper interference on

5   the federal bankruptcy process, just as the Ninth Circuit did in *Miles*.

6          Finally, the two preemption cases Meritage relies upon principally are

7   distinguishable, as both involved *conduct outside of the bankruptcy process*.  Meritage

8   Op. Br. at 23-24 (cting *Davis v. Yageo Corp.*, 481 F.3d 661 (9th Cir. 2007), and *In re*

9   *Extended Stay, Inc.*, 435 B.R. 139, 151 (S.D.N.Y. 2010)).  *Davis v. Yageo* addressed

10  whether a pre-bankruptcy vote by a board of directors to take a company into bankruptcy

11  violated the board's duties to the company's minority shareholders.  The Ninth Circuit

12  distinguished *MSR*, *Gonzales*, and *Miles* because, unlike in those cases, the claims in

13  *Davis* "concern conduct that occurred ***prior to*** bankruptcy."  *Davis*, 481 F.3d at 678

14  (emphasis in original); *see also id.* at 680 (noting that plaintiffs only had standing to assert

15  claims that existed "immediately ***prior to*** the Chapter 11 filing").  The Ninth Circuit held

16  that those claims were governed by state law, as there was no bankruptcy case pending at

17  the time the conduct occurred.  Meritage fails to quote this critical language.

18         Similarly, in *Extended Stay*, as the section of the opinion Meritage quotes makes

19  clear, there was "no claim that the filing of the bankruptcies was wrongful under the

20  Bankruptcy Code."  *Extended Stay, Inc.*, 435 B.R. at 151.  Rather, the claim was that the

21  defendants should "continue or consummate arrangements outside of bankruptcy."  *Id.*

22  "The Line Trust Plaintiffs complain of actions taken by non-debtors ***prior to*** the

23  commencement of bankruptcy proceedings.  Their contentions that the formulation of

24  those provisions ***prior to*** the bankruptcy filings violated contractual or common-law duties

25  among the creditors as such does nothing to demonstrate a connection with the bankruptcy

26  process . . . ."  *Id.* at 152 (emphasis added).  Again, Meritage fails to quote this language.

27         The exculpation in Section 8.10 of the South Edge Plan is expressly limited to

28  actions or omissions "in connection with, relating to, or arising out of the Chapter 11

39

Case, the formulation, negotiation, implementation, confirmation, or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case or otherwise created in connection with this Plan." Tab 8, AER 824.  The purpose and scope of Section 8.10 is clearly to protect the bankruptcy process itself from collateral attack.

Meritage has sued JPMorgan in Ohio for both filing the involuntary bankruptcy petition and for negotiating the Plan settlement with the Settling Builders.  Meritage also has raised identical counterclaims in connection with the Agent's action against Meritage in this Court to recover on Meritage's Repayment Guaranty.  These are precisely the types of claims that can and must be resolved in the bankruptcy process, and not through collateral litigation.  Section 8.10 of the Plan was a proper exercise of the Bankruptcy Court's power to oversee the federal bankruptcy process.

Rather than taking the path directed by the Ninth Circuit, Meritage elected not to challenge in the Bankruptcy Court the involuntary petition filed by JPMorgan and the other Prepetition Lenders.  Only the Debtor-out-of-possession opposed the petition in the Bankruptcy Court, which opposition was overruled by the Bankruptcy Court after extensive discovery and a trial.  *See* Tabs 10 & 32.  Only then did Meritage try to appeal, but this Court held that Meritage lacked standing due to its failure to oppose the involuntary petition in the Bankruptcy Court.  *See South Edge, LLC v. JPMorgan Chase Bank, N.A.*, 2011 U.S. Dist. LEXIS 49621 (D. Nev. Apr. 28, 2011).

Meritage did argue at the Plan confirmation hearing that the Plan was negotiated and proposed in bad faith, but the Bankruptcy Court rejected Meritage's contentions.  The Bankruptcy Court expressly found that "[t]he Plan is not being used by the Plan Proponents as an improper 'litigation tactic' against the Meritage Parties.  The Plan is a good faith resolution of the Debtor's financial problems." Tab 8, AER 751.  The Bankruptcy Court also rejected the same attacks on the involuntary petition and the plan process that Meritage is trying to preserve:

40

1

2

3

4

5

6

7

> The Meritage Parties contend that the Settling Builders are acting in bad faith by proposing the Plan, after first having opposed the involuntary petition. The evidence shows, however, that the Settling Builders are resolving their disputes with the Agent, the Prepetition Lenders, and the Estate through a settlement, and as part of that settlement, the Settling Builders are agreeing to withdraw their challenges to this Chapter 11 Case and the appointment of the Chapter 11 Trustee.  There is no evidence of bad faith in the Settling Builders' actions.
>
> The Settling Builders, the Agent, the Prepetition Lenders, and the Debtor's Estate are entering into a good faith settlement of disputes that have existed for more than three years. . .  The settlement of these disputes is in good faith, at arms' length, and not for the purpose of prejudicing any other party.

8   Tab 8, AER 753.  Notably, Meritage has **not** appealed these findings.

9         Meritage's most recent challenge to the involuntary petition and Plan negotiations

10   in the Ohio Action and before this Court are precisely the kind of collateral attacks on the

11   bankruptcy process that Ninth Circuit preemption law is intended to prevent, and that the

12   Plan exculpation provision protects against.  The exculpation clause prevents parties such

13   as Meritage, who are disappointed with the bankruptcy process, from seeking to

14   circumvent it through collateral attacks in other forums, consistent with the principles of

15   *Gonzales*, *MSR*, and *Miles*.  Meritage had the opportunity to object to the involuntary

16   petition in the Bankruptcy Court, but it failed to do so.  Meritage argued that the Plan was

17   proposed in bad faith, and it lost that argument.  Meritage cannot now be permitted to

18   raise the same arguments in collateral litigation.

19         **B.      The Bankruptcy Court Did Not Err In Ruling That Confirmation Of The Plan Shall Not Affect Or Satisfy Liability On The Guaranties.**

20

21         The Bankruptcy Court held that "[t]he Plan's treatment of the Class S3 and U1

22   Claims will not affect the Meritage Parties' liability on their Repayment, Completion, and

23   Limited Guaranties, which are not being satisfied or released under the Plan."   Tab 8,

24   AER 765.  Meritage acknowledges that it was aware that the Plan Proponents were

25   seeking from the Bankruptcy Court a determination that "Meritage's Repayment, Limited

26   and Completion Guaranties shall not be released, but rather shall remain fully enforceable

27   against the Meritage Parties," *see* Meritage Op. Br. at 28, and that is precisely what the

28   Bankruptcy Court held.

The Bankruptcy Court's holding is entirely appropriate and consistent with Ninth Circuit law, which provides that "discharge of the principal debtor in bankruptcy will not discharge the liabilities of codebtors or guarantors . . . ." *American Hardwoods*, 885 F.2d at 625; *see also In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610, 616 (B.A.P. 9th Cir. 1990) (holding that plan cannot affect the liability of the co-debtors of the debtor as to the debt owed to the debtor). Absent the guaranteed party's consent, bankruptcy cannot affect the validity or enforceability of third-party guaranties:

> The general rule is that a discharge in bankruptcy does not affect a guarantor's liability. *See* 11 U.S.C. § 524(e) (1994) ("Discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."); *see also N.C.N.B. Texas Nat'l Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994) (holding that **to allow a confirmed reorganization plan to effect an accord and satisfaction on a loan guaranty "would defeat the purpose of loan guaranties; after all, a lender obtains guaranties specifically to provide an alternative source of repayment in the event that the primary obligor's debt is discharged in bankruptcy"**); *Matter of Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1351 (5th Cir. 1989) ("A discharge in bankruptcy will simply not affect the liability of a guarantor.").

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 918 (5th Cir. 2000) (emphasis added).

Moreover, the Bankruptcy Court's holding is consistent with the plain language of the Meritage Repayment Guaranty, which states that (1) Meritage's guaranty is absolute, irrevocable, and unconditional [Tab 28, SER 1775-76]; (2) Meritage's guaranty includes, without limitation, "interest accruing after the commencement of a proceeding under bankruptcy, insolvency or similar laws" [*id.*]; (3) Meritage's liability shall not be reduced because other guarantors (including the Settling Builders) satisfied their own guaranty obligations [*id.*] ("The obligations of the Guarantor hereunder shall not be reduced by amounts paid by any other guarantor."); and (4) Meritage's liability will not be affected by any release, amendment, or restructuring of South Edge's obligations to the Prepetition Lenders [Tab 28, SER 1776]. The Bankruptcy Court also recognized that, consistent with the South Edge Plan, the Prepetition Lenders had the right to assign participations in their ability to recover from Meritage, and that those participations would be fully enforceable:

**APPELLEES' OPENING BRIEF**

SECTION 16.  Assignment.  This Guaranty shall be binding on, and shall inure to the benefit of the Guarantor, the Administrative Agent, the Lenders and the other Holders of Secured Obligations and their respective successors and assigns; provided that the Guarantor may not assign or transfer its rights or obligations under this Guaranty.  **Without limiting the generality of the foregoing, any Lender may assign, sell participations in or otherwise transfer its rights under the Facilities to any other person or entity on and subject to the terms set forth in the Credit Agreement, and the other person or entity shall then become vested with all the rights and benefits granted to the Lenders in this Guaranty or otherwise.**

Tab 28, SER 1779 (emphasis added).

To be clear, the Bankruptcy Court did not hold that Meritage was liable on its Repayment Guaranty.  Whether, for example, Meritage has a valid defense based upon its purported "take down" in 2008 is an issue that will be decided by this Court in the separate civil action.  But, the Bankruptcy Court did determine the effect of the Plan's confirmation, holding that Meritage would not be released from its guaranty simply because the Plan Proponents consummated their settlement.  In addition to being correct as both a matter of Ninth Circuit law and the plain language of the Meritage Repayment Guaranty, the Bankruptcy Court's holding was entirely fair and just – Meritage was paying nothing into the Plan settlement, so it could not reasonably expect the Plan settlement to result in a release of its several obligations.  Such a windfall would defy both fairness and common sense.  In response to Meritage's complaints that it was not receiving such a windfall, the Bankruptcy Court summed it up simply: "Does that come as a surprise, I mean, and what's the evil plan behind that?"  Tab 7, AER 591.

Meritage does not refute any of the foregoing in its Opening Brief.  Rather, Meritage argues that the Bankruptcy Court's finding was improper because:  (1) it was a ruling on an issue of state law that was properly within the domain of the Ohio state court; and (2) Meritage was denied due process because it was not afforded the opportunity to present evidence regarding the merits of Meritage's alleged defenses to payment of the Guaranties.  Both of these contentions is incorrect.

The Bankruptcy Court's ruling was simply a determination regarding the effect of the chapter 11 Plan that it was confirming, and the Court made clear that the Plan did not

43

do what Ninth Circuit law prohibits – effect a discharge of Meritage's guaranty obligations.  *See American Hardwoods*, 885 F.2d at 625.  It was appropriate for the Bankruptcy Court to determine the effect of its confirmation order.  *See In re Morning Treat Coffee Co.,* 77 B.R. 62, 63 (Bankr. M.D. La. 1987).  Meritage's suggestion that the Bankruptcy Court lacked the authority to enter a ruling regarding the effect of the Plan it was confirming is plainly wrong.

Moreover, Meritage itself placed its Repayment Guaranty liability squarely at issue.  Meritage introduced its own guaranties into evidence [Tab 25, SER 1675], as well as nearly forty other documents having relevance only to its guaranty liability [Tab 25, SER 1675-78].  Meritage's opening argument at the confirmation hearing began with Meritage's contention that it owed nothing on its Repayment Guaranty, and the Bankruptcy Court should recognize that fact (which purportedly made Meritage "different") in considering whether to confirm the Plan.  Tab 22, AER 1503-06.  Likewise, Meritage's only witness, Larry Seay, filed a declaration in opposition to confirmation in which he contended that Meritage had performed on its "take down" obligations in 2008, and thus did not owe anything on its Repayment Guaranty.  Tab 5, AER 428-31.  Meritage cross-examined the Plan Proponents' witnesses extensively on whether Meritage was liable on its guaranty, and whether the Plan would result in a satisfaction of Meritage's obligations.  *See, e.g.*, Tab 22, AER 1517-37, 1607-09, 1612-13.  Indeed, the first questions Meritage's counsel asked the Plan Proponents' witnesses were with respect to Meritage's purported guaranty defenses.  *See* Tab 22, 1517 & 1607.  Even the Court examined a witness on the effect of the Plan on Meritage's guaranties [Tab 22, AER 1598-1601], which Meritage's counsel followed up with additional cross examination [Tab 22, AER 1601-05].

It was only after Meritage had finished its cross examination of all of the Plan Proponents' witnesses and the Chapter 11 Trustee that the Bankruptcy Court indicated that it would not hold a "mini trial" on events that occurred pre-bankruptcy.  Tab 22, AER 1652.  The Bankruptcy Court, however, made clear that it would rule on whether the Plan

1   would have any effect on Meritage's Repayment Guaranty, addressing Meritage's

2   contentions that the Plan could result in a "satisfaction" or "release" of its guaranty.

3        So my concern and **the reason I let that in is to allow evidence with respect to the effect of the plan on future prosecution of those claims**

4   and because I believe -- I mean, as I understand [Meritage's] argument from their objection, [Meritage's] contention is to the extent that those

5   claims are altered, A, it's impermissible under the bankruptcy code, and, B, it shows bad faith because that's contrary to what the plan proponents

6   have testified, but **that properly looked at is a relatively narrow range of questions**.

7   

8   Tab 22, AER 1652 (emphasis added); *see also* Tab 7, AER 559 (the Court stating that "as

9   I have said, I think the issue under bankruptcy law is the effect, if any, of confirmation of

10  this plan on their rights vis-à-vis the repayment guarantee or any other obligation as to any

11  other nondebtor").  **Meritage fails to acknowledge this anywhere in its brief.**

12       Meritage did not object to the Bankruptcy Court's explanation of what the Court

13  was, and was not, deciding at the confirmation hearing.  *See* Tab 7, AER 578-79.  Instead,

14  Meritage made clear that it "argues that the plan transaction satisfies its guarantee."  Tab

15  7, AER 618.  Having put the validity of its guaranties squarely at issue itself, Meritage

16  cannot now complain that the Bankruptcy Court decided that, in fact, confirmation of the

17  Plan had no effect whatsoever on the enforceability of the guaranties.  The Plan neither

18  increased Meritage's liability on the guaranties, nor did the Plan decrease (or release) it.

19       Meritage's proffer to this Court of cherry-picked excerpts from the confirmation

20  hearing transcript as proof that it was denied due process is misleading and disingenuous.

21  The Bankruptcy Court never barred Meritage from introducing evidence or making

22  arguments as to the effect of the Plan on its guaranty liability.  To the contrary, the

23  Bankruptcy Court (1) took extensive evidence on the Repayment Guaranty, (2) allowed

24  Meritage to cross examine the Plan Proponents' witnesses on the subject, and (3) stated at

25  least three times that it would be deciding what effect the Plan would, or would not, have

26  on Meritage's Repayment Guaranty.

27       The Bankruptcy Court's ruling simply preserved the status quo and left the

28  substantive issue of Meritage's liability on the Repayment Guaranty for another court to

1   decide.  Meritage was not harmed by Judge Markell's ruling because he did not rule on

2   the issue of liability; instead, he ruled only on whether the Plan had any effect on the

3   Meritage Guaranties, which it did not.

4          There can be no mistake that, through briefing, argument, and evidence, Judge

5   Markell gave full consideration to Meritage's stance that the Plan impermissibly

6   forecloses Meritage's guaranty defenses and, likewise, to the Plan Proponents' position

7   that the Plan had no effect on Meritage's guaranty liability and their concern that Meritage

8   would seek to use confirmation "offensively" in non-bankruptcy forums.  Indeed, as

9   predicted by the Plan Proponents and foreshadowed by Meritage during the Confirmation

10  Hearing, Meritage has attempted to take advantage of the Plan to avoid liability.  In a brief

11  filed just one day before the entry of the Confirmation Order, Meritage argued to this

12  Court that, in fact, following the Plan's confirmation, JPMorgan and the other Prepetition

13  Lenders have been paid in full and no longer have any interest or legal right to pursue

14  claims against Meritage under the Repayment Guaranty (although Meritage does

15  acknowledge that the Settling Builders can still attempt to collect money under Meritage's

16  Repayment Guaranty).[17]

17         Finally, Meritage tries to make much of the Plan Proponents' negotiating positions

18  communicated long before they actually filed their Plan.  *See* Meritage Op. Br. at 10-11.

19  Meritage appears to argue that, because the Settling Builders agreed in the negotiations to

20  take the litigation risk that the Meritage Repayment Guaranties may not be enforceable,

21  the Settling Builders thus should not be permitted to benefit from any recovery on them

22  (even as assignees of the Prepetition Lenders' rights).  The Bankruptcy Court correctly

23  rejected Meritage's efforts to rewrite the Plan that was actually filed with the Court and

24  voted on by creditors:

25

26  [17] *See Meritage Homes Corporation's and Meritage Homes of Nevada, Inc.'s Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment* at 35-37, *JPMorgan Chase Bank, N.A., v. Meritage Homes Corp.*, Case No. 2:11-cv-01364-

27  PMP-CWH (D. Nev. Oct. 26, 2011), D.E. 39, attached as <u>Exhibit 2</u> to Rosenbaum Decl.

28

**APPELLEES' OPENING BRIEF**

1

2

3

4

5

6

7

        The Meritage Parties contend that the Plan Proponents' bad faith is evidenced by various emails between the Plan Proponents and their representatives during the period that they were negotiating the Plan Support Agreement. *See, e.g.*, Meritage P&A at p.17 n.16. The Court finds, however, that the emails reflect negotiating positions of the parties in the context of trying to resolve years of high stakes and very contentious litigation. The record shows that the purpose of the Plan was to deal with the entire project and more than $350 million in Claims against the Debtor, of which the Meritage Parties were a relatively small portion. **Moreover, the transaction that is being presented to the Court for its approval is the Plan, and not various proposals and counter-proposals that the parties circulated in the course of their good faith negotiations.**

8

Tab 8, AER 752 (emphasis added).

9

    **C.**     **The Bankruptcy Court Did Not Err In Granting A Post-Confirmation Injunction To Protect The Debtor's Estate.**

10

11

      Section 8.3 of the Plan contains a limited injunction barring creditors from

12

pursuing collection actions against South Edge and its bankruptcy estate until the South

13

Edge bankruptcy is fully administered, "except as otherwise provided in the Plan." Tab 8,

14

AER 819. Put simply, what this means is that, vis-à-vis South Edge and its bankruptcy

15

estate, creditors have the rights set forth in the Plan. Creditors cannot attempt to expand

16

upon those rights or otherwise end-run the Plan by bringing collateral litigation. The

17

injunction will terminate when South Edge's bankruptcy estate is fully administered.

18

      Section 8.3 is a common plan provision that is utilized when, as is the case in

19

South Edge, the bankruptcy estate remains open after confirmation of the Plan. "Although

20

it is normally the case that once a plan is confirmed the estate ceases to exist, it is not

21

always so. The reversion of property from the estate to the debtor upon confirmation

22

contained in 11 U.S.C. § 1141(b) is explicitly subject to the provisions of the plan." *Hillis*

23

*Motors v. Hawaii Auto. Dealers' Ass'n (In re Hillis Motors)*, 997 F.2d 581, 587 (9th Cir.

24

1993) (internal citations omitted).

25

      Under the Plan, numerous assets have remained in the South Edge bankruptcy

26

estate post-confirmation. Those assets include all of South Edge's agreements with the

27

City of Henderson and other governmental entities, and all "Retained Actions," which

28

include litigation claims arising out of South Edge's Operating Agreement (including

**APPELLEES' OPENING BRIEF**

1   claims against Meritage for breaches the Focus arbitration panel found that Meritage

2   committed).  Tab 8, AER 764 & 767-68.  Thus, as in *Hillis*, the South Edge bankruptcy

3   estate remains open.  Moreover, the ***only*** assets that South Edge has are property of South

4   Edge's bankruptcy estate; all other estate assets were transferred to Inspirada Builders free

5   and clear of liens, claims, and encumbrances.  Tab 8, AER 745, 763-64 & 810.

6        The Ninth Circuit in *Hillis* made clear that, so long as there is a bankruptcy estate,

7   the protections of the automatic stay in Bankruptcy Code section 362 apply to protect the

8   assets in that estate.  997 F.2d at 589-90 ("we conclude that after confirmation Hillis'

9   corporate property remained part of the estate to which the automatic stay continued to

10   apply").  The scope of the stay is "quite broad."  *Id.* at 585.  As explained by the Ninth

11   Circuit, the stay:

12          is designed to effect an immediate freeze of the status quo by precluding
     and nullifying post-petition actions, judicial or nonjudicial, in

13          nonbankruptcy fora against the debtor or affecting the property of the
     estate.  The automatic stay plays a vital and fundamental role in

14          bankruptcy.  The stay ensures that all claims against the debtor will be
     brought in a single forum, the bankruptcy court.

15

16   997 F.2d at 585 (internal citations omitted).

17        The language in Section 8.3 of the Plan is consistent with (and certainly no broader

18   than) the automatic stay, notwithstanding Meritage's protests to the contrary.  The

19   automatic stay of Bankruptcy Code section 362 bars, among other things: (1) "the

20   commencement or continuation . . . of a judicial, administrative, or other action or

21   proceeding against the debtor that was or could have been commenced before the

22   commencement of the case under this title, or to recover a claim against the debtor that

23   arose before the commencement of the case under this title," (2) "any act to obtain

24   possession of property of the estate or of property from the estate or to exercise control

25   over property of the estate," and (3) "the setoff of any debt owing to the debtor that arose

26   before the commencement of the case under this title against any claim against the

27   debtor."  Section 8.3 does no more than effectuate that and the free and clear transfer of

28   the Inspirada development to Inspirada Builders as the "Acquirer" under the Plan.

1      Thus, contrary to Meritage's assertion, Section 8.3 of the Plan is not a "discharge"

2   of a liquidating debtor.  A discharge under the Bankruptcy Code lasts forever, and would

3   apply regardless of whether South Edge's only assets remained property of the bankruptcy

4   estate.  By its express terms, Section 8.3 will cease to apply once the South Edge

5   bankruptcy estate has been fully administered, and is intended specifically to protect those

6   assets that remain subject to the automatic stay.  *See Hillis*, 997 F.2d at 589-90.

7      Liquidating plans in chapter 11 cases are common, and such plans typically

8   include ongoing protection of the estate's assets to ensure that they go to the right parties,

9   and that creditors do not "end run" the plan by making additional claims against those

10   assets.  *See In re Pac. Energy Res. Ltd.*, 2010 Bankr. LEXIS 5300 at *26-28 (Bankr. D.

11   Del. Dec. 15, 2010) (liquidating plan confirmed by Meritage's counsel, providing that

12   creditors "are permanently enjoined from taking . . . actions against property of the

13   Liquidating Debtors or the Estates").  Such relief routinely is approved in other cases in

14   this district using language nearly identical to that in Section 8.3 of the South Edge Plan.

15   *See, e.g.*, *In re In re Xyience Incorporated*, Case No. 08-10474 (MKN), Docket No. 321 at

16   ¶ 11 (Bankr. D. Nev. Oct. 23, 2008) (liquidating plan confirmed by Meritage's counsel);

17   *In re USA Commercial Mortgage Company*, Case No. 06-10725 (LBR), Docket No. 2376

18   at ¶¶ 50-51 (Bankr. D. Nev. Jan. 8, 2007); *In re Mega-C Corp.*, Case No. 04-50962

19   (GWZ), Docket. No. 1166 at Ex. 1 §§ 10.3 & 10.4 (Bankr. D. Nev. Nov. 8, 2006).

20      The limited injunction in Section 8.3 of the Plan does not prejudice Meritage in

21   any way.  Section 8.3 simply provides that, if Meritage has a claim against South Edge, its

22   claim must be satisfied in accordance with the Plan, with the same treatment that all other

23   creditors in the respective classes received.  Moreover, to the extent that Meritage believes

24   it has defenses to any claims that South Edge might bring against it, nothing in Section 8.3

25   bars the assertion of defenses or, if otherwise permissible under the Bankruptcy Code,

26   rights of setoff.  The plan injunction is limited in duration and does not provide the South

27   Edge or the Estate Representative with any additional rights vis-à-vis third parties.  It

28

49

1    simply preserves the status quo in the latter stage of the chapter 11 case.  For these

2    reasons, Meritage's request that the plan injunction be stricken should be denied.

3    　　　　Finally, Meritage asserts that Section 8.3 is somehow intended to "intimidate"

4    Meritage and thereby discourage it from bringing any actions against the Settling

5    Builders.  Meritage Op. Br. at 31.  In advancing this hypothesis, Meritage intentionally

6    blurs the distinction between Inspirada Builders, which acquired South Edge's assets and

7    also serves as Estate Representative under the Plan, and the Settling Builders who,

8    collectively through representatives of their affiliates, manage Inspirada Builders.

9    Nevada, like every other state, recognizes the separate legal identities of corporate

10   subsidiaries from their management.  *See, e.g.*, *Rowland v. Lepire*, 99 Nev. 308, 316-17,

11   662 P.2d 1332, 1337 (1983).  Inspirada Builders is a separate corporate entity from the

12   Settling Builders, whose formation was approved as part of the Plan.  *See* Tab 8, AER 745

13   & 763; Tab 35, SER 2071-2161.  Meritage fails to cite any evidence in support of its

14   contentions that the separateness of Inspirada Builders should be disregarded, and no such

15   evidence was introduced at the confirmation hearing.

16   **V.    CONCLUSION**

17   　　　　For the reasons discussed above and in the Motion to Dismiss, Appellees

18   respectfully request that this Court either (1) dismiss Meritage's appeal as moot, or (2) if

19   this Court concludes that it has jurisdiction to consider the merits of Meritage's appeal,

20   affirm the Bankruptcy Court's judgment confirming the Plan in all respects.

21

22   Respectfully submitted on February 28, 2012,

23

24   　/s/ Robert M. Charles, Jr.  (Bar No. NV6593)

25   LEWIS AND ROCA LLP                         MORRISON & FOERSTER LLP
     Robert M. Charles, Jr.                     G. Larry Engel (admitted *pro hac vice*)
26   3993 Howard Hughes Parkway, Suite 600       425 Market Street
     Las Vegas, Nevada  89169-5996               San Francisco, California  94105-2482
27   Telephone:   (702) 949-8320                 Telephone:   (415) 268-7000
     Facsimile:   (702) 949-8321                 Facsimile:   (415) 268-7522
28   E-mail:      rcharles@LRLaw.com             E-mail:      lengel@mofo.com

**APPELLEES' OPENING BRIEF**

Norman S. Rosenbaum (admitted *pro hac vice*)
Jordan A. Wishnew (admitted *pro hac vice*)
Erica J. Richards (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:   (212) 468-7900
E-mail:      nrosenbaum@mofo.com
             jwishnew@mofo.com
             erichards@mofo.com

*Attorneys for JPMorgan Chase Bank, N.A., as Administrative Agent*

_/s/ Richard McKnight_

LAW OFFICES OF RICHARD McKNIGHT
Richard McKnight (Nevada Bar No. 001313)
330 S. Third Street #900
Las Vegas, Nevada  89101
Telephone:   (702) 388-7185
Facsimile:   (702) 388-0108
E-mail:      rmcknight@lawlasvegas.com

STUTMAN, TREISTER & GLATT PC
Robert A. Greenfield (admitted *pro hac vice*)
K. John Shaffer (admitted *pro hac vice*)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California  90067
Telephone:   (310) 228-5600
Facsimile:   (310) 228-5788
E-mail:      rgreenfield@stutman.com
             jshaffer@stutman.com

*Attorneys for the Settling Builders*

51

**APPELLEES' OPENING BRIEF**